UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OWN YOUR HUNGER LLC, a Delaware limited liability company, LIGHTEN UP FOODS, a Delaware limited liability company, DEFIANT FOODS LLC, a Utah limited liability company,<br>   *Plaintiffs*,<br><br>vs.<br><br>LINUS TECHNOLOGY, INC., EPOGEE LLC, PETER RAHAL<br>   *Defendants* | Case No. _____<br><br><br>**COMPLAINT** |

**INTRODUCTION**

 Plaintiffs OWN Your Hunger LLC, Lighten Up Foods, LLC, and Defiant Foods, LLC, ("Plaintiffs") respectfully move this Court pursuant to Federal Rule of Civil Procedure 65 for entry of a Temporary Restraining Order and Preliminary Injunction against Linus Technology Inc., Epogee LLC, and Peter Rahal ("Defendants"). This motion is made pursuant to Fed. R. Civ. P. 65 on the grounds that Defendants have engaged in unlawful monopolization in violation of federal antitrust laws (Sherman Act §§ 1 & 2, Clayton Act § 7) and New York's Donnelly Act by orchestrating the acquisition of Epogee LLC through secretive and collusive conduct, using their resulting control over EPG to exclude competitors and create an artificial monopoly.

1

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) over Plaintiffs' claims arising under federal antitrust laws, including the Sherman Act (15 U.S.C. §§ 1-2) and Clayton Act (15 U.S.C. §§ 12-27).

2. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 22 as Defendants conduct substantial business activities in this District and the anticompetitive conduct occurred substantially within this jurisdiction.

## PARTIES

### Plaintiffs

4. OWN Your Hunger LLC is a Delaware limited liability company engaged in manufacturing low-calorie food products using EPG as an essential ingredient.

5. Lighten Up Foods LLC is a Delaware limited liability company engaged in manufacturing low-calorie food products using EPG as an essential ingredient.

6. Defiant Foods LLC is a Utah limited liability company engaged in manufacturing low-calorie food products using EPG as an essential ingredient.

### Defendants

7. Upon information and belief, Linus Technology, Inc. is a Delaware corporation with its principal place of business in New York City, New York.

8. Upon information and belief, Linus Technology, Inc. operates under the trade name "David Protein" and manufactures protein bars and other food products.

9. Upon information and belief, Epogee LLC ("Epogee") is an Indiana limited liability company and the exclusive manufacturer of EPG worldwide.

10. Upon information and belief, Peter Rahal is a resident of New York City, New York and the controlling person of Linus Technology, Inc.

11. Plaintiffs reserve the right to amend this complaint to add additional defendants as their identities and roles in the anticompetitive conduct are discovered through the litigation process.

12. Upon information and belief, Epogee was acquired by Defendants through secretive negotiations in 2025.

13. Upon information and belief, Epogee is now a wholly owned subsidiary of Defendants.

14. Upon information and belief, Rahal is the founder of Linus Technology, Inc. and has significant controlling interest in numerous companies that are related to the acquisition.

15. Upon information and belief, Rahal has controlling stake in Linus Technology, Inc. and Litani Ventures LLC.

16. Upon information and belief, Rahal has controlling person liability and is likely associated with numerous other companies involved in the acquisition.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. EPG's Development and Essential Facility Status

17. EPG (esterified propoxylated glycerol) is a revolutionary patented fat replacement ingredient that reduces calories from fat by 92% while maintaining traditional taste and texture.

18. EPG required 18 years of continuous research and development (2007-2025) and over $150 million in investment by Epogee LLC, demonstrating the impossibility of competitors developing viable alternatives.

19. EPG's manufacture involves proprietary fermentation technology and specialized production methods that cannot be easily replicated by competitors.

20. EPG has received "Generally Recognized as Safe" (GRAS) certification from the FDA across more than 10 food categories.

21. EPG represents the only commercially viable fat replacement ingredient with broad food applications and consumer acceptance.

**B. EPG Became an Essential Facility after Investments and Reliance from EPG Innovators**

22. Epogee actively solicited and encouraged numerous clients to make substantial financial commitments and assume significant business risks by investing heavily in EPG-dependent product development, celebrating their innovations as market showcases to attract additional brands and validate EPG's commercial viability (Exhibit 6, p. 2-3).

23. For over five years, Plaintiffs and numerous other food manufacturers invested hundreds of thousands of dollars in R&D, manufacturing infrastructure, marketing campaigns, and product development specifically tailored to EPG, reasonably relying on Epogee's encouragement and assurances of continued access. These brands fundamentally restructured their entire business models around EPG as their core competitive advantage and "secret sauce" ingredient, making EPG access essential to their survival. Epogee provided the bricks, while Plaintiffs and other brands built the house.

24. Defendants' acquisition and subsequent exclusionary conduct constitutes a deliberate "bait-and-switch" scheme that systematically eliminated the very brands whose substantial investments, innovations, and market development efforts had elevated EPG's commercial success and market value. By "pulling the rug" from under invested competitors, Defendants reaped the benefits of others' risk-taking and financial commitments while simultaneously destroying the businesses that

had propelled EPG's market acceptance, creating an unconscionable transfer of value from the actual innovators to the strategic acquirer.

25. As a result of Epogee's lure to develop new innovations with EPG, EPG became an "essential facility" under established antitrust doctrine for Plaintiffs and other brands.

26. EPG is controlled by a monopolist, now Defendants.

27. Competitors cannot practically duplicate EPG due to the 18-year development timeline and $150 million investment requirement.

28. Access to EPG is essential for competition in the low-calorie food market that relies on fat replacement and/or substitution ingredients.

29. Providing access to EPG is feasible, as demonstrated by over 5 years of successful distribution.

### C. Historical Supply Arrangements

30. From 1999 through March 25, 2025, Epogee LLC maintained reliable EPG supply with consistent and reasonable supply terms for all qualified food manufacturers.

31. Effective January 1, 2025, Epogee implemented new supply terms for orders of 5,000 pounds or less requiring 7-10 business day lead times.

32. For orders exceeding 5,000 pounds, Epogee required 50% deposit with reasonable lead times.

33. Epogee maintained commercially reasonable pricing accessible to qualified manufacturers.

34. Epogee consistently honored these terms from January 1, 2025 through March 25, 2025.

### D. Immediate and Ongoing Harm

35. On March 25, 2025, Epogee first started reporting shortages for certain types of EPG, but expected to have the product ready in May, while "*working diligently to put processes in place to avoid this in the future*" (Exhibit 2, p. 10).

36. March 26, 2025 - May 22, 2025: Throughout this period, Epogee continued to provide vague responses, such as "*2-3 months*" estimates for supply restoration.

37. May 23, 2025: After Defendants inquired again, with suspicions of a potentially disruptive acquisition (Exhibit 2, p. 8-9), Epogee continued to provide vague responses such as "*we should have a clear line of sight to our resolution sometime next week*" (Exhibit 2, p. 8).

**E. The Nosh.com Publication and Immediate Suppression**

38. May 27, 2025: Food industry news source nosh.com published an article announcing Defendants acquisition of Epogee (Exhibit 1, p. 2-5);

39. Same day: The article was immediately taken down at the explicit request of Defendants, with the news article displaying a "Article Not Found" error (Exhibit 1, p. 6);

40. During the secretive suppression taking place over a period of two months, from March 25, 2025 to May 27, 2025, Defendants continuously provided vague timelines for resolutions regarding EPG availability, keeping Plaintiffs unnecessarily in the dark for a critical ingredient they rely on.

41. Despite public disclosure on May 27, 2025, and becoming public knowledge that Epogee had been acquired, Epogee still did not formally and internally inform their existing clients for several days, and continued to deliberately delay customer communication, even when presented with a screenshot of the news article that finally confirmed the acquisition had occurred (Exhibit 2, p. 7);

42. On May 29, 2025, Epogee sent formal email communication informing clients they will no longer accept new orders and are winding down accounts following the acquisition (Exhibit 2, p. 12).

**F. Direct admissions of exclusionary conduct and anticompetitive intent by Peter Rahal**

43. On May 29, 2025, food industry news channel snaxshot.com conducted an interview with Peter Rahal. When asked the question *"What are you planning to do with the existing brands that use EPG, is it like a direct cut or will you taper it off?"*, Rahal replied with *"Given supply situation, cease supply"* (Exhibit 4, p. 12).

44. The same news article provides various other quotes from Peter Rahal making direct anticompetitive admissions and intent, including "*CPG sucks—it does. It sucks because of the competition.*" and *"We will be taking all the supply"* (Exhibit 4, p. 12).

45. Rahal's contradictory public statements further confirm the exclusionary purpose of this acquisition. While claiming David (Defendants' EPG-based protein bar brand) would run Epogee *"at arm's length as a subsidiary"* Rahal immediately contradicted this by stating *"we need it to be serving David as a customer"*, (Exhibit 4, p. 5), demonstrating that the acquisition was designed to prioritize the new acquirer of Epogee's supply needs over all other customers, completing the foreclosure of the remaining 10% of competitive access. Through deceptive patterns of contradictory statements, Rahal again admits the use of acquisition to secure exclusive dealing and eliminate competition.

46. On May 29, 2025, when clients who had just been notified of the cancelation of their contracts inquired about any remaining EPG stock left, a representative of Epogee revealed via telephone that the acquirer of Epogee had already purchased, secured, and stockpiled "all of the capacity for at least two years of supply", an amount far exceeding the 1-year shelf life of their

7

protein bars, and an amount beyond any legitimate business need (e.g. 3-6 months of normal supply).

### G. Coordinated concealment scheme

47. The coordinated timing demonstrates collusion between Defendants to eliminate competition and create monopolistic conditions.

48. Defendants deliberately maximized competitive harm to EPG-dependent manufacturers by not confirming or fulfilling purchase orders for at least 2 months and misleading them by blaming the problem on raw material lead times (Exhibit 2, p. 10).

49. Defendants deliberately hoarded all available EPG inventory production capacity for the next 2 years to ensure competitors have no access to EPG.

50. The coordinated conduct was designed to prevent customers from seeking alternative arrangements during the concealed acquisition period.

51. Defendants created artificial market conditions favorable to monopolization through systematic supply denial and market manipulation.

52. This exclusionary scheme was to be accomplished via Rahal's admitted monopolization method: "We will be taking all the supply," cementing defendants' exclusive dealing intent.

### H. Immediate and Ongoing Harm

53. Since March 25, 2025, when EPG first became unavailable, Plaintiffs have experienced immediate and substantial operational disruptions.

54. Plaintiffs have suffered complete production halts for EPG-dependent product lines.

55. Plaintiffs have been forced to lay off at least 4 employees due to EPG unavailability.

56. Plaintiffs have experienced over 800 idle manufacturing hours due to production stoppages.

8

57. Plaintiffs have been unable to fulfill existing retailer commitments, resulting in lost sales of approximately $85,000.

58. Plaintiffs have suffered lost sales of approximately $22,000 worth of canceled orders and contracts.

59. Plaintiffs have sunk lifetime R&D investments for EPG-dependent products of approximately $449,000.

60. Plaintiffs suffer ongoing operational losses from production stoppages, including facility and warehouse lease payments of approximately $15,000 per month.

61. Plaintiffs have been forced to write off inventory of partially produced goods requiring EPG to be complete, with a total retail value of approximately $85,000.

62. Not counting Plaintiffs, at least five other known food manufacturing businesses are planning or have executed layoffs, product discontinuation, and closures due to EPG's unavailability.

63. Defendants' monopolization has resulted in 100% control of the EPG supply market, increased from their previous 90% control.

64. Defendants' conduct has reduced product choice in the EPG-dependent low-calorie food markets.

65. Defendants' monopolization has created inflationary pricing trends in the relevant markets.

66. Defendants have eliminated innovation in EPG-dependent food categories through their exclusionary conduct.

## MEMORANDUM OF LAW

### I.  LEGAL STANDARD FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Under Fed. R. Civ. P. 65 and the Winter standard, a plaintiff seeking a preliminary injunction must demonstrate:

1. Likelihood of success on the merits or serious questions going to the merits;
2. Irreparable harm in the absence of preliminary relief;
3. Balance of equities tips in plaintiff's favor; and
4. Public interest weighs in favor of granting the injunction.

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## II. LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Sherman Act Section 1 - Agreement in Restraint of Trade

The coordinated conduct between Defendants constitutes an agreement in restraint of trade under 15 U.S.C. § 1:

1. Agreement: Coordinated timing between supply restrictions and acquisition negotiations demonstrates agreement
2. Restraint of Trade: Artificial EPG shortage during acquisition restrains competition
3. Anticompetitive Effects: Complete elimination of EPG supply harms competition

### B. Sherman Act Section 2 - Monopolization

Under 15 U.S.C. § 2, monopolization requires: (1) monopoly power and (2) willful acquisition or maintenance of that power through exclusionary conduct.

1. Monopoly Power: Defendants possesses 100% control over global EPG supply
2. Broader Market Power: Defendants claims to be on pace to generate $140 million for the current year, making it one of the fastest growing companies in food industry history, and is already on track to establish itself as a leader in the protein bar market, regardless of the use of EPG.

3.  Willful Acquisition: Coordinated timing of supply restrictions with secret acquisition demonstrates defendants' willful exclusionary conduct

4.  Lack of Business Justification: Concealment efforts lack legitimate business purposes

5.  Defendant Peter Rahal's direct admissions to the media to control supply and eliminate competition

### C. Clayton Act Section 7

The Epogee acquisition violates 15 U.S.C. § 18 by substantially lessening competition and tending to create a monopoly in EPG supply.

## III. IRREPARABLE HARM

Plaintiffs face irreparable harm that cannot be remedied by monetary damages:

1. Business destruction through complete production halts
2. Loss of market position and customer relationships
3. Daily ongoing competitive harm that monetary damages cannot remedy
4. Industry-wide competitive elimination

## IV. BALANCE OF EQUITIES

The balance strongly favors Plaintiffs:

1. Minimal Defendant harm from resuming previous supply arrangements. In quantifiable amounts, $0 especially if the hoarding and artificial supply constrains were based on overly optimistic future sales forecasts.

2. Substantial Plaintiff harm from continued exclusion. In the 2 months since EPG became unavailable, Plaintiffs have stopped production lines for over 800 hours and laid off at least 4 employees. Immediate ongoing operational financial loses from the date in which EPG supply has been restricted have already exceeded $222,000. This does not count the

numerous EPG-dependent manufacturers that are not named Plaintiffs, whose total immediate losses reach well over $1,000,000.

3. Proven feasibility of EPG supply based on historical operations

## V. PUBLIC INTEREST

1. The public interest strongly favors preventing monopolistic conduct and maintaining competition in food markets.

## VI. CONCLUSION

Defendants' orchestrated monopolization scheme violates fundamental antitrust principles and threatens immediate, irreversible harm to competition. Emergency relief is necessary to preserve the competitive marketplace.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION (Violation of Sherman Act § 1 - Agreement in Restraint of Trade)**

67. Plaintiffs incorporate by reference paragraphs 1-66 as if fully set forth herein.

68. Defendants entered into an agreement to restrict EPG supply and coordinate acquisition activities in restraint of trade.

69. The agreement is evidenced by the coordinated timing between supply restrictions beginning March 25, 2025, and the secretive acquisition negotiations occurring simultaneously.

70. Defendants deliberately misled EPG customers by blaming supply shortages on "raw material lead times" while concealing the true acquisition-related nature of the restrictions.

71. Defendants coordinated the immediate suppression of the May 27, 2025 nosh.com article announcing the acquisition to prevent customers from understanding the anticompetitive nature of the supply restrictions.

72. The agreement included coordinated hoarding of 24 months of EPG supply, far exceeding legitimate business needs and the 1-year shelf life of Defendants' protein bar products.

73. Peter Rahal's admission that "We will be taking all the supply" demonstrates the explicit agreement to eliminate competitive access to EPG.

74. The agreement between Defendants is supported by multiple "plus factors" that exclude the possibility of independent parallel conduct:

75. Defendants' coordinated conduct contrary to their individual economic interests, including Epogee's agreement to immediately terminate profitable customer relationships and Defendants' hoarding of 24 months of supply far exceeding its legitimate business needs.

76. The secretive acquisition negotiations provided Defendants the opportunity to coordinate supply restrictions, as evidenced by the precise timing between supply cutoffs (March 25) and acquisition completion.

77. Defendants' immediate coordination to suppress the May 27, 2025 nosh.com article demonstrates ongoing communication and agreement to conceal their anticompetitive scheme.

78. Defendants had strong economic motives to coordinate exclusionary conduct (i.e., collusion), as evidenced by Rahal's admission that "CPG sucks because of the competition" and Defendants' 90% customer dependency on Epogee.

79. Defendants engaged in unprecedented conduct including immediate supply cutoffs after 5 years of reliable service, coordinated article suppression, and systematic customer deception about supply availability blamed on raw material shortages.

80. Market Concentration Facilitating Agreement: The concentrated market structure (single EPG manufacturer with dominant customer controlling 90% of demand) facilitated the coordination and agreement between Defendants.

81. Simultaneity Beyond Coincidence: The precise coordination between acquisition negotiations, supply restrictions, customer deception, and article suppression demonstrates agreement rather than parallel unilateral conduct.

82. The agreement unreasonably restrains trade in the relevant market for EPG supply and EPG-dependent low-calorie food products.

83. The restraint has caused substantial anticompetitive effects, including elimination of competition, artificial scarcity, and business closures throughout the EPG-dependent food manufacturing industry.

**SECOND CAUSE OF ACTION (Violation of Sherman Act § 2 - Monopolization)**

84. Plaintiffs incorporate by reference paragraphs 1-83 as if fully set forth herein.

85. The relevant market is the United States market for EPG supply, in which Epogee is the exclusive United States manufacturer.

86. Prior to acquisition, Defendants already possessed substantial market power as Epogee's dominant customer, comprising over 90% of Epogee's business.

87. Through the acquisition of Epogee, Defendants now possesses 100% monopoly power over global EPG supply.

88. Defendants willfully acquired this monopoly power through exclusionary conduct, including secretive acquisition negotiations designed to prevent competitive responses.

89. Defendants willfully maintain monopoly power through exclusionary conduct lacking legitimate business justification, including 24-month hoarding of EPG supplies far exceeding any reasonable business need.

90. Peter Rahal's admission that "CPG sucks because of the competition" demonstrates anticompetitive intent and willful maintenance of monopoly power.

91. Defendants' exclusionary conduct includes coordinated supply denial, artificial scarcity creation, and systematic elimination of EPG-dependent competitors.

92. Defendants' conduct has harmed competition by eliminating the remaining 10% of competitive access to EPG and destroying businesses that invested substantial resources in EPG-dependent product development.

93. This monopolization violates 15 U.S.C. § 2 and has caused substantial harm to competition and consumers.

**THIRD CAUSE OF ACTION (Violation of Clayton Act § 7 - Illegal Acquisition)**

94. Plaintiffs incorporate by reference paragraphs 1-93 as if fully set forth herein.

95. Defendants' acquisition of Epogee constitutes an acquisition of assets substantially engaged in commerce within the meaning of 15 U.S.C. § 18.

96. The acquisition substantially lessens competition in the relevant markets for EPG supply and EPG-dependent low-calorie food products.

97. Prior to acquisition, Defendants controlled 90% of Epogee's business while other manufacturers, including Plaintiffs, competed for the remaining 10% of EPG access.

98. The acquisition eliminated this remaining competitive segment and created 100% monopoly control over global EPG supply.

99. The acquisition was specifically designed to foreclose competition, as evidenced by Peter Rahal's admission that "We will be taking all the supply" and defendants' coordinated exclusionary conduct.

100. The acquisition tends to create a monopoly by eliminating the last source of competitive access to EPG and destroying businesses that had invested substantially in EPG-dependent innovation.

101. The acquisition constitutes a "killer acquisition" designed to eliminate potential competition rather than achieve legitimate business efficiencies.

102. This acquisition violates 15 U.S.C. § 18 and threatens substantial harm to competition and consumer welfare.

**FOURTH CAUSE OF ACTION (Violation of New York Donnelly Act § 340)**

103. Plaintiffs incorporate by reference paragraphs 1-102 as if fully set forth herein.

104. Defendants have created and maintained a monopoly in EPG supply within New York State through the coordinated acquisition and exclusionary conduct described herein.

105. Defendants' conduct has restrained trade and competition within New York State by eliminating access to EPG for New York-based food manufacturers and businesses serving New York consumers.

106. The monopolization has harmed New York consumers by reducing product choices in EPG-dependent low-calorie food markets and creating artificial scarcity.

107. Defendants' exclusionary conduct lacks legitimate business justification and constitutes willful monopolization under New York law.

108. This conduct violates N.Y. Gen. Bus. Law § 340 and entitles Plaintiffs to treble damages under N.Y. Gen. Bus. Law § 340(5).

**FIFTH CAUSE OF ACTION (Essential Facilities Doctrine Violation)**

109. Plaintiffs incorporate by reference paragraphs 1-108 as if fully set forth herein.

110. EPG constitutes an essential facility under established antitrust doctrine because it is controlled by a monopolist (Defendants through Epogee), competitors cannot practically duplicate it, access is essential for competition, and providing access is feasible.

111. EPG is controlled by monopolists that are now the Defendants, which now owns 100% of global EPG production capacity through its acquisition of Epogee.

112. Competitors cannot practically duplicate EPG due to the 18-year development timeline, over $150 million investment requirement, and proprietary technology involved in its manufacture.

113. Access to EPG is essential for competition in EPG-dependent low-calorie food markets, as demonstrated by Plaintiffs' and other manufacturers' substantial investments in EPG-dependent business models.

114. Providing access to EPG is feasible, as demonstrated by over five years of successful distribution to multiple customers prior to defendants' exclusionary conduct.

115. Defendants have denied access to this essential facility without legitimate business justification through their coordinated exclusionary conduct and artificial hoarding.

116. This denial of access harms competition and constitutes a violation of federal antitrust law.

**SIXTH CAUSE OF ACTION (Treble Damages - Clayton Act § 4 and Donnelly Act § 340(5))**

117. Plaintiffs incorporate by reference paragraphs 1-116 as if fully set forth herein.

118. Plaintiffs have suffered antitrust injury directly caused by defendants' violations of federal and state antitrust laws.

119. Plaintiffs' collective injuries include lost sales of approximately $107,000, collective sunk R&D investments of approximately $449,000, collective ongoing operational losses of approximately $15,000 per month, collective and inventory write-offs of approximately $85,000.

120. These injuries flow directly from defendants' anticompetitive conduct and would not have occurred in a competitive market.

121. Plaintiffs are entitled to treble damages under 15 U.S.C. § 4 (Clayton Act) for injuries caused by defendants' Sherman Act and Clayton Act violations.

122. Plaintiffs are entitled to treble damages under N.Y. Gen. Bus. Law § 340(5) for injuries caused by defendants' Donnelly Act violations.

123. Plaintiffs are further entitled to reasonable attorneys' fees and costs under applicable antitrust statutes.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs respectfully request this Court enter an order:

A. Grant a Temporary Restraining Order pursuant to Fed. R. Civ. P. 65(b), effective immediately, restraining and enjoining Defendants from restricting, limiting, or denying access to EPG to existing customers and qualified food manufacturers who previously had access.

B. Restrain and enjoin Defendants from maintaining any policy, practice, or agreement that prevents competitors from accessing EPG on commercially reasonable terms substantially similar to the January 1, 2025 terms and conditions.

C. Restrain and enjoin Defendants from using control over EPG to exclude competition in the low-calorie food market.

D. Restrain and enjoin Defendants from prioritizing Defendants' internal EPG needs over existing customer commitments.

E. Grant a Preliminary Injunction pursuant to Fed. R. Civ. P. 65(a) with identical terms pending final resolution of this action.

F. Within 5 business days of issuing an order, direct immediate restoration of EPG supply under the January 1, 2025 terms with 7-10 business day lead times for orders less than 5,000 pounds, accessing any hoarded supply as needed.

G. Within 5 business days of issuing an order, order Defendants to accept orders 5,000 pounds and above with 50% deposit requirement and reasonable lead times consistent with historical practices, accessing any hoarded supply as needed.

H. Order Defendants to provide EPG at commercially reasonable pricing consistent with historical terms.

I. Award treble damages pursuant to 15 U.S.C. § 4 (Clayton Act) and N.Y. Gen. Bus. Law § 340(5) (Donnelly Act).

J. Grant such other relief as this Court deems just and proper.

K. Waive any security requirement under Fed. R. Civ. P. 65(c) given the public interest in preventing monopolization and Defendants' superior financial position, or alternatively, set security in a nominal amount.

### ATTORNEY CERTIFICATION PURSUANT TO FED. R. CIV. P. 65(b)(1)(B)

I, Brittany Meyer-Belnap, attorney for Plaintiffs, hereby certify that:

1. EFFORTS TO GIVE NOTICE: No advance notice of this TRO application was provided to Defendants.

2. REASONS WHY NOTICE SHOULD NOT BE REQUIRED: (a) immediate irreparable injury will result before Defendants can be heard, including daily losses exceeding $2,000 and ongoing business destruction; (b) advance notice would enable acceleration of exclusionary conduct and potential evidence concealment given Defendants' demonstrated pattern of coordinated concealment; and (c) the emergency nature of daily competitive elimination requires immediate relief.

Respectfully submitted,

Dated: June 2, 2025

By: */s/ Brittany Meyer-Belnap*
Brittany Meyer-Belnap
1121 14th Street NW #1010
Washington DC 20009
Tel. 202-550-5700
bmeyer@tmdstrategies.com

*Attorney for Plaintiffs*