UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

OWN YOUR HUNGER LLC, LIGHTEN UP FOODS, and
DEFIANT FOODS LLC,

*Plaintiffs*,

- against -

1:25-cv-4544-VM

LINUS TECHNOLOGY, INC., EPOGEE LLC, and
PETER RAHAL,

*Defendants*.

---

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
Geoffrey S. Berman
Peter L. Simmons
Samuel Groner
One New York Plaza
New York, New York 10004
(212) 859-8000
geoffrey.berman@friedfrank.com
peter.simmons@friedfrank.com
samuel.groner@friedfrank.com

Kathy O'Neill
801 17th Street, NW
Washington, DC 20006
(202) 639-7000
kathy.oneill@friedfrank.com

*Attorneys for Defendants Linus Technology,
Inc., Epogee LLC, and Peter Rahal*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS .................................................................................... 4

I.    David Protein and Epogee ......................................................................... 4

II.   Epogee's Financial and Operational Challenges ........................................ 6

III.  This Case and Plaintiffs' Allegations ....................................................... 7

ARGUMENT .................................................................................................... 8

I.    Legal Standard ........................................................................................ 8

II.   Plaintiffs Cannot Meet the Requirements for a Temporary Restraining Order ...................... 9

  A.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims .................................. 9

    1.   Plaintiffs Cannot Succeed on Their Sherman Act § 2 Claim ........................................ 9

    2.   Plaintiffs Cannot Succeed on Their Essential Facilities "Claim" ................................ 13

    3.   Plaintiffs Cannot Succeed on Their Sherman Act § 1 and Donnelly Act Claims ......... 15

    4.   Plaintiffs Cannot Succeed on Their Clayton Act Claim ............................................. 17

  B.   Plaintiffs Have Not Shown Irreparable Harm .................................................... 18

  C.   Plaintiffs Cannot Show the Balance of The Equities Favors Them ............................ 20

  D.   A Temporary Restraining Order Would Harm the Public Interest ............................. 21

CONCLUSION ................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adderall XR Antitrust Litig.*,
  754 F.3d 128 (2d Cir. 2014)......................................................................................11

*AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*,
  740 F. Supp. 2d 465 (S.D.N.Y. 2010)....................................................................8, 18

*Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders
  Ass'n, Inc.*, 2015 WL 4033019 (S.D.N.Y. June 29, 2015)........................................20

*Anwar v. Fairfield Greenwich Ltd.*,
  728 F. Supp. 2d 462 (S.D.N.Y. 2010)...........................................................................8

*Arbitron Co. v. Phoenix Broad. Corp.*,
  1997 WL 452020 (S.D.N.Y. Aug. 6, 1997)................................................................19

*Barefoot Contessa Pantry, LLC v. Aqua Star (USA) Co.*,
  2015 WL 845711 (S.D.N.Y. Feb. 26, 2015)...........................................................20, 21

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
  813 F. Supp. 2d 569 (S.D.N.Y. 2011)..............................................................9, 10, 11

*Beldock v. Deutsche-Eco USA Corp.*,
  2016 WL 8809221 (D. Vt. Feb. 22, 2016)..................................................................19

*Black & Decker, Inc. v. Hoover Serv. Ctr.*,
  765 F. Supp. 1129 (D. Conn. 1991)............................................................................18

*Boothbay Absolute Return Strategies, LP v. Belgische Scheepvaartmaatschappij-
  Compagnie Mar. Belge SA*, 2024 WL 1097128 (S.D.N.Y. Mar. 13, 2024) ............20

*Christie-Spencer Corp. v. Hausman Realty Co.*,
  118 F. Supp. 2d 408 (S.D.N.Y. 2000)...........................................................................8

*City of New York v. Grp. Health Inc.*,
  649 F.3d 151 (2d Cir. 2011)........................................................................................18

*Convergen Energy WI, LLC v. L'Anse Warden Elec. Co., LLC*,
  2020 WL 5894079 (S.D.N.Y. Oct. 5, 2020)...............................................................19

*Copperweld Corp. v. Indep. Tube Corp.*,
  467 U.S. 752 (1984)....................................................................................................16

Page(s)

## Cases

*Delux Pub. Charter, LLC v. Cnty. of Westchester*,
   2024 WL 3744167 (S.D.N.Y. July 25, 2024) ........................................................................19

*In re EpiPen Marketing, Sales Practices & Antitrust Litig.*,
   545 F. Supp. 3d 922 (D. Kan. 2021) .......................................................................................17

*EZ-Ink, Inc. v. Brother Indus., Ltd.*,
   2021 WL 7909312 (E.D. Va. Dec. 9, 2021) .....................................................................21, 22

*Goldstein v. Hochul*,
   680 F. Supp. 3d 370 (S.D.N.Y. 2023) .....................................................................................8

*In re Google Digit. Advert. Antitrust Litig.*,
   627 F. Supp. 3d 346 (S.D.N.Y. 2022) ...................................................................................12

*In re Indep. Serv. Orgs. Antitrust Litig.*,
   203 F.3d 1322 (Fed. Cir. 2000) .............................................................................................12

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
   893 F. Supp. 1207 (S.D.N.Y. 1994), *aff'd*, 62 F.3d 69 (2d Cir. 1995) ...................................13

*Intellective, Inc. v. Mass. Mut. Life Ins. Co.*,
   190 F. Supp. 2d 600 (S.D.N.Y. 2002) .....................................................................................9

*Kramer v. Pollock-Krasner Found.*,
   890 F. Supp. 250 (S.D.N.Y. 1995) ........................................................................................13

*Linzer Prods. Corp. v. Sekar*,
   499 F. Supp. 2d 540 (S.D.N.Y. 2007) ..............................................................................11, 12

*Miller Insituform, Inc. v. Insituform of N. Am., Inc.*,
   830 F.2d 606 (6th Cir. 1987) .................................................................................................12

*MiniFrame Ltd. v. Microsoft Corp.*,
   2013 WL 1385704 (S.D.N.Y. Mar. 28, 2013),
   *aff'd*, 551 F. App'x 1 (2d Cir. 2013) .....................................................................................12

*Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*,
   2018 WL 2012875 (E.D.N.Y. Apr. 30, 2018) .......................................................................20

*In re Mylan N.V. Securities Litig.*,
   666 F. Supp. 3d 266 (S.D.N.Y. 2023), *aff'd sub nom.*,
   *Menorah Mivtachim Ins. Ltd. v. Sheehan*,
   2024 WL 1613907 (2d Cir. Apr. 15, 2024) .................................................................15, 16, 17

**Page(s)**

**Cases**

*Nat'l Coal. on Black Civic Participation v. Wohl,*
    498 F. Supp. 3d 457 (S.D.N.Y. 2020)......................................................................................8

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC,*
    861 F. Supp. 2d 344 (S.D.N.Y. 2012)..................................................................................15

*In re NorthShore Univ. HealthSystem Antitrust Litig.,*
    2018 WL 2383098 (N.D. Ill. Mar. 31, 2018)......................................................................17

*Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.,*
    485 F. Supp. 2d 387 (S.D.N.Y. 2007)..................................................................................15

*Otter Tail Power Co. v. United States,*
    410 U.S. 366 (1973)............................................................................................................14

*Parler LLC v. Amazon Web Servs., Inc.,*
    514 F. Supp. 3d 1261 (W.D. Wash. 2021)...........................................................................21

*Person v. New York Post Corp.,*
    427 F. Supp. 1297 (E.D.N.Y. 1977), *aff'd*, 573 F.2d 1294 (2d Cir. 1977)...........................16

*Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.,*
    812 F. Supp. 387 (S.D.N.Y. 1993) ......................................................................................17

*Retail Imaging Mgmt. Grp., LLC v. Fujifilm N. Am. Corp.,*
    841 F. Supp. 2d 1189 (D. Or. 2012) ...................................................................................22

*RxUSA Wholesale, Inc. v. Alcon Laboratories, Inc.,*
    661 F. Supp. 2d 218 (E.D.N.Y. 2009), *aff'd*, 391 F. App'x 59 (2d Cir. 2010) .................14, 15

*Sanborn Libr. LLC v. Eris Info. Inc.,*
    2021 U.S. Dist. LEXIS 165496 (S.D.N.Y. Aug. 30, 2021) ...................................................13

*SCM Corp. v. Xerox Corp.,*
    645 F.2d 1195 (2d Cir. 1981)..............................................................................................12

*Twin Lab'ys, Inc. v. Weider Health & Fitness,*
    900 F.2d 566 (2d Cir. 1990)................................................................................................14

*United States  v. Grinnell Corp.,*
    384 U.S. 563 (1966)..............................................................................................................9

*United States v. Am. Express Co.,*
    838 F.3d 179 (2d Cir. 2016), *aff'd sub nom., Ohio v. Am. Express Co.,*
    585 U.S. 529 (2018)............................................................................................................15

Page(s)

**Cases**

*United States v. E.I. du Pont de Nemours & Co.* ("*Cellophane*"),
 351 U.S. 377 (1956) ...................................................................................2, 9, 10

*United States v. Terminal Railroad Ass'n,*
 224 U.S. 383 (1912) .................................................................................................14

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
 540 U.S. 398 (2004) .................................................................................................13

*Winter v. Nat. Res. Def. Council, Inc.,*
 555 U.S. 7 (2008) ............................................................................................8, 20

*In re Zinc Antitrust Litig.,*
 155 F. Supp. 3d 337 (S.D.N.Y. 2016) .................................................................15, 16

**Statutes**

Sherman Antitrust Act of 1890 § 1, 15 U.S.C. § 1 ........................................15, 16, 18

Sherman Antitrust Act of 1890 § 2, 15 U.S.C. § 2 ............................................ *passim*

Clayton Antitrust Act of 1914 § 7, 15 U.S.C. § 18...........................................15, 17, 18

35 U.S.C. §271(d) .............................................................................................22

Donnelly Act, NY Gen. Bus. Law § 340 (1999) ..................................................15, 18

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
 Principles and Their Application (2025 Cumulative Supp. 2018-2023) ................................14

## PRELIMINARY STATEMENT

What plaintiffs are trying to dress up as an antitrust monopolization suit is nothing but a case of bad business planning – failing to secure long term supply contracts for an ingredient that they now say is important to their food business. But defendants Epogee LLC and its new corporate owner, a Linus Technology affiliate (which is better known by its trade name David Protein) are under no obligation to sell them the ingredient they want – a fat substitute called esterified propoxylated glycerol, or "EPG." Epogee has four patents that cover the process for making EPG. It is black letter law that patent holders are not obligated to sell their product to third parties or to license third parties to practice the patent.

There are also an abundance of fats and fat substitutes available in the market from a multitude of suppliers that plaintiffs could employ for their food products. Plaintiffs just do not want to use them. While they claim that they designed their product formulations and manufacturing processes around EPG as a central ingredient, they did not do what most businesses do, particularly when faced with a sole source of supply for a supposedly important ingredient or component – sign a contract. Before it bought Epogee, David Protein was a customer of Epogee's, just like plaintiffs here claim to be. But, unlike plaintiffs, David Protein negotiated a long-term supply agreement to ensure that EPG would be available to it for use in its David protein bars for many years to come. Other Epogee customers did the same thing. These plaintiffs did not.

Now they want the Court to rescue them from a predicament they created for themselves. They ask the Court to issue a temporary restraining order requiring defendants to reprioritize their business, reallocate a limited supply of EPG product during a time of supply chain disruption (when Epogee cannot even produce enough EPG to fill defendants' own internal

demand), and keep product available for one-off sale to plaintiffs – at a loss – if plaintiffs sporadically happen to issue a purchase order.  There is no such legal requirement.

There are myriad problems with plaintiffs' motion.

First, David Protein and Epogee do not possess monopoly power in a relevant market, which is an essential requirement for a monopolization claim.  David Protein makes protein nutrition bars – a crowded $4 billion market dominated by multinational companies where David Protein has a market share in the low single digits, and is competing to gain ground in mass market distribution channels.  None of the plaintiffs even compete in that market – they do not make protein bars.  Nor do defendants have monopoly power in the market for fats and fat substitutes, which itself features a number of large agricultural product companies such as Cargill, Archer-Daniels-Midland, Columbus Vegetable Oils and AAK.

Plaintiffs' theory rests on the tautology that the relevant market should be defined as the market for the one ingredient they want to buy – EPG – and which, by virtue of its patents, only Epogee makes.  But that flies in the face of the Supreme Court's *Cellophane* decision nearly 70 years ago, and decades of case law since then, holding that the relevant market consists of all reasonably interchangeable (*i.e.*, substitutable) products.

EPG is one of dozens of fats and fat substitutes that can be used in protein bars such as those David Protein makes, or in chocolate bars, nut butters and sauces of the type plaintiffs claim to make.  Indeed, none of David Protein's competitors in the protein bar market use EPG, opting instead for a variety of other readily available alternatives such as vegetable oils, cocoa butter and almond butter.  Plaintiffs' commercial choice to use EPG instead of substitutable alternatives does not mean that Epogee can be compelled to sell EPG to them or any other

-2-

prospective buyer when such one-off sales in small quantities result in unprofitable transactions that do not align with defendants' current business strategy.

To date, Epogee has been unprofitable.  The prior owners sold the business to David Protein because they were not prepared to pour more money into the business.  As part of a commercial reorientation of the business under David Protein's ownership, defendants have stopped making money-losing low volume sales to small customers so that they can focus instead on customers with consistent, high volume demand for the product, which will allow them to spread costs across a larger volume, dramatically lowering manufacturing costs on a per unit basis and hopefully turning the business profitable.  It is not anticompetitive to change one's business strategy in hopes of achieving profitability.  Quite the opposite – it is pro-competitive for defendants to find a way to operate Epogee profitably and sell EPG not only to enable David Protein to compete with the larger protein bar companies but also to encourage higher volume sales of EPG to third parties for other food products.

Plaintiffs' speculation that Epogee is exclusively providing EPG to its parent company David Protein for use in protein bars is wrong.  Epogee is simply going after higher volume buyers to achieve economies of scale.  Further, Plaintiffs are not competitors of David Protein in the protein bar space, and the wide array of fat and fat substitute ingredients with which EPG competes remains available to plaintiffs. Thus, there is no basis for plaintiffs' allegation that the acquisition and defendants' change in strategy is aimed at foreclosing competitors.

Plaintiffs' conspiracy theory suffers from the further flaw that there can be no conspiracy between defendants as a matter of law because the intra-corporate conspiracy doctrine treats a parent company (David), subsidiary (Epogee) and their CEO (Rahal) as one actor engaged in unilateral activity, rather than independent actors coordinating activity.

Equally fatal to plaintiffs' motion, they have not met their burden of showing irreparable harm. Plaintiffs insist that they will lose sales, or even lose their businesses, if they do not quickly obtain a court-ordered supply of EPG. This is wholly speculative where a host of substitutes exist. Indeed, some of Epogee's other former customers have voluntarily swapped some of the EPG in their products for other fats or fat substitutes, which has the added effect of bringing their costs down, since EPG is expensive to make. More fundamentally, there can be no irreparable harm (and the equities favor David Protein and Epogee) where plaintiffs only have themselves to blame for not signing long-term supply agreements. Other buyers of EPG took this obvious step after deciding to use EPG in their products. That plaintiffs failed to do so does not now create a cognizable emergency. Further, plaintiffs' enumeration of supposedly lost profits, while entirely speculative, underscores that their alleged harm is compensable by money damages, which further precludes the issuance of injunctive relief.

## STATEMENT OF FACTS[1]

### I.    David Protein and Epogee

Linus Technology, Inc. (now technically Linus Technology MergerSub, LLC, but better known by its trade name David Protein) is a relatively new entrant in the highly competitive protein bar space. Ranen Decl. ¶ 2. Its founders are two food entrepreneurs, Peter Rahal and Zach Ranen, who were interested in creating a protein bar with a very high protein-to-calorie ratio to help people reach their goals of increasing muscle and decreasing body fat. *Id.*

---

[1] References to "Compl. ¶ _" refer to the Plaintiffs' Complaint (ECF No. 5). References to "Mot. ¶ __" refer to the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 4). References to "Ranen Decl. ¶ __" refer to the accompanying Declaration of Zachary Ranen in opposition to this motion. All internal quotation marks, alterations, and citations have been omitted from quotations

Epogee is the manufacturer of EPG and holds four patents to the process for making EPG.  Ranen Decl. ¶¶ 8-11.  As plaintiffs admit, EPG was developed over the course of more than a decade, and with an investment of tens of millions of dollars in research and development capital.  Ranen Decl. ¶ 11; Compl. ¶ 18.  Today, EPG represents a tiny (single digit) percentage of sales in the vast market for fats and fat alternatives, which include nut butters, vegetable oils, plant-derived fats and waxes, fat mimetics and bulking agents, among other products.  Ranen Decl. ¶¶ 12, 14.  This market includes large agricultural product companies such as Cargill, Archer-Daniels-Midland, Columbus Vegetable Oils and AAK.  *Id*. ¶ 14.  EPG, like every other fat and fat alternative, has pros and cons.  For example, EPG has the lowest calories per gram of any fat substitute, but other fats and fat substitutes have superior cost and palatability and are less processed, which some consumers care about.  Ranen Decl. ¶¶ 11, 13.

Protein bar (and other food product) manufacturers can choose among a variety of ingredients, which have different tradeoffs and costs.  Ranen Decl. ¶ 3, 12–13.  All protein bars contain fats or fat substitutes, which are essential for taste, texture, and consistency.  *Id.* ¶ 3.  David Protein chose EPG for its fat source, along with a combination of other ingredients, to create a high-protein, low calorie bar.  Ranen Decl. ¶¶ 3, 8.  However, every other protein bar on the market takes a different approach.  For instance, Quest, the leading protein bar company, chooses to use ground almonds and cocoa butter in its products instead of EPG.  *Id*. ¶ 13.  A Quest bar has 40 more calories than a David bar, but it is cheaper to make.  *Id.*  Other competing protein bars also use different fats or fat substitutes to achieve their objectives of taste, nutrition, texture and price.  *Id*. ¶¶ 12-13.

Following years of financial struggles, Epogee approached David Protein to ask them to consider acquiring Epogee.  Ranen Decl. ¶ 19.  A non-binding term sheet was signed in February

2025 and the transaction closed in May 2025. *Id.* ¶ 19. Prior to that time, David Protein had a purely arm's length relationship with Epogee as a purchaser of EPG as an ingredient. *Id.* ¶ 8. As is customary, neither David Protein nor Epogee's owners disclosed the merger negotiations to the public while they were ongoing. *Id.* ¶ 20.

## II.    Epogee's Financial and Operational Challenges

Prior to its acquisition by David Protein, Epogee was unprofitable, in part because producing EPG is expensive and Epogee could not manufacture and sell in sufficient quantities to be profitable. Ranen Decl. ¶ 19. Epogee lost money on sales to customers like the plaintiffs who purchased EPG in small volumes – if they purchased at all. *Id.* For instance, plaintiff Defiant Foods LLC placed only two orders with Epogee totaling less than $3,500. Ranen Decl. ¶ 38. Plaintiff Lighten Up LLC never bought any product at all – it received some free samples but never paid Epogee anything. *Id.* ¶¶ 30-31. Serving sporadic and low volume customers like plaintiffs does not allow Epogee to achieve the scale it needs to turn a profit. *Id.* ¶ 21.

Epogee has also faced supply chain issues which have caused recent shortages. Ranen Decl. ¶ 24. As a result, Epogee has had trouble fulfilling orders for EPG in 2025, and some of David Protein's own products are therefore out of stock. *Id.* ¶¶ 24-26. Plaintiffs offer no evidence that any shortages resulted from any supposed anticompetitive conspiracy, and instead rely on their own conjecture that defendants "deliberately maximized competitive harm" to plaintiffs while "blaming [the shortages] on raw material lead times," even as they concede elsewhere that a bona fide supply shortage existed. Compl. ¶¶ 43, 48.

After David Protein acquired Epogee, it changed the company's business strategy and began targeting companies that have the capacity to purchase significantly higher volumes of product per year, thus allowing Epogee to spread its costs and thereby reduce the cost per unit of

EPG produced.  Ranen Decl. ¶ 21.  With this strategy, David Protein hopes to make Epogee profitable, which will enable it to bring innovation and competition to the food industry.  *Id.*

### III.    This Case and Plaintiffs' Allegations

Plaintiffs filed this action asserting a range of antitrust violations (Compl. ¶¶ 67-123), but essentially complaining that under defendants' new strategy to serve customers who can order in larger quantities, they no longer have access to EPG.  Compl. ¶¶ 53-66.  However, other food businesses that use EPG as a fat source signed long-term agreements to secure their supply of EPG and will continue to receive that supply.  Ranen Decl. ¶ 17.  In fact, that is what David Protein itself did when it was just a customer of Epogee.  *Id.*  Plaintiffs never attempted to secure long-term supply contracts and submit no evidence to the contrary.  *Id.*  Indeed, plaintiffs concede that they only placed one-off orders for EPG.  Compl. ¶ 48; Sanburg Decl. ¶ 7; Fugal Decl. ¶ 7; Safai Decl. ¶ 7.  (As noted above, one plaintiff never paid for a single order and another placed only two orders totaling less than $3,500.)

Plaintiffs further allege that Epogee is (supposedly wrongfully) meeting David Protein's internal needs for EPG for David protein bars first, instead of meeting plaintiffs' needs.  Compl. ¶¶ 45, 49.  However, Epogee is not even currently meeting that internal demand for EPG due to supply chain issues.  Ranen Decl. ¶¶ 24-26.  As reflected on its public website, David Protein is currently out of stock of two popular flavors of its bars due to the unavailability of EPG.  Ranen Decl. ¶ 24.

Plaintiffs are concededly not competitors of David Protein, as none manufactures protein bars.  Sanburg Decl. ¶ 10; Fugal Decl. ¶ 10; Safai Decl. ¶ 10.  Plaintiffs also offer no evidence that they have tested alternatives to EPG to ameliorate the effects of the shortages and Epogee's change in strategy, even as there are ready substitutes.  Ranen Decl. ¶ 40.  Their claim essentially is that David Protein and Epogee should run their business to serve plaintiffs' needs first, even if

those transactions are unprofitable, even if there is not enough EPG to go around at present, and

even if doing so is contrary to the growth strategy that defendants want to pursue.

## ARGUMENT

### I.    Legal Standard

"Temporary restraining orders and preliminary injunctions are among 'the most drastic

tools in the arsenal of judicial remedies,' and must be used with great care." *Anwar v. Fairfield*

*Greenwich Ltd.*, 728 F. Supp. 2d 462, 472 (S.D.N.Y. 2010). "The party seeking the injunction

carries the burden of persuasion to demonstrate, 'by a clear showing,' that the necessary

elements are satisfied." *Goldstein v. Hochul*, 680 F. Supp. 3d 370, 388 (S.D.N.Y. 2023) (citing

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

"When considering a motion for a preliminary injunction, unlike a motion to dismiss, the

Court need not accept as true the well-pleaded allegations in plaintiff['s] complaint." *Nat'l Coal.*

*on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020). Rather, the

party seeking a temporary restraining order or preliminary injunction must demonstrate its

entitlement with actual evidence, *see Christie-Spencer Corp. v. Hausman Realty Co.*, 118 F.

Supp. 2d 408, 422 (S.D.N.Y. 2000), and must meet its burden by a preponderance of the

evidence, *AFA Dispensing Grp. B.V. v. Anheuser-Busch*, Inc., 740 F. Supp. 2d 465, 471

(S.D.N.Y. 2010).

The essential requirements for a temporary restraining order are well known: (1)

likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3)

the balance of equities tips in the movant's favor, and (4) an injunction is in the public interest.

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

II.    **Plaintiffs Cannot Meet the Requirements for a Temporary Restraining Order**

A.  **Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims**

1.    **Plaintiffs Cannot Succeed on Their Sherman Act § 2 Claim**

Plaintiffs here do not come close to demonstrating unlawful monopolization. A monopolization claim under Section 2 of the Sherman Act, 15 U.S.C. § 2, requires "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident." *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 574 n.4 (S.D.N.Y. 2011). Plaintiffs have not satisfied and cannot satisfy either of these elements.

First, David Protein and Epogee do not possess monopoly power in any relevant market – not for protein bars, and not for fats and fat substitutes. Quite the opposite, defendants are tiny players in both markets. Ranen Decl. ¶ 6, 14. Establishing monopoly power first requires plaintiffs to define "a relevant geographic and product market." *Bayer Schering*, 813 F. Supp. 2d at 574. "Every product that can be substituted for the same use or purpose should be included within a single product market." *Intellective, Inc. v. Mass. Mut. Life Ins. Co.,* 190 F. Supp. 2d 600, 610 (S.D.N.Y. 2002). Put another way, the relevant market is all products "reasonably interchangeable by consumers for the same purposes[.]" *United States v. E.I. du Pont de Nemours & Co*., 351 U.S. 377, 395 (1956) (the "*Cellophane*" case); *accord United States  v. Grinnell Corp*., 384 U.S. 563, 592-93 (1966).

Here, plaintiffs have self-servingly sought to define the relevant market as a single patented food ingredient, EPG. Compl. ¶ 85. This is untenable as a matter of law. Countless fats and fat substitutes are alternatives for EPG (Ranen Decl. ¶ 12), and products with EPG are reasonably interchangeable for products made with other fats or fat substitutes, as evidenced by the fact that

none of David Protein's numerous competitors in the protein bar market use EPG but instead use other oils and butters.  Ranen Decl. ¶¶ 7, 12, 13.

Plaintiffs cannot concoct a market consisting of a single ingredient (EPG) simply because they prefer that ingredient's properties, which is all they claim.  Compl. ¶ 21.  The Supreme Court settled that issue nearly 70 years ago in the *Cellophane* case, where it held that while cellophane has unique transparency, strength, and cheapness, it is nevertheless part of a broader market for packaging materials, not its own market.  351 U.S. at 394.  Similarly, in *Bayer Schering*, Judge Gardephe held that even if there is just one unique molecule that both prevents pregnancy and alleviates depression, drugs containing that molecule do not constitute their own market but rather are part of the broad and diversified markets for oral contraceptives and antidepressants, respectively.  813 F. Supp. 2d at 575-76.

So too here, consumers shop for, and manufacturers make, protein bars and other foods – not EPG.  EPG is one of dozens of fats and fat substitutes – such as palm oil, cocoa butter, ground almonds (almond paste), and guar gum – that can be used, either alone or in combination, in nutrition bars and other foods.  Ranen Decl. ¶ 12.[2]  For instance, in David Protein's market for nutrition bars with about 12 grams of protein or more, it is uncontested that the David bar is a tiny player in a field with large, well-established and well-capitalized competitors, and does not possess anything even remotely approaching monopoly power.  Indeed, the protein bar market represented about $4 billion in U.S. sales in 2024, and David Protein, though growing quickly, represented less than 1% of those sales last year.  Ranen Decl. ¶¶ 4, 6.  The largest players in the protein bar market are Quest Nutrition, which makes its Quest Bars using almond paste as the main source of fat, and

---

[2]    Indeed, some former Epogee customers reduced their use of EPG in their non-bar products such as ice cream in favor of other, preferred and lower cost fat sources even before David Protein bought Epogee.  Ranen Decl. ¶ 34.

Barebells, which uses cocoa butter. *Id.* ¶¶ 6, 13. Neither of them uses EPG. In fact, over 99% of protein bar sales in 2024 came from brands that do not use EPG. Ranen Decl. ¶ 6.

Looking more generally at the market for fat and fat substitutes, there are multiple sources of supply for a host of alternative ingredients to EPG, including well known multi-billion dollar companies such as Cargill, Archer-Daniels-Midland and AAK. *Id.* ¶ 14.

Because defendants lack monopoly power in either the market for protein bars or the market for fats and fat substitutes, the claim under Section 2 of the Sherman Act is not just unlikely to succeed, but it is doomed to fail. Accordingly, plaintiffs' request for a temporary restraining order is "legally insufficient" and should be denied. *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 554 (S.D.N.Y. 2007) (dismissing Sherman Act claim on basis that plaintiffs erroneously defined market as paint rollers made pursuant to defendants' patented process rather than the broader market for paint rollers more generally).

There is also a second, independent reason why plaintiffs' claim under Section 2 of the Sherman Act fails: they have not demonstrated a "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen or historic accident." *Bayer Schering*, 813 F. Supp. 2d at 574 n.4. A violation of Section 2 requires not just the "possession of monopoly power," but "anticompetitive conduct," which is "conduct without a legitimate business purpose that makes sense only because it eliminates competition." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014).

Here, defendants had a very legitimate business purpose for their decision to stop selling EPG to small businesses like plaintiffs that placed sporadic, low-volume and unprofitable orders – they want Epogee to become a profitable business that will survive and grow in the long term by realizing efficiencies of scale. Ranen Decl. ¶¶ 19, 21. In fact, before David Protein's acquisition

of Epogee, Epogee had been losing money on isolated small volume sales to parties such as the plaintiffs. *Id.* ¶ 19. To satisfy the requirements of a claim under section 2 of the Sherman Act, "the monopolist's conduct must be irrational but for its anticompetitive effect." *In re Google Digit. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 383 (S.D.N.Y. 2022). Commencing a profitable business strategy and trying to spread manufacturing costs over a larger volume to reduce per unit costs is not irrational. *Id.*

Moreover, independent of the legitimate objective of revising Epogee's strategy to turn the business profitable, defendants would ***still*** have been within their rights to cease selling to the plaintiffs. A patent is a congressionally approved right of exclusivity for a defined term of years. *See SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1204 (2d Cir. 1981). "A patent holder who lawfully acquires a patent cannot be held liable under Section 2 of the Sherman Act for maintaining the monopoly power he lawfully acquired by refusing to license the patent to others." *Miller Insituform, Inc. v. Insituform of N. Am., Inc.*, 830 F.2d 606, 609 (6th Cir. 1987).

As the owner of four patents related to the unique processes for manufacturing and using EPG (Ranen Decl. ¶ 11), defendants are entitled to decide to whom – if anyone – they wish to license or sell EPG. *See Linzer*, 499 F. Supp. 2d at 554 ("[A] patentee is entitled to impose conditions on licenses or refuse to grant licenses entirely."); *see also MiniFrame Ltd. v. Microsoft Corp.*, 2013 WL 1385704, at *3–4 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 551 F. App'x 1 (2d Cir. 2013) ("Patent holders possess broad authority to enforce their intellectual property rights without violating the antitrust laws."). Plaintiffs' position that defendants should be required to sell EPG to them "overlooks the pro-competitive effects of the patent right, to wit, the incentive ... to innovate." *Linzer*, 499 F. Supp. 2d at 555; *see also In re Indep. Serv. Orgs. Antitrust Litig.*, 203

F.3d 1322, 1326 (Fed. Cir. 2000) ("There is no reported case in which a court ha[s] imposed antitrust liability for a unilateral refusal to sell or license a patent....").

Finally, plaintiffs' core allegation of anticompetitive conduct is not just legally unsupported; it is also factually wrong. Plaintiffs speculate that David Protein and Epogee are hoarding EPG and selling to no one (Compl. ¶ 49), but in fact defendants are working to make the unprofitable Epogee into a profitable company by focusing on sales to industry players who are in a position to place more sizable orders that create economies of scale. Ranen Decl. ¶¶ 21-22.

Accordingly, plaintiffs are unlikely to succeed on the merits of their Sherman Act Section 2 claim.

### 2. Plaintiffs Cannot Succeed on Their Essential Facilities "Claim"

Plaintiffs also assert a purported cause of action for an "Essential Facilities Doctrine Violation" (Compl. ¶¶ 109-116) but "[t]he essential facility doctrine is a label that may aid in the analysis of a monopoly claim, not a statement of a separate violation of law." *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 893 F. Supp. 1207, 1213 (S.D.N.Y. 1994), *aff'd*, 62 F.3d 69 (2d Cir. 1995). Moreover, (1) the Supreme Court has noted that it has "never recognized such a doctrine," *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004), (2) "the continued viability of the essential facilities doctrine has been called into question in recent years," and (3) "courts in this Circuit have not sustained a claim under the doctrine since the Supreme Court's ruling in *Verizon*." *Sanborn Libr. LLC v. Eris Info. Inc.*, 2021 U.S. Dist. LEXIS 165496, at *38 (S.D.N.Y. Aug. 30, 2021).

In any event, even if such a doctrine remains viable (which it is not), it has no application here. Cases discussing the essential facilities doctrine make clear that it is inapplicable unless ***both*** (1) the defendant's facility is "essential," *i.e.*, "one for which there is no feasible alternative," ***and*** (2) the plaintiff is "a competitor of the defendant monopolist whose facility it seeks to employ."

*Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995). Here, plaintiffs do not meet either requirement.

Typically, essential facilities are those that "are a natural monopoly, facilities whose duplication is forbidden by law, and perhaps those that are publicly subsidized and thus could not practicably be built privately." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 773b2 (2025 Cumulative Supp. 2018-2023). Courts have found an essential facility only rarely, and generally in situations such as a rail transportation company that shut out others from using the railroad, *United States v. Terminal Railroad Ass'n*, 224 U.S. 383 (1912), and a power company that owned power and refused to transmit power directly to municipalities, *Otter Tail Power Co. v. United States*, 410 U.S. 366, 377-79 (1973). Conversely, courts have not applied the doctrine in cases much closer to this one. For instance, in *RxUSA Wholesale, Inc. v. Alcon Laboratories, Inc.*, 661 F. Supp. 2d 218, 224 (E.D.N.Y. 2009), *aff'd,* 391 F. App'x 59 (2d Cir. 2010), the plaintiffs were secondary wholesalers of drugs who sued pharmaceutical manufacturers alleging that they were cut off from purchasing drugs for resale when the manufacturers abruptly refused to deal with them. The plaintiffs alleged that in refusing to sell to the plaintiffs, the companies intended to stifle competition from the secondary wholesale market so that they could raise prices in other markets. *Id.* at 225. The court held the essential facility doctrine was inapplicable because the secondary wholesalers are not competitors with pharmaceutical manufacturers. *Id.* at 229.

EPG is not "essential" because there are numerous alternatives available, such as cocoa butter, ground almonds, oils, structured waxes, fat mimetics, and engineered fat replacers. Ranen Decl. ¶ 12. *See Twin Lab's, Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir. 1990) ("As the word 'essential' indicates, a plaintiff must show more than inconvenience, or even some

economic loss; he must show that an alternative to the facility is not feasible. Since [plaintiff] has failed to make such a showing, we hold that its essential facilities claim fails.").

Equally dispositive, plaintiffs are not competitors of David Protein or Epogee – David Protein produces protein bars while plaintiffs produce peanut butter-like spreads, chocolate bars, and a sauce. Ranen Decl. ¶¶ 30, 37, 39. *See RxUSA Wholesale, Inc.*, 661 F. Supp. 2d at 229; *Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387, 394 (S.D.N.Y. 2007) ("Because DTC is not a competitor in the relevant market, [plaintiff's] alternative theories for monopolization [such as] based on ... the essential facility doctrine…also fail as a matter of law.").

### 3.    Plaintiffs Cannot Succeed on Their Sherman Act § 1 and Donnelly Act Claims

Plaintiffs' claim under Section 1 of the Sherman Act fares no better. A Section 1 claim requires a plaintiff to show: "(1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." *United States v. Am. Express Co.*, 838 F.3d 179, 193 (2d Cir. 2016), *aff'd sub nom., Ohio v. Am. Express Co.*, 585 U.S. 529 (2018). The Donnelly Act imposes the same requirements as Section 1 of the Sherman Act. *See Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012).[3]

A key requirement of a Section 1 claim is that there be concerted action, *i.e.*, a conspiracy. *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 366 (S.D.N.Y. 2016). In cases such as this alleging a vertical restraint – an agreement among a combination of different levels of the market

---

[3]    In listing the claims for which plaintiffs believe that they are likely to succeed on the merits, Plaintiffs only list the Sherman Act claims and the Clayton Act claim (the first, second, and third causes of action in the complaint), not the Donnelly Act claim or the other causes of action. Mot. § II (A-C). Accordingly, the Court need not consider plaintiffs' fourth, fifth, and sixth causes of action in connection with this motion.

structure – the rule of reason applies, and plaintiffs must show that the alleged restraint on trade is unreasonable. *See In re Mylan N.V. Securities Litig.*, 666 F. Supp. 3d 266, 300 (S.D.N.Y. 2023), *aff'd sub nom., Menorah Mivtachim Ins. Ltd. v. Sheehan*, 2024 WL 1613907 (2d Cir. Apr. 15, 2024). This claim is equally bound to fail.

*First*, there is no concerted action. "As a matter of law, only separate entities can conspire in violation of the antitrust laws; thus, a corporate parent and its wholly owned subsidiary are incapable of conspiring." *In re Zinc Antitrust Litig.*, 155 F. Supp. at 365; *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) ("[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act."). Similarly, since companies can only operate through the management that runs them, a company cannot conspire with its own CEO, which is Peter Rahal's role here. *See Person v. New York Post Corp.*, 427 F. Supp. 1297, 1307 (E.D.N.Y. 1977), *aff'd*, 573 F.2d 1294 (2d Cir. 1977) ("To the extent that plaintiffs' theory of concerted activity is that the Post conspired with its own officers, directors, employees, agents or attorneys, their § 1 claim may not be maintained, for, as a matter of law, the Post would then be conspiring with itself to perform a single, unilateral act."). Accordingly, as a matter of law, there can be no conspiracy between parent David Protein and its wholly owned subsidiary Epogee, or between either of them and their CEO Rahal.

*Second*, there is no unreasonable restraint on trade, even assuming that David Protein and Epogee were capable of conspiring with each other (which they are not). Plaintiffs' theory of restraint rests on a supposed exclusive dealing agreement between Epogee and David Protein. Compl. ¶¶ 68–83. No such relationship exists and, even if it did, "the Supreme Court has long held that such agreements, whether challenged under Section 1 or Section 2, are presumptively

procompetitive and lawful unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the market." *In re Mylan*, 666 F. Supp. 3d at 291; *see also Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc.*, 812 F. Supp. 387, 392 (S.D.N.Y. 1993) ("Antitrust laws were enacted for the protection of *competition* not *competitors*.... Even if there were a conspiracy to shut out [a particular competitor], there would not necessarily be an antitrust violation absent an anticompetitive effect on the industry as a whole."). Here, there is no foreclosure of competition in a substantial share of the market. David Protein currently occupies less than 1% of the highly competitive protein bar market, while Epogee occupies less than 1% of the vast market for fats and fat alternatives. Ranen Decl. ¶¶ 6, 14. Market foreclosure is not demonstrated when a conspiracy restrains even 30% of the market. *See In re Mylan*, 666 F. Supp. 3d at 302; s*ee also In re EpiPen Marketing, Sales Practices & Antitrust Litig.*, 545 F. Supp. 3d 922, 1014-15 (D. Kan. 2021) (finding that calculation of 31% market foreclosure was insufficient).

***Third***, there is no factual support for the claim of an exclusive dealing arrangement. Plaintiffs merely speculate, with no personal knowledge, about what they imagine David Protein and Epogee must be doing. Defendants, by contrast, have proffered a declaration with testimony explaining that the supposition is wrong, that there is no exclusive dealing, and that rather than preventing others from purchasing EPG, defendants are targeting ***increased*** future sales of EPG to customers that are able to place far ***larger*** orders for EPG than Epogee's prior customers. Ranen Decl. ¶ 21. Just because Epogee is not selling to the plaintiffs does not mean it is not selling to anyone.

### 4.    Plaintiffs Cannot Succeed on Their Clayton Act Claim

For their claim under Section 7 of the Clayton Act, plaintiffs are required to prove monopoly power in a defined market. *See In re NorthShore Univ. HealthSystem Antitrust Litig.*,

2018 WL 2383098, at *4 (N.D. Ill. Mar. 31, 2018) ("For both theories of liability advanced by the Plaintiffs—Section 2 of the Sherman Act and Section 7 of the Clayton Act—monopoly power in a defined market must be proven in order for the Plaintiffs to prevail.").  For the same reason that plaintiffs cannot establish that David Protein and Epogee had monopoly power in the relevant market for purposes of Section 2 of the Sherman Act, *see supra* Section II.A.1, they similarly are not likely to succeed on the merits of their Clayton Act claim.  *See Black & Decker, Inc. v. Hoover Serv. Ctr.*, 765 F. Supp. 1129, 1141 (D. Conn. 1991) (determining that because the plaintiff could not likely establish that it would be excluded from the relevant market for purposes of its Section 2 Sherman Act claim, it was not likely to succeed on its Clayton Act claim).  Plaintiffs incorrectly define the market as the single product EPG, or alternatively, the market for EPG-dependent foods, and complain that the combined David Protein and Epogee have shut them out of those markets. Compl. ¶ 96.  Plaintiffs cannot posit an imaginary "market" consisting of a single ingredient when EPG is one of dozens of fats and fat substitutes that can be used in nutrition bars and other products. *See supra* II.A.1; *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 156 (2d Cir. 2011) (affirming summary judgment for defendants on claims under § 7 of the Clayton Act, §§ 1 and 2 of the Sherman Act, and the Donnelly Act because the market alleged in the complaint was legally insufficient insofar as it was "defined by the [plaintiff]'s preferences, not according to the rule of reasonable interchangeability").

Because plaintiffs have not carried their burden to establish a likelihood of success on the merits for any of their claims, their request for a temporary restraining order must be denied.

### B.  Plaintiffs Have Not Shown Irreparable Harm

Plaintiffs also fail to demonstrate that, absent relief, they will suffer irreparable harm – "an injury that is … actual and imminent, and one that cannot be redressed through a monetary award." *AFA Dispensing Grp.*, 740 F. Supp. 2d at 472.  Plaintiffs' histrionic but speculative allegations

that they will suffer the loss of their businesses, market share, and customer relationships (Sanburg Decl. at ¶ 11; Fugal Decl. at ¶ 11; Safai Decl. at ¶ 11) do not meet the standard for a temporary restraining order.

**First**, "[i]rreparable harm does not exist where alternatives are available to a movant, even if 'these alternatives are less convenient.'" *Delux Pub. Charter, LLC v. Cnty. of Westchester*, 2024 WL 3744167, at *2 (S.D.N.Y. July 25, 2024). Plaintiffs ignore the numerous alternative products available as substitutes for EPG, including conventional fats and oils, structured fats and waxes, fat mimetics, and engineered fat replacers. Ranen Decl. ¶¶ 12-14. Even if a substitution is less convenient or desirable for plaintiffs, mere inconvenience does not establish irreparable harm. *See Arbitron Co. v. Phoenix Broad. Corp.*, 1997 WL 452020, at *5 (S.D.N.Y. Aug. 6, 1997) (no irreparable harm because of the "availability of alternatives").

**Second**, plaintiffs' assertions of irreparable harm are undercut by the fact that their own failure to secure long-term supply agreements is the reason that they no longer have access to EPG. *See* Ranen Decl. ¶ 17. "[I]t has long been the rule that the party claiming irreparable harm cannot also be the cause of the harm." *Beldock v. Deutsche-Eco USA Corp.*, 2016 WL 8809221, at *4 (D. Vt. Feb. 22, 2016); *see also Convergen Energy WI, LLC v. L'Anse Warden Elec. Co., LLC*, 2020 WL 5894079, at *5 (S.D.N.Y. Oct. 5, 2020) ("[i]f the harm complained of is self-inflicted, it does not qualify as irreparable."). Recognizing the importance of EPG to their business plans, David Protein and other EPG customers proactively sought and negotiated long-term supply agreements with Epogee – with David Protein even making a down payment to ensure a flow of product. Ranen Decl. ¶ 17. Plaintiffs' failure to do something similar is their own fault.

**Third**, plaintiffs' financial enumeration of their supposed "collective injuries," including the amounts of their lost sales, investments in research and development, operational losses, and

inventory write-offs (Compl. ¶ 119), underscores that their alleged harm is compensable by money damages.  Accordingly, plaintiffs have conceded that their alleged injuries are not irreparable.  *See Boothbay Absolute Return Strategies, LP v. Belgische Scheepvaartmaatschappij-Compagnie Mar. Belge SA*, 2024 WL 1097128, at *5 (S.D.N.Y. Mar. 13, 2024) (plaintiffs "fail[ed] to show that monetary damages would not provide an adequate remedy" because complaint expressly requested damages and "appear[ed] to offer a simple formula for calculating damages").

Accordingly, plaintiffs have not carried their burden to establish irreparable harm.

### C.  Plaintiffs Cannot Show the Balance of The Equities Favors Them

Before awarding even temporary relief, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24.  Plaintiffs must show "that the balance of equities tips in [their] favor."  *Id.* at 20.

While plaintiffs allege that their lack of access to EPG has caused their production lines to stop (Compl. ¶¶ 53–61), not only are such harms entirely their own fault, since plaintiffs failed to negotiate for long-term supply agreements for EPG (Ranen Decl. ¶ 17), but they also have not shown that they have made any effort to mitigate the supposed hard by availing themselves of any of the alternative options available in the market.  *See Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, 2015 WL 4033019, at *13 (S.D.N.Y. June 29, 2015) (balance of equities did not favor plaintiff, who failed to purchase "Alzheimers Foundation" keywords for search engine advertising before defendants did so and who could still purchase other relevant keywords).  Other EPG customers secured long-term supply agreements for EPG.  Ranen Decl. ¶ 17.  The balance of the equities does not favor a party who has "only itself to blame for its present predicament."  *Mitsubishi Motors N. Am. Inc. v. Grand Auto., Inc.*, 2018 WL 2012875, at *8 (E.D.N.Y. Apr. 30, 2018); *see also Barefoot Contessa Pantry, LLC v. Aqua*

*Star (USA) Co.*, 2015 WL 845711, at *8 (S.D.N.Y. Feb. 26, 2015) (harm was self-inflicted where plaintiffs "took a calculated risk" and chose to proceed without a license "at their peril").

What is more, plaintiffs' theory seems to be that David Protein and Epogee should be compelled to continue money-losing transactions so plaintiffs can make money, and should be forced to change their business strategies because plaintiffs do not want to have to make any changes of their own.

On top of that, at least one of the plaintiffs is actively engaged in an online campaign to denigrate and bad-mouth David Protein, and to turn consumers against the brand. Plaintiff Lighten Up LLC's founder Blake Sanburg has released multiple negative videos asserting that David Protein is trying to shut down Lighten Up, and is engaged in unlawful conduct. Ranen Decl. ¶ 33. In response, various consumers who follow his posts are echoing the negative comments and saying they will cease buying David bar products. *Id*. ¶ 35. In other words, beyond seeking a court order that puts plaintiffs' business desires ahead of defendants' right to operate their business profitably and efficiently, Lighten Up is seeking to inflict additional harm on David Protein through consumer channels.

The balance of equities favors David Protein and Epogee, not Plaintiffs.

### D. A Temporary Restraining Order Would Harm the Public Interest

The public interest is also better served by denying plaintiffs' motion. As an initial matter, because plaintiffs cannot demonstrate a likelihood that they will succeed on any of their claims, "[i]t therefore necessarily follows that the claims do not support a finding that the public interest weighs in favor of granting the injunction." *Parler LLC v. Amazon Web Servs., Inc.*, 514 F. Supp. 3d 1261, 1270 (W.D. Wash. 2021).

Moreover, the public interest strongly favors protecting the rights of patent holders like defendants. *See EZ-Ink, Inc. v. Brother Indus., Ltd.*, 2021 WL 7909312, at *12 (E.D. Va. Dec. 9,

2021) (citing the "strong public interest in preserving the rights of patent holders" in support of its decision to deny the plaintiffs' motion for a preliminary injunction).  Any other conclusion would fly in the face of the Patent Act's declaration that refusal to license is not misuse and would disincentivize the labor, time, and money inventors invest into their products.  *See* 35 U.S.C. §271(d).

Finally, ordering Defendants to fulfill one-off orders at the whims of smaller customers like plaintiffs who lack long-term supply contracts – and therefore have made no corresponding commitment to buy while they insist defendants stand ready to sell – would damage Epogee's business and ultimately harm competition and innovation in the food industry.  Ranen Decl. ¶¶ 21, 28; *see also Retail Imaging Mgmt. Grp., LLC v. Fujifilm N. Am. Corp.*, 841 F. Supp. 2d 1189, 1198 (D. Or. 2012) (public interest did not favor injunctive relief where plaintiffs set forth insufficient evidence that "this is anything more than simply the competitive forces of the marketplace at work").  Conversely, permitting defendants to turn Epogee into a profitable business by leveraging economies of scale will enhance consumer choice as Epogee's customers develop new applications for EPG.  Ranen Decl. ¶¶ 21, 28.  The public interest therefore favors defendants.

# CONCLUSION

For the foregoing reasons, plaintiffs' motion for a temporary restraining order should be denied.

Dated:      June 11, 2025                    Respectfully submitted,

                                             FRIED, FRANK, HARRIS, SHRIVER
                                               & JACOBSON LLP


                                             By:    _/s/ Peter L. Simmons_____
                                             Geoffrey S. Berman
                                             Peter L. Simmons
                                             Samuel Groner
                                             One New York Plaza
                                             New York, New York 10004
                                             (212) 859-8000
                                             geoffrey.berman@friedfrank.com
                                             peter.simmons@friedfrank.com
                                             samuel.groner@friedfrank.com

                                             Kathy O'Neill
                                             801 17th St NW #600
                                             Washington, DC 20006
                                             (202) 639-7000
                                             kathy.oneill@friedfrank.com


                                             *Attorneys for Defendants Linus Technology, Inc.,
                                             Epogee LLC, and Peter Rahal*

## <u>Certification Pursuant to S.D.N.Y. Local Civil Rule 7.1</u>

I, Peter L. Simmons, hereby certify that this document was prepared on a computer using Microsoft Word, and the word count for this memorandum of law is 7,230 words, inclusive of all footnotes, and exclusive of the caption, table of contents, table of authorities, and signature block.

Dated:    June 11, 2025                   _____*/s/ Peter L. Simmons*_____
                                                                   Peter L. Simmons