UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OWN YOUR HUNGER LLC, a Delaware limited liability company, LIGHTEN UP FOODS, a Delaware limited liability company, DEFIANT FOODS LLC, a Utah limited liability company, <br>     *Plaintiffs*, <br><br> v. <br><br> LINUS TECHNOLOGY, INC., EPOGEE LLC, PETER RAHAL <br>     *Defendants* | Case No. 1:25-cv-04544 <br><br> **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

    Plaintiffs OWN Your Hunger LLC, Lighten Up Foods LLC, and Defiant Foods LLC bring this First Amended Complaint against Defendants Linus Technology, Inc., Epogee LLC, and Peter Rahal. Plaintiffs acknowledge this Court's June 17, 2025 decision and order regarding a denied temporary restraining order ("TRO") and have further amended their complaint to address the Court's concerns regarding market definition, patent considerations, and standards for injunctive relief.

**NATURE OF THE ACTION**

1.   This is a civil action for injunctive relief and damages arising under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 7 of the Clayton Act, 15 U.S.C. § 18, and the New York Donnelly Act, N.Y. Gen. Bus. Law § 340.

2.   Defendants have unlawfully monopolized the market for EPG (Esterified Propoxylated Glycerol), a revolutionary fat replacement ingredient that reduces calories from fat by 92% while

maintaining the taste, texture, and mouthfeel of traditional fats - a combination no other ingredient can achieve.

3.  Through a secretive acquisition of Epogee LLC, the sole manufacturer of EPG worldwide, and the immediate termination of supply to all competitors, Defendants have destroyed multiple businesses that invested millions of dollars developing innovative low-calorie food products dependent on EPG as an essential input.

4.  This case presents rare direct evidence of anticompetitive intent, including Defendant Peter Rahal's public admission that Defendants would be "*taking all the supply*" and would "*cease supply*" to competitors and "*CPG sucks - it does. It sucks because of the competition.*"

5.  Plaintiffs provide this First Amended Complaint to address the Original Complaint's deficiencies, highlighted by this Court's June 17, 2025 TRO Decision and Order regarding a denied motion for a TRO which raised concerns regarding market definition, the relevance of EPG's patent protection, and the application of essential facilities doctrine, and to demonstrate why EPG constitutes a properly defined antitrust market under *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ("*Cellophane*") and its progeny.

## JURISDICTION AND VENUE

6.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, which grant district courts jurisdiction over antitrust actions.

7.  This Court has personal jurisdiction over each Defendant because each transacts substantial business in this District, maintains offices in this District, and committed tortious acts within this District.

8.   Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c), because Defendants reside in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

9.   This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal antitrust claims that they form part of the same case or controversy.

## PARTIES

### Plaintiffs

10. OWN Your Hunger LLC is a Delaware limited liability company engaged in manufacturing low-calorie food products using EPG as an essential ingredient, including peanut butter and hazelnut spreads, and dessert squares that leverage various properties of EPG, including its inherent flavor absorbing properties, fat binding properties, and calorie reducing properties.

11. Lighten Up Foods LLC is a Delaware limited liability company engaged in manufacturing using EPG as an essential ingredient to primarily improve the general texture and flavor of its line of sauces, as well as to reduce its calories.

12. Defiant Foods LLC is a Utah limited liability company engaged in manufacturing chocolate food products using EPG as an essential ingredient, primarily using EPG as an essential ingredient to reduce the calories of its products.

### Defendants

13. Linus Technology, Inc. is a Delaware corporation with its principal place of business in New York City, New York.

14. Linus Technology, Inc., may also be known as Linus Technology MergerSub, LLC, operates under the trade name "David Protein" and manufactures protein bars and other food products.

3

15. Epogee LLC ("Epogee") is an Indiana limited liability company and was, until its acquisition by Defendants, the exclusive manufacturer of EPG worldwide.

16. Epogee is now a wholly-owned subsidiary of Defendants.

17. Peter Rahal ("Rahal") is the founder and controlling person of Linus Technology, Inc., and a resident of New York City, New York.

18. Peter Rahal is believed to be the architect of the anticompetitive scheme alleged herein.

19. Plaintiffs reserve the right to amend this complaint to add additional defendants as their identities and roles in the anticompetitive conduct alleged herein become known through discovery and investigation.

## INTERSTATE AND INTERNATIONAL COMMERCE

20. At all relevant times, Defendants manufactured, marketed, distributed, and sold EPG and EPG-containing products in interstate commerce throughout the United States.

21. Prior to Defendant's acquisition of Epogee, both Plaintiffs and Defendants purchased EPG in interstate commerce and sold their products to customers throughout the United States.

22. Defendants also sell their products internationally, including in Canada.

23. Defendants' anticompetitive conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce, including reduced output, increased prices, and diminished innovation in low-calorie food products.

## STATEMENT OF FACTS

### A. EPG is a Revolutionary Ingredient with No Functional Substitutes

24. EPG represents a breakthrough in food science as the only commercially viable fat replacement that achieves a 92% reduction in calories from fat while maintaining the taste, texture, mouthfeel, and functional properties of traditional fats.

25. The development of EPG required 18 years of continuous research and development from 2007 to 2025, and an investment of over $150 million in research, testing, and regulatory approvals - creating insurmountable barriers to entry (Exhibit 1, p.13-14).

26. EPG is manufactured through proprietary fermentation technology and specialized production processes protected by four patents owned by Epogee, making replication by competitors legally and practically impossible (Exhibit 1, p.8-9).

27. EPG has received FDA "Generally Recognized as Safe" (GRAS) certification for use in 14 food categories, enabling its use in a wide variety of food products from baked goods to frozen desserts (Exhibit 1, p.2).

28. The only other low-calorie fat replacement ever developed is Olestra, which has severe limitations that make it non-substitutable for EPG: (a) it is restricted to narrow applications like potato chips and cannot be used in the broad range of 14 categories where EPG excels and has GRAS approval for (Exhibit 1, p.2); (b) it causes significant gastrointestinal distress and vitamin absorption problems that led to its commercial failure (Exhibit 1, p.18); and (c) it is not currently commercially available in the United States market.

29. Epogee, knowing Olestra is the only product customers would consider a potential substitute to EPG, published marketing material listing numerous reasons how "EPG is not another Olestra", that "they are two different technologies that function very differently" (Exhibit 1, p.16), clearly demonstrating that no "effective substitutes for the [product] which do not infringe the patent" (i.e., EPG) exist. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 178 (1965).



**EPG IS NOT ANOTHER OLESTRA.**

They are two different technologies that function very differently.

| EPG | Olestra |
|---|---|
| ✔ Made from fat and functions like fat | ✔ Not a fat - made from sucrose so sugars may have to be added back in to overcome poor mouthfeel and unpleasant taste |
| ✔ 65 safety studies - up to 150 grams ingested per day with no gastrointestinal distress | ✔ Proven gastrointestinal distress caused by consumption levels as low as 10 grams per day |
| ✔ FDA GRAS status across 14 applications (despite Olestra's failure) | ✔ Currently banned in Canada and European Union |
| ✔ Safe to consume does not deplete the body nor block the absorption of fat-soluble vitamins | ✔ Inhibits the absorption and depletes the body of fat-soluble vitamins and nutrients |
| ✔ Is an alternative fat that safely reduces 92 percent of calories & saturated fat from replaced fat | ✔ Fat substitute (not a fat) that claims to reduce 100 percent of calories |
| ✔ Breaks down naturally in environment with no remaining residue | ✔ Does not break down naturally in the environment |

30. Traditional fats and fat substitutes contain approximately 9 calories per gram and cannot enable manufacturers to make "low-calorie" claims under FDA regulations, which require products labeled as "low-calorie" to contain no more than 40 calories per serving (21 C.F.R. § 101.60(b)(2)).

31. EPG contains only 0.7 calories per gram, uniquely enabling food manufacturers to create genuinely low-calorie versions of traditionally high-fat foods while maintaining consumer-acceptable taste, texture, and no gastrointestinal distress with large quantities consumed - a commercial impossibility with any other ingredient including Olestra (Exhibit 1, p.16).

32. Epogee's former CEO confirmed EPG's unique position, stating he was not "aware of any other technology that has better effectiveness, versatility and safety" than EPG (Exhibit 1, p.19), and industry publications recognize EPG as "the one and only solid alternative fat that can safely and 'dramatically' lower calories." (Exhibit 1, p.21).

33. Industry behavior confirms EPG's unique market position: despite EPG commanding a price premium of 300% over the average cost of traditional fats ($6/lb vs. $2/lb), demand remained inelastic, with no customer switching to alternatives even during Epogee's 2021 price increase.

34. EPG contains numerous other functional properties to enhance the characteristics of foods. Although many customers use EPG as its traditional fat replacement utility to lower calories in foods, EPG provides numerous other functional benefits, such as a medium to absorb and evenly distribute flavors, and a binding agent that holds ingredients together while providing optimal texture.

**B. Market Structure Before the Acquisition**

35. Prior to the May 2025 acquisition, Epogee LLC was the sole manufacturer of EPG worldwide, holding all patents and proprietary knowledge necessary for EPG production.

36. Defendant Linus Technology, operating under the trade name "David Protein," become Epogee's dominant customer sometime within 2024, purchasing approximately 90% of Epogee's total EPG production capacity for use in its protein bars (Exhibit 6, p.3).

37. All other EPG customers combined, including Plaintiffs and at least five other food manufacturers, shared the remaining 10% of Epogee's production capacity through periodic purchase orders.

38. This extreme concentration gave Linus Technology extraordinary leverage as Epogee's dominant customer and created both the opportunity and incentive for exclusionary conduct.

39. Despite already controlling 90% of EPG supply, Defendants sought to eliminate the remaining 10% competitive access to prevent potential competition from innovative EPG-based products and to secure what Rahal called "*a really defensible business with 3 moats.*" (Exhibit 6, p. 7).

**C. Plaintiffs Built Their Businesses Around EPG as an Essential Input**

40. Each Plaintiff built its entire business model around EPG as the "secret sauce" that enabled them to offer unique low-calorie products that maintained the sensory experience of full-calorie alternatives - a commercial proposition impossible with any other ingredient.

41. Plaintiff OWN Your Hunger launched its first products in 2020 with unique EPG-based peanut butter and hazelnut spreads that achieve 50% fewer calories than traditional spreads while maintaining the taste and texture consumers expect, investing over $320,000 in EPG-specific R&D.

42. Plaintiff Lighten Up Foods developed a line of low-calorie sauces using EPG to replace traditional fats, enabling calorie reductions that would violate FDA regulations if attempted with any other ingredient.

43. Plaintiff Defiant Foods created low-calorie chocolate products using EPG to maintain the creamy texture and mouthfeel of traditional chocolate while dramatically reducing calories, a feat impossible with other fat substitutes.

44. Plaintiffs collectively invested over $615,000 in research and development specifically for EPG-based formulations, along with specialized equipment designed for EPG's unique properties, marketing campaigns emphasizing EPG's benefits, and business infrastructure built entirely around EPG as an irreplaceable input.

45. Plaintiffs made these investments in reasonable reliance on Epogee's assurances of continued supply and its active encouragement of innovation using EPG as a platform ingredient.

**D. The Strategic Partnership Between Epogee and OWN Your Hunger**

46. From 2020 through 2024, Epogee maintained a strategic partnership with Plaintiff OWN Your Hunger that went far beyond a typical vendor-customer relationship and created reasonable expectations of continued access.

8

47. Epogee selected OWN Your Hunger's products as showcase examples at industry trade shows, including the Natural Products Expo, demonstrating EPG's commercial viability to potential customers and investors (Exhibit 2, p.19-21).

48. Epogee provided Plaintiffs with extensive technical support, including access to food scientists and objective product analysis, demonstrating that successful EPG implementation required specialized knowledge that only Epogee possessed (Exhibit 3, p.11,21,23).

49. OWN Your Hunger reciprocated by conducting European Union shelf-life testing that was essential for Epogee to help meet EU regulatory requirements and its plans to expand EPG distribution to further countries - assistance that increased Epogee's enterprise value (Exhibit 2, p.19).

50. On February 18, 2021, Epogee issued a press release celebrating this partnership, stating: "We couldn't be more thrilled that EPG is included as a key ingredient in OWN's revolutionary new nut butter spreads. It is exciting to help our innovative customer OWN Your Hunger capture market share." (Exhibit 2, p.3).

51. This collaborative relationship, including the exchange of valuable services and confidential information about formulations and international expansion strategies, created a relationship of trust and interdependence beyond mere commercial transactions.

**E. The Shift from Transparent Business Practices to Deceptive Conduct**

52. Historically, Epogee handled genuine supply constraints in a transparent and commercially reasonable manner that preserved access for all customers while managing legitimate business challenges.

53. In late 2021, when facing actual raw material cost increases, Epogee implemented modest price increases of 10-15% and required customers not to exceed 110% of historical order sizes for a

one-year period, while maintaining open communication with all customers about the genuine nature of these constraints (Exhibit 4, p.4).

54. On September 30, 2024, just six months before the alleged shortage, Epogee announced that supply chain efficiencies had allowed it to reduce EPG prices by 5% and expressed hopes for further price reductions in 2025 (Exhibit 4, p.5).

55. This September 2024 announcement induced Plaintiffs and other manufacturers to continue investing in EPG-dependent products, launching new SKUs, and expanding production capacity based on representations of improving supply and pricing conditions.

56. The stark contrast between Epogee's transparent handling of genuine 2021 constraints and its deceptive conduct in 2025 demonstrates that the March 2025 "shortage" was a pretext for monopolistic exclusion rather than a legitimate supply issue.

**F. The Secret Acquisition and Coordinated Supply Restrictions**

57. In February 2025, Defendants began secret negotiations for Linus Technology to acquire Epogee, deliberately concealing these negotiations from other EPG customers to prevent competitive bidding or alternative arrangements.

58. On March 25, 2025, while acquisition negotiations were ongoing, Epogee suddenly announced that EPG was unavailable due to "raw material lead times," (Exhibit 4, p.8), while providing only vague estimates of "2-3 months" to when EPG supply would be restored without any specific explanation of which raw materials were affected.

59. This claimed shortage was immediately suspicious, occurring just six months after Epogee's announcement of improving supply conditions and price reductions due to improved supply chain efficiencies (Exhibit 4, p.5), with no intervening force majeure events, natural disasters, or supplier bankruptcies that could explain such a dramatic reversal.

60. While Plaintiffs struggled with the alleged shortage and made desperate attempts to find alternatives, Defendants continued negotiating the acquisition in secret, using the artificial supply restriction to depress Epogee's value and mask their anticompetitive intent.

61. On May 9, 2025, Linus Technology completed its acquisition of Epogee for $75 million, obtaining complete control over the worldwide EPG supply and all related patents and trade secrets.

62. The conspiracy between Linus Technology and Epogee began no later than February 2025, when arm's-length acquisition negotiations commenced, as evidenced by: (a) Epogee's immediate shift from transparent business practices to deceptive conduct; (b) the synchronized timing of negotiations and supply restrictions; (c) the mutual benefit to both parties - Linus Technology gained monopoly control while Epogee's owners maximized sale price by eliminating competitive bidders; and (d) the coordinated concealment lasting through acquisition closing.

63. This pre-merger coordination between horizontal competitors for EPG supply violates *Copperweld Corp. v. Independent Tube Corp.*, 467 U.S. 752, 777 (1984), which explicitly preserves antitrust scrutiny of conduct during "the acquisition of control."

64. The timing and pattern of communications between Linus Technology and Epogee during the February-May 2025 period demonstrates coordinated action: (a) Epogee's supply restriction announcement came within 48 hours of Linus Technology's initial acquisition offer; (b) both parties used identical language about "raw material constraints" despite no apparent actual supply issues; and (c) internal emails produced in discovery are expected to show direct coordination of the supply restriction strategy.

65. Epogee did not have to sell itself to Defendants and could have been acquired by any other company that would agree to continue to supply EPG to its existing customers. Instead, these "two legally distinct economic entities" agreed to a "conscious commitment to a common scheme

designed to achieve an unlawful objective". *Caruso Mgmt. Co. v. Bd. of Managers of French Oaks Condo.,* 403 F. Supp. 3d 193, 201 (S.D.N.Y. 2019).

**G. The Cover-Up and Announcement of Total Exclusion**

66. On May 27, 2025, the industry website nosh.com published an article revealing the acquisition (Exhibit 5, p.1), but it was immediately suppressed, causing it to display an "Article Not Found" error within hours of publication (Exhibit 5, p.2).

67. Even after the news briefly leaked, Epogee continued misleading customers for two additional days, refusing to confirm the acquisition despite direct inquiries from customers who had seen the article and demanded transparency about their submitted orders (Exhibit 4, p.10).

68. On May 29, 2025, after ensuring complete control and preventing any competitive responses, Defendants announced they would "cease supply" to all competitors. All Plaintiffs received similar letters indicating they would no longer be able to submit new purchase orders for EPG going forward (Exhibit 4, p. 13).

69. Plaintiffs believe, based on analysis of manufacture and expiration dates listed on containers that EPG is shipped in, that Epogee produces EPG in campaign cycles that repeat every 24 months, representing the same "supply" available for the following 24 months commencing sometime between March and May 2025 (Decl. Safai ¶ 14).

70. This hoarding of 24 months of EPG supply is double the one-year shelf life of Defendants' products and far exceeds any legitimate business need, serving only to ensure competitors cannot access EPG.

**H. Direct Evidence of Anticompetitive Intent**

71. In public interviews with snaxshot.com and TBPN, Defendant Peter Rahal made extraordinary admissions that provide direct evidence of anticompetitive intent.

72. When asked by a reporter what Defendants would do with the entire EPG supply, Rahal stated unequivocally: "*We will be taking all the supply.*" (Exhibit 6, p.7).

73. When specifically asked about existing brands that use EPG to compete in low-calorie markets, Rahal responded with remarkable clarity: "*Given supply situation, cease supply.*" (Exhibit 7).

74. Rahal explained his anticompetitive motive with unprecedented candor in a taped and broadcasted interview: "*CPG sucks - it does. It sucks because of the competition.*" (Exhibit 6, p.7).

75. Rahal described how the acquisition would prevent future competition through exclusionary "moats": "*We have a really defensible business with 3 moats... in three years we're not going to have 10 copy cats, they'll try on protein, but it won't be there in calories.*" (Exhibit 6, p.7).

76. While claiming Epogee would operate "*at arm's length,*" Rahal immediately contradicted himself by stating "*we need it to be serving David as a customer,*" revealing that any claimed independence was pretextual (Exhibit 6, p.3).

**I. The Deceptive "11 Customers" Representation to the Court**

77. In opposing Plaintiffs' motion for a temporary restraining order, Defendants submitted the Declaration of Zachary Ranen (Ranen Decl.), co-founder and president of Linus Technology, made under penalty of perjury.

78. Ranen declared that Defendants "*proactively contacted 11 then-active Epogee customers to confirm that we intended to continue fulfilling their orders*" and that "*10 had prospects of meaningful volume consistent with the business's new focus on achieving production scale and financial sustainability.*" (Ranen Decl. ¶ 22).

79. Plaintiffs allege that this representation is materially misleading through calculated omission, as every single of the ten existing customers that plaintiffs contacted via email or on the phone,

including two of the longest running and largest purchasers of EPG still in business received nearly identical notices: "*While we will fulfill all confirmed purchase orders, we won't be able to accept new orders going forward*." (Exhibit 4, p.13). Not one company contacted by plaintiffs received a deviation of this message or was proactively contacted regarding ongoing supply availability.

80. Plaintiffs therefore believe "fulfillment" Ranen referenced was only for final pending orders before permanent termination, not the ongoing supply relationships his carefully crafted language was designed to imply to this Court.

81. Ranen further claimed Defendants would "*target customers capable of committing to large volumes*" and are "*selling to larger customers who can meaningfully expand the use of EPG over time*" (Ranen Decl. ¶ 21) while concealing that Epogee's largest non-affiliated customers received the same termination notice as smaller customers.

82. Therefore, upon information and belief, Plaintiffs allege that even Epogee's largest non-affiliated customers (i.e., the same "*target customers capable of committing to large volumes*") received the same termination notices as smaller customers, confirming that the supply cutoff was not limited to low-volume accounts. One potential major customer, known to be releasing a competing EPG-based protein bar with a large EPG order volume forecast, has attested to this fact by the equivalent of a signed declaration (Exhibit 4, p.14).

83. Plaintiffs allege that the Ranen declaration created a narrative for this Court that only smaller customers like Plaintiffs were excluded for legitimate commercial reasons when in fact all non-affiliated customers - regardless of size, purchase history, or volume potential - were cut off in the same way.

84. Ranen's declaration also suggests that "*we have run out of stock of two of our most popular flavors of David bars. That is why our own website regrettably shows some flavors out of stock*"

(Ranen Decl. ¶ 24) when in fact other online sales channels reveal those same two popular flavors (namely, "Red Velvet" and "Cinnamon Roll") were available at the time of the declaration and remain available for purchase (Exhibit 8, p. 5-7).

85. The flavors Ranen claims are unavailable on their website due to EPG shortages are new or special edition releases that routinely sell out from marketing-driven demand (Exhibit 8, p. 4).

**J. The Anti-Competitive Effects and Consumer Harm**

86. Defendants' monopolization has already produced substantial anticompetitive effects in the market, validating the economic theory that monopolists restrict output and raise prices.

87. David Protein currently sells protein bars, a product made possible through the global supply of EPG, at prices 30% higher than similar interchangeable products compared to the same interchangeable products referenced in Ranen Decl. ¶ 13, extracting monopoly rents from consumers who have no alternative source for low-calorie protein bars with EPG's unique properties.

88. Several known food manufacturers that depend on EPG and operate as third parties have announced plans to close or have already shut down operations for those EPG-dependent products, representing a substantial reduction in innovation and consumer choice in low-calorie foods.

89. The elimination of EPG access has forced manufacturers to either: (a) exit the EPG-enabled market segment entirely; (b) reformulate to enter an **entirely different** market; or (c) cease operations altogether.

90. Consumers have lost access to innovative products that were only possible with EPG, including Plaintiffs' unique spreads, sauces, and chocolates that make use of the various unique properties provided by EPG (not just calorie reduction) that cannot be replicated with any other substitute.

15

**K. Immediate and Ongoing Irreparable Harm to Plaintiffs**

91. Since March 25, 2025, Plaintiffs have suffered catastrophic business disruption that cannot be remedied by monetary damages and threatens their continued existence.

92. Plaintiffs have collectively suffered over $449,000 in sunk research and development investments specific to EPG-based products that cannot be recovered or repurposed for products using other ingredients.

93. Plaintiffs have lost over $107,000 in confirmed sales due to inability to fulfill customer orders, with these losses compounding daily as customers switch to competitors' full-calorie products.

94. Plaintiffs have been forced to write off over $85,000 in specialized inventory, including packaging that prominently features EPG-based calorie claims that would be illegal if used with any other ingredient.

95. Plaintiffs suffer ongoing operational losses exceeding $15,000 per month from idle manufacturing capacity, lease obligations, and fixed costs without corresponding revenue to support operations.

96. Plaintiffs have been forced to terminate multiple employees, including specialized personnel trained in EPG-based formulations and quality control procedures specific to EPG's unique properties.

97. Plaintiff OWN Your Hunger has breached binding delivery commitments to major retail customers due to EPG unavailability, causing irreparable reputational harm and triggering penalty clauses that compound its damages.

98. The destruction of customer relationships built over years, loss of first-mover advantage in EPG innovation, and forced revelation of confidential formulations while attempting to find alternatives constitute irreparable harm beyond monetary calculation.

### RELEVANT MARKET DEFINITION

99. The relevant product market for analyzing Defendants' anticompetitive conduct is "the global market for EPG supply" (esterified propoxylated glycerol), a unique fat replacement ingredient that enables the manufacture of low-calorie foods maintaining full sensory properties.

100.    The relevant geographic market is worldwide, as Epogee is the sole manufacturer of EPG globally, EPG as a commercial input ingredient is distributed internationally without geographic limitations, and Defendants' monopolization affects all EPG users regardless of location. Defendants are known to sell their EPG-based products in at least the United States and in Canada.

101.    To clarify an important distinction, the market definition is not limited to Plaintiff's protein bars, nor is it limited to the "low-calorie foods market", but rather an input market (EPG supply) distinct from any downstream output markets that enables development of broad food categories.

102.    The categories of foods developed with EPG are broad, consisting of foods ranging from nut butters, sauces, and chocolates (i.e., foods developed by Plaintiffs), to cookies, brownies, ice creams, and protein bars (i.e. foods already developed or have trademark applications filed by Defendants) (Exhibit 9, p.1-3).

103.    Although Plaintiffs incorrectly shifted the relevant market from "United States market for EPG supply" in their original complaint (Compl. ¶ 85) to "low-calorie indulgence foods" during oral arguments in the motion for TRO hearing, Plaintiffs respectfully request the Court to accept through

this First Amended Complaint that the relevant market is not to be deviated from being defined as anything other than "the global market for EPG supply" as an input market.

**A. The Applicable Legal Framework Under *Cellophane* and Its Progeny**

104.    This Court's June 17, 2025 TRO Denial Order correctly noted that under *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956) ("*Cellophane*"), products are in the same relevant market when they are "reasonably interchangeable by consumers for the same purposes."

105.    The Court in *Cellophane* emphasized that market definition must focus on "the availability of alternative materials which possess the desired characteristics" for the intended commercial use. *Id.* at 395.

106.    Critically, *Cellophane* requires examining cross-elasticity of demand - whether "consumers would respond to a slight increase in the price of one product by switching to another product." *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024).

107.    This case is distinguishable from *Cellophane* because while cellophane competed with other flexible wrapping materials that could all successfully wrap products (waxed paper, aluminum foil, etc.), no alternative to EPG can perform its essential function of enabling FDA-compliant low-calorie claims across 14 food categories (Exhibit 1, p.2) while maintaining palatability, maintaining the body's absorption levels of fat soluble vitamins, and eliminating gastrointestinal distress with higher quantities (Exhibit 1, p.16).

**B. EPG Has No Reasonably Interchangeable Substitutes**

108.    No ingredient is reasonably interchangeable with EPG for the various functionality EPG provides as required by *Cellophane* and *Regeneron*.

109.    EPG is the only alternative fat that is made from fat and functions like fat, unlike other substances that require sugars to be added back to overcome poor mouthfeel and unpleasant taste (Exhibit 1, p.16).

110.    EPG is the only alternative fat that allows up to 150 grams to be ingested per day with no gastrointestinal distress (Exhibit 1, p.16).

111.    EPG is the only alternative fat that does not deplete the body nor block the absorption of fat-soluble vitamins (Exhibit 1, p.16).

112.    EPG, upon information and belief, is the only alternative fat that is known to be manufactured and distributed in the present market.

113.    EPG is the only fat replacement that achieves 92% calorie reduction while maintaining taste, texture, and mouthfeel - a combination confirmed as unique by Epogee's own marketing statements and executive declarations (Exhibit 1, p.17-19).

114.    EPG is the only fat replacement that has FDA GRAS (Generally Recognized As Safe) approval in a broad range of 14 food categories (Exhibit 1, p.2). No other known fat replacement has approval for this range of food categories (Exhibit 1, p.27-52).

115.    Considering just the low-calorie attribute of EPG, substituting traditional fats (at 9 calories per gram) for EPG (at 0.7 calories per gram) would force manufacturers to abandon their entire business model of producing low-calorie foods, as they could no longer make "low-calorie" claims under FDA regulations (21 C.F.R. § 101.60).

116.    This is analogous to claiming water could substitute for gasoline in combustion engines - while both are liquids sold at similar retail locations, one cannot perform the essential function required for the commercial purpose.

117.    The cross-elasticity of demand between EPG and other fats is zero - when Epogee raised EPG prices by 15% in 2021 (Exhibit 4, p.4), not a single customer known to Plaintiffs switched to alternatives because doing so would require exiting the EPG market entirely.

118.    Defendants' own economic behavior confirms zero cross-elasticity: in 2025, when facing the choice between (a) purchasing more of readily available traditional fats averaging $2 per pound or (b) paying millions to acquire Epogee for exclusive EPG access at approximately $6 per pound, Defendants chose the dramatically more expensive option (i.e., at triple the cost of traditional fats) - behavior that is economically irrational unless no substitution is possible.

119.    Ranen's Declaration provides substantial evidence that despite an extensive list of conventional fat options are available for its protein bars ("*e.g., nut butters, palm oil, palm kernel oil, canola oil*", etc.) (Ranen Decl. ¶ 12-15), Defendants still decided to restrain trade to the relevant product market consisting of the global supply of EPG.

120.    Under the hypothetical monopolist test from the DOJ/FTC Horizontal Merger Guidelines, a profit-maximizing monopolist of EPG could profitably impose at least a 5-10% price increase because no manufacturer would switch to alternatives that require exiting the low-calorie market entirely.

121.    This Court, in its June 17, 2025 TRO Decision and Order, noted that a non-party ice cream company (Nick's) reformulated away from EPG, but this actually proves Plaintiffs' market definition: Nick's was forced to either abandon its unique "lower-calorie yet still creamy" (i.e., a lower-calorie product that still retains high-calorie and fat-like properties) claim enabled only by the global supply of EPG, or reposition as a premium product with higher calories that instead claimed the benefit no added sugar, demonstrating that "reformulation" means market exit, not substitution. Nick's ultimately chose the latter category, effectively abandoning the "lower-calorie yet still

creamy" nature its ice cream was once known for, an attribute made possible only through the global supply of EPG.

122.    All other non-party customers excluded from the supply of EPG share the same fate as Nick's - they must either entirely exit the distinct market made possible by the supply of EPG, or attempt to reposition themselves with drastically different attributes with a high risk of failure.

123.    The Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451 (1992), confirms that monopoly power can exist in a distinct input market where customers are "locked in" to a unique product with no functional substitutes, even if competition exists in broader markets. Unlike *Cellophane*, where substitutes existed at monopoly pricing, EPG's patented, FDA-approved properties render it irreplaceable for low-calorie innovation. Defendants' conduct mirrors *Kodak*: by controlling EPG (an essential input) and abruptly terminating access, they foreclosed competition in a market defined by zero cross-elasticity of demand, as reformulation requires market exit, not substitution.

124.    Economic analysis of the EPG market demonstrates that "reformulation" is not substitution but market exit: (a) every known attempt to reformulate away from EPG has resulted in products that cannot make low-calorie claims; (b) the cost of reformulation typically exceeds $50,000 with no guarantee of success; and (c) consumer acceptance of reformulated products drops substantially for products that build their brand around the low-calorie aspect.

**C. Patent Rights Define, But Do Not Immunize, the Market**

125.    Responding to this Court's June 17, 2025 concern about EPG being patented, Plaintiffs acknowledge that under *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 178 (1965), the relevant inquiry is whether there are "effective substitutes for the [product] which do not infringe the patent."

126.    Here, no non-infringing alternatives can achieve 92% calorie reduction because EPG's unique molecular structure and manufacturing process - which enables its function - are protected by numerous patents that prevent any workaround.

127.    No non-infringing alternatives can achieve the remaining properties of EPG, not even the only other possible comparable product in "EPG is not another Olestra" (Exhibit 1, p.16).

128.    While patent rights can define market boundaries, the Supreme Court has repeatedly held that lawfully obtained patents do not confer immunity from antitrust liability when used to illegally monopolize markets through exclusionary conduct. *FTC v. Actavis, Inc.*, 570 U.S. 136, 147 (2013).

129.    Defendants' conduct goes far beyond any legitimate exercise of patent rights: (a) they acquired a company that was already willingly licensing the technology through product sales; (b) they induced additional investments by customers through deceptive practices; (c) they discriminated among customers without any patent-related justification; and (d) they actively deceived both customers and this Court about their intentions. This pattern of deception and discrimination finds no protection in patent law.

130.    The Federal Circuit has consistently held that "patent rights do not confer a privilege to violate the antitrust laws." See *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1325 (Fed. Cir. 2000). Here, Defendants used the acquisition not to protect patent rights but to eliminate competition through exclusionary conduct that would be illegal regardless of any patents.

131.    Here, Defendants are not exercising patent rights through refusal to license - they acquired a company that had already licensed the technology through product sales, induced reliance, then cut off access to Plaintiffs. This conduct falls outside any patent rights protection. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 479-80 (1992) (patent rights do not immunize anticompetitive conduct in related markets).

132.    Defendants did not merely exercise patent rights through refusal to license - they acquired a patent-holding company after encouraging industry reliance, then used discriminatory conduct to monopolize, going far beyond legitimate patent exploitation.

**D. Defendants' Own Conduct Proves EPG is a Distinct Market**

133.    Under *Cellophane*'s framework, Defendants' conduct provides powerful evidence of market definition: just as "du Pont would not have paid a monopoly price for cellophane-producing assets if close substitutes existed," Defendants would not have paid $75 million for EPG control, hoarded two years of supply, and excluded all competitors if traditional fats were reasonable substitutes.

134.    Defendants' willingness to forego profits from selling to other manufacturers - who collectively represented profitable customers - demonstrates that controlling 100% of EPG was more valuable than those profits, which only makes economic sense if EPG lacks substitutes.

135.    The 30% price premium David Protein bars feature (Exhibit 8, p.2) compared to interchangeable products following the acquisition demonstrates the pricing power that flows from monopoly control, confirming EPG as a distinct market under the hypothetical monopolist test.

136.    Any claimed efficiency justification fails because: (a) excluding all competitors while maintaining discriminatory access to select customers demonstrates the acquisition's purpose was exclusion, not efficiency and (b) Epogee was already operating efficiently with multiple customers as shown by its September 2024 price reduction.

**E. High Barriers to Entry and Essential Facilities Considerations**

137.    The 18-year development period and $150 million investment required to create EPG constitute insurmountable barriers to entry that both define and protect the relevant market from potential competition.

138.    Patent protection through 2035 prevents any competitor from developing alternative processes to manufacture EPG or similar calorie-reducing fat replacements, creating legal barriers that reinforce the natural barriers.

139.    FDA regulatory requirements for GRAS certification across multiple food categories create additional barriers requiring years of testing and millions in investment that no rational competitor would undertake for a market already monopolized.

140.    EPG satisfies all four elements of the essential facilities doctrine as articulated in *MCI Communications Corp. v. AT&T*, 708 F.2d 1081, 1132-33 (7th Cir. 1983): (1) control of the essential facility by a monopolist; (2) competitor's inability to practically or reasonably duplicate the essential facility; (3) denial of use of the facility to a competitor; and (4) feasibility of providing the facility.

141.    While the Supreme Court noted in *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004) that it has "never recognized" the essential facilities doctrine, the Second Circuit has not categorically rejected it and continues to consider its application in appropriate circumstances. *See Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir. 1990) (analyzing essential facilities claim); *see also Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 150 (4th Cir. 1990) (post-*Aspen Skiing* courts continue to recognize doctrine for facilities that cannot be reasonably duplicated). Here, unlike in *Trinko* where regulatory requirements provided alternative access mechanisms, no regulatory scheme exists to ensure EPG access, and no functional alternatives exist.

142.    This case is distinguishable from *Trinko* in critical ways: (a) no regulatory regime exists to ensure EPG access; (b) Defendants created the monopoly through acquisition rather than internal development; (c) Defendants previously provided access then withdrew it to harm competitors; and (d) the facility at issue is a physical input, not a network or service. As the Second Circuit

recognized in *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007), termination of a prior profitable course of dealing can support antitrust liability where it reveals anticompetitive intent. Here, Defendants' abrupt cessation of EPG supply to established customers following their acquisition demonstrates exclusionary conduct beyond any legitimate business justification.

143.    EPG is controlled by Defendants as monopolists (100% ownership), competitors cannot practically duplicate it (18 years and $150 million investment plus patent barriers), Defendants have denied access (Rahal admitting "*cease supply*"), and providing access is feasible (demonstrated by 5+ years of prior distribution to multiple customers).

**F. The Input Market Nature of This Case**

144.    This Court correctly noted in its June 17, 2025 TRO Decision and Order that Plaintiffs' products (sauces, spreads, chocolates) are not reasonably interchangeable with Defendants' protein bars from a consumer perspective.

145.    However, to re-iterate the crucial distinction, this case involves monopolization of an input market (global EPG supply) distinct from any downstream output markets, and Plaintiffs need not compete with Defendants' finished products (e.g., protein bars) for antitrust injury to occur through input foreclosure. *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945).

146.    All manufacturers of foods - whether bars, spreads, sauces, ice creams or chocolates, seeking any of the specific functional benefits that EPG provides, compete for access to the limited supply of EPG, creating direct horizontal competition in the upstream input market regardless of downstream product differentiation.

147.    Defendants' own trademark applications (Exhibit 9, p. 1-4). demonstrate their intent to expand into ice cream, brownies, chips, cookies, and spreads using EPG, confirming that control of this essential input provides platform power across multiple downstream markets.

## INTERSTATE AND INTERNATIONAL COMMERCE

148.    Defendants' monopolization of EPG substantially affects interstate and international commerce, as EPG is shipped across state lines to food manufacturers throughout the United States and exported to international customers.

149.    The elimination of competitive access to EPG has reduced output of the distinct market that was once enabled through the non-exclusive access to the global supply for EPG, reduced food product options sold in interstate commerce, raised prices to consumers, and eliminated innovation that would have occurred but for Defendants' anticompetitive conduct.

## DAMAGES

150.    Plaintiffs seek the following categories of compensable damages based on reasonable estimates, subject to statutory trebling:

151.    Lost research and development investments: $615,000 or more

152.    Lost revenue from March 25, 2025 to July 1, 2025: $254,000 (and continuing)

153.    Total lost revenue from July 1, 2025: To be proven at trial

154.    Inventory write-offs: $85,000 or more

155.    Total incurred expenses due to idle leases and other fixed costs: To be proven at trial

156.    Lost enterprise value from business destruction: To be proven at trial

157.    Lost customer relationships and goodwill: To be proven at trial

158.    These damages are not speculative but flow directly from Defendants' anticompetitive

conduct, as Plaintiffs' businesses cannot exist without EPG access they were led to rely on, making

causation direct and damages calculable.

## ANTITRUST INJURY

159.    Plaintiffs have suffered antitrust injury of the type antitrust laws were intended to

prevent, including exclusion from the market for an essential input, inability to compete in their

chosen market segment, and destruction of investments made in reliance on competitive market

conditions.

160.    Plaintiffs' injuries flow directly from Defendants' anticompetitive conduct and would not

have occurred in a competitive market where multiple suppliers existed, or access was provided on

non-discriminatory terms.

161.    The causal link between Defendants' conduct and Plaintiffs' injuries is direct and

undeniable: but for Defendants' exclusionary acquisition and supply termination, Plaintiffs would be

operating profitably, expanding their product lines, and serving growing customer demand. No

intervening factors or market conditions contributed to Plaintiffs' harm - it flows solely from

Defendants' anticompetitive conduct.

## CAUSES OF ACTION

## COUNT I - VIOLATION OF SHERMAN ACT § 1

## (Conspiracy in Restraint of Trade - 15 U.S.C. § 1)

162.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

163.    Beginning in early 2025, while Linus Technology and Epogee were still independent

entities negotiating at arm's length, Defendants entered into an agreement, understanding, and

conspiracy to restrain trade in the market for EPG.

164.    The conspiracy is evidenced by: (a) the synchronized timing between the commencement of acquisition negotiations and the sudden announcement of EPG "shortages"; (b) the coordinated concealment of the acquisition from customers and competitors; (c) the immediate implementation of exclusionary policies upon closing; and (d) the material misrepresentations made to customers during the conspiracy period.

165.    This horizontal agreement between competitors for EPG supply (Linus Technology purchased 90% while others purchased 10%) to divide the market and exclude rivals constitutes a per se violation of Section 1 of the Sherman Act.

166.    Alternatively, under the rule of reason analysis required by *Fed. Trade Comm'n v. Shkreli*, 581 F. Supp. 3d 579, 624 (S.D.N.Y. 2022), the agreement imposed an unreasonable restraint of trade by eliminating all competitive access to an essential input with no procompetitive justifications.

167.    The agreement's anticompetitive effects include: elimination of all non-Defendant access to EPG; reduction in output of low-calorie foods; increase in prices for remaining EPG-based products; and destruction of innovation in the low-calorie food sector.

168.    As a direct and proximate result of this conspiracy, Plaintiffs have suffered antitrust injury in their business and property, including but not limited to lost investments, lost profits, and destruction of business value.

## COUNT II - VIOLATION OF SHERMAN ACT § 2

## (Monopolization - 15 U.S.C. § 2)

169.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

170.    As required by *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966), Defendants possess monopoly power in the relevant market, controlling 100% of the worldwide EPG supply (i.e., the relevant market) through their acquisition and control of Epogee.

171.    Defendants willfully acquired this monopoly power through exclusionary and anticompetitive conduct rather than through "growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.*

172.    Defendants' exclusionary conduct includes: (a) acquiring the sole EPG manufacturer while already controlling 90% of supply as the dominant customer; (b) immediately cutting off all competitors upon acquisition; (c) hoarding two years of inventory to prevent any competitor access even in the future; (d) deceiving customers about supply availability during the acquisition; and (e) discriminating between customers without legitimate business justification.

173.    Peter Rahal's admission that "*CPG sucks because of the competition*" provides direct evidence of anticompetitive intent that satisfies the willfulness requirement of Section 2.

174.    Defendants cannot claim protection under patent rights because they are not merely refusing to license patents but are engaging in deceptive and exclusionary conduct while acquiring and maintaining monopoly power. *Walker Process*, 382 U.S. at 177.

175.    As a direct and proximate result of Defendants' monopolization, Plaintiffs have suffered antitrust injury in their business and property.

## COUNT III - VIOLATION OF CLAYTON ACT § 7

### (Illegal Acquisition - 15 U.S.C. § 18)

176.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

177.    Defendant's acquisition of Epogee constitutes an acquisition of assets within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

178.    As required by Section 7, "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly" in the market for EPG.

179.    Pre-acquisition, Defendants already controlled 90% of EPG supply as Epogee's dominant customer, while all other manufacturers competed for the remaining 10% - a market structure that made competitive harm from the acquisition inevitable.

180.    The acquisition eliminated this remaining competitive fringe, creating 100% monopoly control and foreclosing all competitor access to an essential input required for participation in low-calorie food markets.

181.    The acquisition was specifically designed to eliminate competition, as evidenced by: (a) Rahal's statement that Defendants would be "*taking all the supply*"; (b) the immediate "*cease supply*" to all competitors; (c) the deceptive conduct during negotiations.

182.    This vertical acquisition by a dominant customer that forecloses all rivals represents the paradigmatic anticompetitive acquisition that Section 7 was designed to prevent. *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 102 (2d Cir. 1998) (Section 7 prohibits vertical acquisitions that "foreclose competition in a substantial share of the relevant market"). Here, the acquisition achieved complete foreclosure - eliminating the only remaining 10% of competitive EPG access and creating absolute monopoly control over an essential input.

183.    As a direct and proximate result of this illegal acquisition, Plaintiffs have suffered antitrust injury in their business and property.

## COUNT IV - VIOLATION OF NEW YORK DONNELLY ACT

### (Monopolization - N.Y. Gen. Bus. Law § 340)

184.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

185.    Defendants' conduct constitutes monopolization in violation of Section 340 of New York's Donnelly Act, which prohibits "[e]very contract, agreement, arrangement or combination... which... [i]s for... monopolizing... trade or commerce." N.Y. Gen. Bus. Law § 340(1).

186.    Through the acquisition and exclusionary conduct described herein, Defendants have established and maintained a monopoly in the market for EPG within the State of New York and affecting New York commerce.

187.    As required by *Altman v. Bayer Corp.*, 125 F. Supp. 2d 666, 672 (S.D.N.Y. 2000), Plaintiffs have: (1) identified the relevant product market (EPG); (2) described the nature and effects of the conspiracy (acquisition and exclusion); (3) alleged how the economic impact restrains trade (elimination of all competitive access); and (4) shown a conspiracy between entities (pre-merger coordination).

188.    Defendants' monopolistic conduct has restrained trade and commerce within New York by eliminating competitive access to an essential ingredient for New York businesses and raising prices for New York consumers.

189.    As a direct and proximate result, Plaintiffs have suffered injury in their business and property and are entitled to treble damages under N.Y. Gen. Bus. Law § 340(5).

## COUNT V - ESSENTIAL FACILITIES DOCTRINE VIOLATION

190.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

191.    EPG constitutes an essential facility under the four-part test established in *MCI Communications Corp. v. AT&T*, 708 F.2d 1081, 1132-33 (7th Cir. 1983), and recognized by courts in this Circuit.

192.    First, EPG is controlled by Defendants as monopolists through their 100% ownership of Epogee and all means of EPG production.

193.    Second, competitors cannot practically or reasonably duplicate EPG given: (a) the 18-year development period and $150 million investment required; (b) patent protection preventing alternative manufacturing methods; (c) proprietary knowledge and trade secrets; and (d) FDA regulatory requirements.

194.    Third, Defendants have denied Plaintiffs and other competitors use of this essential facility, as admitted by Rahal ("*cease supply*") and confirmed by termination notices.

195.    Fourth, providing access to EPG is feasible, as demonstrated by: (a) over 5 years of successful distribution to multiple customers before the acquisition; (b) Epogee's existing production capacity; (c) Defendant's holding of a full 2 year cycle of supply; and (d) the discriminatory provision to select customers.

196.    Defendants have denied access to this essential facility without any legitimate business justification, as denying all competitor access serves no procompetitive purpose.

197.    As a direct and proximate result of this denial of access to an essential facility, Plaintiffs have suffered injury in their business and property.

## COUNT VI - TYING IN VIOLATION OF SHERMAN ACT § 1

## (15 U.S.C. § 1)

198.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

199.    Defendants condition the sale of any products containing EPG (tying product) on the purchaser being Linus Technology itself or its approved affiliates (tied product), effectively tying EPG access to agreement not to compete with David Protein products.

200.    Defendants have sufficient market power in the tying product market (100% control of EPG) to force this arrangement on the market.

201.    The arrangement affects a substantial volume of interstate commerce in both EPG and downstream low-calorie food products.

202.    No legitimate business justification exists for this tying arrangement beyond excluding competition and maintaining monopoly power.

203.    This tying arrangement violates Section 1 of the Sherman Act and has directly and proximately harmed Plaintiffs by foreclosing their access to an essential input.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Adjudge and decree that Defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

B. Adjudge and decree that Defendants have violated Section 7 of the Clayton Act, 15 U.S.C. § 18;

C. Adjudge and decree that Defendants have violated the New York Donnelly Act, N.Y. Gen. Bus. Law § 340;

D. Permanently enjoin Defendants from continuing to exclude Plaintiffs and other historic EPG customers from access to EPG;

E. Order Defendants to provide EPG to Plaintiffs and other historic customers on fair, reasonable, and non-discriminatory (FRAND) terms at prices not exceeding those in effect on January 1, 2025;

F. Order structural relief if necessary to restore competition, including but not limited to divestiture of Epogee or licensing of EPG manufacturing rights;

G. Award Plaintiffs damages in an amount to be proven at trial, automatically trebled pursuant to 15 U.S.C. § 15(a) and N.Y. Gen. Bus. Law § 340(5);

H. Award Plaintiffs their costs of suit, including reasonable attorneys' fees pursuant to 15 U.S.C.

§ 15(a);

I. Award Plaintiffs pre-judgment and post-judgment interest as provided by law;

J. Grant such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.


Respectfully submitted,


Dated: June 20, 2025                     By: */s/ Brittany Meyer-Belnap*
                                         Brittany Meyer-Belnap
                                         1121 14th Street NW #1010
                                         Washington DC 20009
                                         Tel. 202-550-5700
                                         bmeyer@tmdstrategies.com


                                         *Attorney for Plaintiffs*



### CERTIFICATE OF SERVICE

I hereby certify that on June 20, 2025, I electronically filed the foregoing First Amended

Complaint for Violations of Federal and State Antitrust Laws with the Clerk of the Court using

the CM/ECF system, which will send notification of such filing to all counsel of record.


Dated: June 20, 2025                     By: */s/ Brittany Meyer-Belnap*
                                         Brittany Meyer-Belnap
                                         1121 14th Street NW #1010
                                         Washington DC 20009
                                         Tel. 202-550-5700

bmeyer@tmdstrategies.com

*Attorney for Plaintiffs*