UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OWN YOUR HUNGER LLC, a Delaware limited liability company, LIGHTEN UP FOODS, a Delaware limited liability company, DEFIANT FOODS LLC, a Utah limited liability company,<br>*Plaintiffs*,<br><br>v.<br><br>LINUS TECHNOLOGY, INC., EPOGEE LLC, PETER RAHAL<br>*Defendants* | Case No. 1:25-cv-04544-VM<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1
II. NATURE OF THE ACTION ........ 3
III. JURISDICTION AND VENUE ........ 4
IV. PARTIES ........ 4
Plaintiffs ........ 4
Defendants ........ 5
V. INTERSTATE AND INTERNATIONAL COMMERCE ........ 6
VI. INDUSTRY BACKGROUND ........ 7
A. EPG is an Ingredient with No Functional Substitutes ........ 7
B. Market Structure Before the Acquisition ........ 9
C. The Collaborative Development of EPG's Market Value ........ 10
D. The Strategic Partnerships Between Epogee and Its Customers ........ 12
VII. DEFENDANTS' ANTICOMPETITIVE CONDUCT ........ 14
A. The Shift from Transparent Business Practices to Deceptive Conduct ........ 14
B. The Secret Acquisition and Coordinated Supply Restrictions ........ 15
C. The Cover-Up and Total Exclusion ........ 16
D. Defendants' Public Statements Regarding Competition ........ 17
E. Pattern of False Statements and Evidence Destruction ........ 20
F. Systematic Market Entry Following Competitor Termination ........ 25
VIII. ANTICOMPETITIVE EFFECTS ........ 26
A. Market Effects and Consumer Harm ........ 26
B. Nick's Forced Exit from "Swedish-style Light Ice Cream" Market After Losing EPG ........ 29
C. Immediate and Ongoing Irreparable Harm to Plaintiffs ........ 32
IX. DEFENDANTS' OWN DEFINITION OF THE EPG MARKET ........ 33
A. Defendants' Marketing of EPG as a Category-Defining Ingredient ........ 33
B. The Input Market Nature of This Case ........ 36

C. Single-Ingredient Market Definition ............ 36
D. Availability of Reasonably Interchangeable Substitutes ............ 37
E. Industry-Wide Confirmation That EPG Has No Substitutes ............ 39
F. Defendants' Pricing and Distribution Decisions ............ 40
G. Patent Rights Define, But Do Not Immunize, the Market ............ 42
H. High Barriers to Entry and Essential Facilities Considerations ............ 43
X. DAMAGES ............ 44
XI. ANTITRUST INJURY ............ 46
XII. CAUSES OF ACTION ............ 48
COUNT I - VIOLATION OF SHERMAN ACT § 1 ............ 48
COUNT II - VIOLATION OF SHERMAN ACT § 2 ............ 49
COUNT III - VIOLATION OF CLAYTON ACT § 7 ............ 51
COUNT IV - VIOLATION OF NEW YORK DONNELLY ACT ............ 52
XIII. PRAYER FOR RELIEF ............ 54
XIV. JURY DEMAND ............ 55

## I. INTRODUCTION

1. Defendants acquired Epogee LLC, the sole manufacturer of EPG, for $75 million on May 9, 2025. Following the acquisition, Defendants terminated EPG supply to all non-affiliated food manufacturers. On May 29, 2025, Defendant Peter Rahal stated to industry media outlets that Defendants were "*taking all the supply*" because "*CPG sucks because of the competition*".

2. EPG (Esterified Propoxylated Glycerol) achieves 92% fat calorie reduction while maintaining taste, texture, and mouthfeel—a combination unique among fat replacements. EPG contains 0.7 calories per gram compared to 9 calories per gram for conventional fats. FDA regulations require 40 calories or less per serving for "low-calorie" claims. EPG required 18 years of development and $150 million in investment. Food manufacturers use EPG to create low-calorie products that maintain consumer acceptance.

3. For over six years, Epogee supplied EPG to multiple food manufacturers. Plaintiff OWN Your Hunger invested over $320,000 developing EPG-based products. Epogee featured OWN's products in a February 2021 press release describing them as "revolutionary new nut butter spreads." In February 2025, acquisition negotiations began. On March 25, 2025, Defendants announced EPG "shortages." After the May 9, 2025 acquisition closing, Defendants terminated all non-affiliated customers. During this period, Defendants maintained EPG inventory with 24-month shelf life.

4. Since the TRO proceedings, ten terminated EPG customers have submitted declarations stating they tested alternative ingredients but could not find functional substitutes for EPG. These customers paid $6 per pound for EPG compared to $2 per pound for traditional fats. Even when EPG prices increased by 50% in 2022, customers continued purchasing EPG.

Nick's ice cream, which had $160 million in funding, discontinued its "Swedish-style Light Ice Cream" positioning after losing EPG access.

5. Ten declarants confirm they received termination notices stating: "*While we will fulfill all confirmed purchase orders, we won't be able to accept new orders going forward.*" In the Ranen Declaration filed with this Court, Defendants stated they "*intended to continue fulfilling orders*" for customers with "*meaningful volume*." All customers received identical termination notices.

6. On June 4, 2025, two days after this lawsuit was filed, Defendants deleted customer comments from their social media platforms, including: "David protein bars are deleting comments because they're trying to monopolize EPG". Defendants removed content from Epogee's website that described EPG as the 'SECRET INGREDIENT' behind a $160 million ice cream company. On July 7, 2025, within seconds after Defendants' counsel responded to Plaintiffs' inquiries regarding Instagram statements that contradicted the Ranen Declaration, Defendants deleted all 56 posts and hundreds of customer comments and replies from their Instagram account.

7. On July 14, 2025, one week after deleting their Instagram evidence, Defendants launched a new product line selling frozen cod for $55 per 24-ounce package—nearly triple the $18.72 that Whole Foods charges for the same quantity. This product launch occurred six weeks after this litigation commenced and followed Defendants' public statement that boiled cod is their "*closest competitor*" to protein bars. Defendants packaged the frozen cod in protein bar-style branding and marketed it on the same website where they sell David Protein bars.

8. This Second Amended Complaint addresses the Court's June 17, 2025 Order. The relevant market is the global supply of EPG. Defendants acquired Epogee LLC, which had been

supplying EPG to at least 10 confirmed customers, for $75 million when traditional fats cost $2 per pound. Following the acquisition, Defendants terminated supply to all non-affiliated customers while maintaining their own EPG access.

## II. NATURE OF THE ACTION

9. This is a civil action for injunctive relief and damages arising under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 7 of the Clayton Act, 15 U.S.C. § 18, and the New York Donnelly Act, N.Y. Gen. Bus. Law § 340.

10. Defendants acquired control over EPG (Esterified Propoxylated Glycerol), a fat replacement ingredient that reduces calories from fat by 92% while maintaining taste, texture, and mouthfeel. Epogee LLC was the sole manufacturer of EPG worldwide.

11. Defendants acquired Epogee LLC, the sole manufacturer of EPG worldwide, on May 9, 2025 without advance notice to EPG customers. Following the acquisition, Defendants terminated supply to all non-affiliated customers. Multiple businesses that had invested in developing EPG-based low-calorie food products ceased operations or exited their markets.

12. Defendant Peter Rahal stated publicly that Defendants would be "*taking all the supply*" and would "*cease supply*" to competitors because "*CPG sucks - it does. It sucks because of the competition*".

13. Ten terminated EPG customers have provided sworn declarations stating that after testing alternative ingredients, they could not replicate EPG's properties in their products. These businesses manufacture products in categories including sauces, confections, protein bars, and chocolates. Each declarant states they exited their EPG-dependent product markets.

14. EPG sells for $6 per pound compared to $0.60-$2.00 per pound for traditional fats. Ten EPG customers have provided declarations stating they exited their markets or

abandoned product lines after losing EPG access. Defendants marketed EPG as a "category-defining ingredient".

15. During the period when Defendants stated EPG was unavailable due to shortages, David Protein secured a $750 million valuation based on projections of $140 million in first-year revenue.

## III. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, which grant district courts jurisdiction over antitrust actions.

17. This Court has personal jurisdiction over each Defendant because each transacts substantial business in this District and maintains offices in this District. Defendant Linus Technology, Inc. maintains its principal place of business in New York City, New York. Defendant Epogee LLC is now a wholly-owned subsidiary of Linus Technology, Inc. Defendant Peter Rahal resides in New York City, New York. The acquisition at issue was negotiated and executed substantially within this District.

18. Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c), because Defendants reside in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

19. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal antitrust claims that they form part of the same case or controversy.

## IV. PARTIES

**Plaintiffs**

20. OWN Your Hunger LLC ("OWN") is a Delaware limited liability company engaged in manufacturing low-calorie food products using EPG as an ingredient, including peanut butter and hazelnut spreads, and dessert squares that leverage various properties of EPG, including its inherent flavor absorbing properties, fat binding properties, and calorie reducing properties.

21. Lighten Up Foods LLC ("Lighten Up Foods") is a Delaware limited liability company engaged in manufacturing using EPG as an ingredient to primarily improve the general texture and flavor of its line of sauces, as well as to reduce its calories.

22. Defiant Foods LLC ("Defiant Foods") is a Utah limited liability company engaged in manufacturing chocolate food products using EPG as an ingredient, primarily using EPG as an essential ingredient to reduce the calories of its products.

**Defendants**

23. Linus Technology, Inc. ("Linus Technology") is a Delaware corporation with its principal place of business in New York City, New York.

24. Linus Technology, Inc., may also be known as Linus Technology MergerSub, LLC, operates under the trade names David ("David") and/or David Protein ("David Protein") and manufactures protein bars and other food products.

25. Epogee LLC ("Epogee") is an Indiana limited liability company and was, until its acquisition by Defendants, the exclusive manufacturer of EPG worldwide.

26. Epogee is now a wholly-owned subsidiary of Defendants.

27. Peter Rahal ("Rahal") is the founder and controlling person of Linus Technology, Inc., and a resident of New York City, New York.

28. Plaintiffs reserve the right to amend this complaint to add additional defendants as their identities and roles in the anticompetitive conduct alleged herein become known through discovery and investigation.

## V. INTERSTATE AND INTERNATIONAL COMMERCE

29. At all relevant times, Defendants manufactured, marketed, distributed, and sold EPG and EPG-containing products in interstate commerce throughout the United States.

30. Prior to Defendants' acquisition of Epogee, both Plaintiffs and Defendants purchased EPG in interstate commerce and sold their products to customers throughout the United States.

31. Defendants also sell their products internationally, including in Canada.

32. The acquisition of Epogee and subsequent termination of EPG supply to customers located in multiple states affected interstate commerce.

33. EPG is distributed from Shakopee, Minnesota and shipped across state lines to food manufacturers throughout the United States. Prior to the acquisition, Epogee shipped EPG to customers in multiple states. Following the acquisition, interstate shipments to non-affiliated customers ceased.

34. EPG is distributed from Shakopee, Minnesota and shipped across international lines to food manufacturers throughout Canada. Prior to the acquisition, Epogee shipped EPG to Canadian customers. Following the acquisition, shipments to non-affiliated Canadian customers ceased.

35. The termination of EPG supply to all non-affiliated manufacturers eliminated multiple product lines that were previously sold in interstate commerce, including Plaintiffs' spreads, sauces, and chocolates that were distributed to retailers in multiple states.

## VI. INDUSTRY BACKGROUND

### A. EPG is an Ingredient with No Functional Substitutes

36. EPG (Esterified Propoxylated Glycerol) is a fat replacement ingredient that achieves a 92% reduction in calories from fat while maintaining the taste, texture, mouthfeel, and functional properties of traditional fats. EPG contains 0.7 calories per gram compared to 9 calories per gram in traditional fats.

37. The development of EPG required 18 years of continuous research and development from 2007 to 2025, and an investment of over $150 million in research, testing, and regulatory approvals (Exhibit 1, p.13-14).

38. EPG is manufactured through proprietary technology and specialized production processes protected by four patents owned by Epogee (Exhibit 1, p.14, Ranen Decl. ¶ 11). These patents prevent competitors from replicating EPG production.

39. EPG has received FDA "Generally Recognized as Safe" (GRAS) certification for use in 14 food categories, enabling its use in a wide variety of food products from baked goods to frozen desserts (Exhibit 1, p.2).

40. Traditional fats contain approximately 9 calories per gram, making it mathematically impossible to create low-calorie foods that meet FDA requirements. EPG contains only 0.7 calories per gram—a 92% reduction that uniquely enables manufacturers to create genuinely low-calorie products while maintaining full fat content for taste and texture.

41. EPG has been rigorously tested in over 60 studies confirming safety at up to 150 grams daily without adverse effects. Epogee's Chief Technology Officer stated he "*isn't aware of any other technology that has better effectiveness, versatility and safety*" than EPG (Exhibit 1, p.19).

42. Industry publications describe EPG as “the one and only solid alternative fat that can safely and “dramatically” lower calories” (Exhibit 1, p.21).

43. Beyond calorie reduction, EPG provides functional properties essential for food manufacturing including a. flavor absorption and distribution capabilities, b. product stability maintenance, c. proper mouthfeel and melting characteristics, and d. binding properties that maintain texture. No other ingredient provides this combination of 92% fat calorie reduction with these functional properties.

44. When Epogee raised EPG prices 50% in 2022, customers continued purchasing EPG rather than switching to traditional fats (Exhibit 4, p.4-5).

45. Prior to the acquisition, Epogee's Chief Commercial Officer publicly stated: "*While other plant-based fat technologies may have a good mouthfeel, texture, and taste, they do not have the added nutritional benefit of EPG's reduced calorie count. Our technology remains the only one on the market with this unique combination of benefits*" (Exhibit 1, p.34). This executive admission confirms that while other fat technologies exist, none can simultaneously provide EPG's critical 92% fat calorie reduction with acceptable taste and texture.

46. Defendants further marketed EPG by distinguishing it from other ingredients. Defendants' marketing materials displayed a chart titled “EPG IS NOT ANOTHER OLESTRA” stating “They are two different technologies that function very differently” (Exhibit 1, p.16). The chart listed EPG as “Made from fat and functions like fat” with “FDA GRAS status across 14 applications,” while listing Olestra as ”Currently banned in Canada and Europe” and noting it “Inhibits the absorption and depletes the body of fat-soluble vitamins and nutrients”.




They are two different technologies that function very differently.

| EPG | Olestra |
|---|---|
| ✔ Made from fat and functions like fat | ✔ Not a fat - made from sucrose so sugars may have to be added back in to overcome poor mouthfeel and unpleasant taste |
| ✔ 65 safety studies - up to 150 grams ingested per day with no gastrointestinal distress | ✔ Proven gastrointestinal distress caused by consumption levels as low as 10 grams per day |
| ✔ FDA GRAS status across 14 applications (despite Olestra's failure) | ✔ Currently banned in Canada and European Union |
| ✔ Safe to consume does not deplete the body nor block the absorption of fat-soluble vitamins | ✔ Inhibits the absorption and depletes the body of fat-soluble vitamins and nutrients |
| ✔ Is an alternative fat that safely reduces 92 percent of calories & saturated fat from replaced fat | ✔ Fat substitute (not a fat) that claims to reduce 100 percent of calories |
| ✔ Breaks down naturally in environment with no remaining residue | ✔ Does not break down naturally in the environment |

*Figure 1. Defendants' Marketing Material for EPG.*

47. EPG required 18 years of development and $150 million in investment. A competitor starting development today would not have a product until 2043. Patents protecting EPG production extend through 2035. No competitor has announced development of a similar fat replacement ingredient.

48. By 2020, EPG had achieved FDA GRAS approval in 14 food categories, patent protection through 2035, and commercial production by Epogee. Multiple food manufacturers began incorporating EPG into their products.

**B. Market Structure Before the Acquisition**

49. Prior to the May 2025 acquisition, Epogee LLC was the sole manufacturer of EPG worldwide, holding all patents and proprietary knowledge necessary for EPG production.

50. Defendant Linus Technology, operating under the trade name "David Protein," became Epogee's dominant customer sometime within 2024, purchasing approximately 90% of Epogee's total EPG production capacity for use in its protein bars (Exhibit 6, p.3).

51. All other EPG customers combined, including Plaintiffs and at least 7 other food manufacturers, shared the remaining 10% of Epogee's production capacity through periodic purchase orders.

52. This concentration resulted in David Protein purchasing 90% of Epogee's annual production while all other customers competed for the remaining 10%. Epogee's business depended substantially on its relationship with David Protein.

53. After already controlling 90% of EPG supply, Defendants acquired the remaining production capacity. Rahal stated the acquisition would create "*a really defensible business with 3 moats" that would prevent "10 copy cats*" from competing (Exhibit 6, p.7).

54. With David Protein purchasing 90% of EPG production, the remaining customers competed for 10% of supply. These customers invested in EPG-specific equipment, formulations, and marketing after establishing multi-year purchase histories with Epogee.

**C. The Collaborative Development of EPG's Market Value**

55. Each Plaintiff built its business model around EPG as described in Epogee's marketing materials as the “secret ingredient” behind successful low-calorie products (Exhibit 2, p.28). Using EPG, Plaintiffs created products with up to 50% fewer calories than traditional versions while maintaining taste and texture.

56. Plaintiff OWN Your Hunger launched its first products in 2020 with unique EPG-based peanut butter and hazelnut spreads that achieve 50% fewer calories than traditional spreads while maintaining the taste and texture consumers expect, investing over $320,000 in EPG-specific R&D.

57. Plaintiff Lighten Up Foods developed a line of low-calorie sauces using EPG to replace traditional fats, enabling calorie reductions that would violate FDA regulations for the "low calorie" requirements (i.e., 40 calories or less per serving) if attempted with any other ingredient.

58. Plaintiff Defiant Foods created low-calorie chocolate products using EPG to maintain the creamy texture and mouthfeel of traditional chocolate while dramatically reducing calories, a feat impossible with other fat substitutes.

59. Plaintiffs made these investments after receiving Epogee's assurances of continued supply and its active encouragement of innovation using EPG as a platform ingredient. Epogee featured these innovations in its marketing materials and trade show demonstrations.

60. Plaintiffs collectively invested over $615,000 in research and development specifically for EPG-based formulations, along with specialized equipment designed for EPG's unique properties, marketing campaigns emphasizing EPG's benefits, and business infrastructure built entirely around EPG as an irreplaceable input.

61. On September 30, 2024, Epogee announced it had achieved "supply chain efficiencies" enabling a 5% price reduction for all customers (Exhibit 4, p.6). This announcement demonstrates that Epogee's customer relationships, including with Plaintiffs, were profitable and sustainable. Epogee's press releases from 2021-2024 celebrated customer innovations and described growing market demand for EPG-based products.

62. The three Plaintiffs were part of a broader ecosystem of EPG-dependent manufacturers who collectively invested millions in product development. Industry sources confirm that developing each EPG formulation requires substantial investment in R&D, specialized equipment, and regulatory compliance. On May 9, 2025, Defendants acquired Epogee for $75 million. On May 29, 2025, Defendants terminated all non-affiliated customers.

**D. The Strategic Partnerships Between Epogee and Its Customers**

63. From 2020 through 2024, Epogee cultivated strategic partnerships with its customers that transcended typical vendor relationships, creating deep interdependencies and reasonable expectations of continued collaboration. These partnerships would prove instrumental in building EPG's market value.

64. Epogee provided customers with scientific support, including access to its food scientists. Noah Bernett of Snack Owl had "multiple phone calls" with Epogee's food scientist(s) for product formulation in cookie dough and chocolate categories (Bernett Decl. ¶ 3).

65. The technical support extended to every aspect of EPG implementation. Epogee provided "technical assistance with chocolate-specific applications" to Defiant Foods (Fugal Decl. ¶ 13), chip formulation guidance to Snack Owl (Bernett Decl. ¶ 3), and proprietary formulation assistance to numerous other customers (Exhibit 3, p.11,21,23-24). Industry testimony confirms that replicating this knowledge independently would require two years and substantial funding even without patent barriers (Safai Decl. ¶ 19)—making Epogee's expertise as essential as EPG itself.

66. Epogee helped customers secure intellectual property protection for EPG-based innovations. Epogee assisted Swedian Foods in filing patent applications for EPG-based mithai

products (Walia Decl. ¶¶ 12-14). These patented formulations require EPG as an ingredient and cannot be commercialized using alternative ingredients.

67. The partnerships were strategically reciprocal. Plaintiff OWN Your Hunger exemplified this mutual value creation by supplying showcase products for trade show demonstrations, conducting European Union shelf-life testing at its own expense, and generating critical data for Epogee's international expansion. This testing directly enhanced Epogee's enterprise value by opening new geographic markets (Exhibit 2, p.19). Epogee actively showcased these contributions at major industry events, including the Natural Products Expo, using OWN's products to demonstrate EPG's commercial viability to potential customers and investors (Exhibit 2, p.19-21).

68. On February 18, 2021, Epogee publicly celebrated this mutually beneficial relationship: "We couldn't be more thrilled that EPG is included as a key ingredient in OWN's revolutionary new nut butter spreads. It is exciting to help our innovative customer OWN Your Hunger capture market share" (Exhibit 2, p.3).

> **We couldn't be more thrilled that EPG is included as a key ingredient in OWN's revolutionary new nut butter spreads. It is exciting to help our innovative customer OWN Your Hunger capture market share, with low-calorie foods consumers will want to purchase again and again.**
>
> X Post this

*Figure 2. Epogee Press Release Celebrating Strategic Partnership with Plaintiff OWN Your Hunger (February 18, 2021).*

69. Beyond public recognition, these partnerships involved extensive exchange of confidential business intelligence. Epogee shared proprietary formulation techniques and cost

structures, while customers like OWN Your Hunger provided international expansion strategies and market testing data. This mutual exchange of valuable information created trust and interdependence that transformed commercial relationships into strategic alliances.

70. Epogee featured customer innovations in its marketing materials and investor presentations. The company showcased OWN Your Hunger's products and those of other customers as examples of EPG's commercial applications (Exhibit 1, p.2). These customer success stories appeared in materials used to attract new business and investment. Epogee was acquired for $75 million on May 9, 2025.

71. Following the May 9, 2025 acquisition, Defendants terminated EPG supply to all non-affiliated customers on May 29, 2025. This included strategic partners who had helped validate EPG's commercial potential and build the $75 million acquisition value. Both five-year collaborators and newer customers received identical termination notices regardless of their contributions to EPG's market development.

72. From 2020 through 2024, Epogee maintained these partnerships with customers who helped develop EPG applications and validate its commercial potential. In February 2025, while these partnerships continued, David Protein began acquisition negotiations with Epogee. By May 29, 2025, all partnership activities ceased when every non-affiliated customer received termination notices.

## VII. DEFENDANTS' ANTICOMPETITIVE CONDUCT

### A. The Shift from Transparent Business Practices to Deceptive Conduct

73. Historically, Epogee handled genuine supply constraints in a transparent and commercially reasonable manner that preserved access for all customers while managing legitimate business challenges (Exhibit 4, p.5).

74. On January 1, 2022, when facing actual raw material cost increases, Epogee implemented substantial price increases of 50% and required customers not to exceed 110% of historical order sizes for a one-year period, while maintaining open communication with all customers about the genuine nature of these constraints (Exhibit 4, p.5).

75. Despite the significant 50% price increase on January 1, 2022, no customer known to Plaintiffs (including Plaintiff OWN Your Hunger) sought alternatives to EPG.

76. On September 30, 2024, just six months before the alleged shortage, Epogee announced that supply chain efficiencies had allowed it to reduce EPG prices by 5% and expressed hopes for further price reductions (Exhibit 4, p.6).

77. This September 2024 announcement induced Plaintiffs and other manufacturers to continue investing in EPG-dependent products, launching new SKUs, and expanding production capacity based on representations of improving supply and pricing conditions.

**B. The Secret Acquisition and Coordinated Supply Restrictions**

78. In February 2025, Defendants began negotiations for David Protein to acquire Epogee. These negotiations were not disclosed to EPG customers at the time they were occurring.

79. On March 25, 2025, Epogee announced that EPG was unavailable due to "raw material lead times" (Exhibit 4, p.8). The announcement provided estimates of "2-3 months" for restoration but did not identify any specific raw materials or suppliers affected. Shipping containers of EPG show manufacture dates of March 2023 (Safai Decl. ¶ 14).

80. Epogee produces EPG in 24-month campaign cycles, with each production run supplying the market for the following 24 months (Safai Decl. ¶ 14). Based on the March 2023 manufacture dates and 24-month cycles, Epogee's next production campaign would have been

scheduled to begin in March 2025. The March 25, 2025 shortage announcement therefore coincided with when a new production cycle would typically commence.

81. This claimed shortage occurred just six months after Epogee had announced improving supply conditions and 5% price reductions due to "supply chain efficiencies" on September 30, 2024 (Exhibit 4, p.6). No force majeure events, natural disasters, supplier bankruptcies, or publicized raw material disruptions occurred between September 2024 and March 2025 that would explain a reversal from improving conditions to complete unavailability.

82. Prior to the May 9, 2025 acquisition, Epogee supplied EPG to at least 10 customers. These customers included companies that had purchased EPG for up to five years, such as Plaintiffs who began purchasing in 2019.

83. Between March 25, 2025 and May 9, 2025, customers could not place new orders or secure long-term supply contracts.

84. On May 9, 2025, David Protein completed its acquisition of Epogee (Ranen Decl. ¶ 19) for $75 million, obtaining complete control over the worldwide EPG supply and all related patents and trade secrets.

85. The acquisition was revealed to customers on May 29, 2025, and all 10 customers received notices stating "*While we will fulfill all confirmed purchase orders, we won't be able to accept new orders going forward*" (Exhibit 4, p.14). These ten customers have provided sworn declarations confirming they received these termination notices.

**C. The Cover-Up and Total Exclusion**

86. On May 27, 2025, two days before the ten known customers were formally notified of supply termination, the industry website nosh.com published an article revealing the acquisition (Exhibit 5, p.1), but it was immediately suppressed, causing it to display an "Article

Not Found" error within hours of publication (Exhibit 5, p.2). The article was eventually restored with its article date updated to May 29, 2025 (Exhibit 5. p.3), the same day that numerous other news outlets published the news and the same day Epogee announced it would cease new orders for EPG.




*Figure 3. Error message displayed on suppressed Nosh.com article revealing Defendants' acquisition, within hours of publication on May 27, 2025.*

87. Even after the article briefly leaked on May 27, 2025, Epogee maintained its silence regarding the acquisition to its customers for two additional days, despite direct inquiries from Plaintiffs who had seen the nosh.com article before it was suppressed and demanded transparency about their submitted orders (Exhibit 4, p.12).

88. On May 29, 2025, after ensuring complete control and preventing any competitive responses, Defendants announced they would "*cease supply*" to all competitors. All three Plaintiffs received similar letters indicating they would no longer be able to submit new purchase orders for EPG going forward (Exhibit 4, p.14).

**D. Defendants' Public Statements Regarding Competition**

89. In public interviews with industry news channels snaxshot.com and TBPN, Defendant Peter Rahal made extraordinary admissions that provide direct evidence of anticompetitive intent.

90. When asked by a reporter what Defendants would do with the entire EPG supply, Rahal stated unequivocally: "*We will be taking all the supply.*" (Exhibit 6, p.7).

"We will be taking all the supply"

Peter Rahal's betting it all on EPG

SNAXSHOT
MAY 29, 2025

9 3 Share




Earlier this week we posted about David's latest raise and acquisition of EPOGEE, since then we have also learned that the brand is now being valued at $750M, and we have gotten the long awaited response from Peter Rahal himself, what are they going to do with the entire EPG supply?

*"We will be taking all the supply"* he messaged me while sharing the official funding news.

*Figure 4a. Defendant Peter Rahal During Recorded Interview.*

*Source: snaxshot.com and quotes from TBPN, May 29, 2025.*

91. When specifically asked about existing brands that use EPG to compete in low-calorie markets, Rahal responded with remarkable clarity: "*Given supply situation, cease supply.*" (Exhibit 6, p.7).

***What are you planning to do with the existing brands that use EPG, is it like a direct cut or will you taper it off?***

*"Given supply situation, cease supply."* he replied.

*Figure 4b. Public admissions by Peter Rahal. Source: snaxshot.com*

92. Rahal explained his anticompetitive motive with unprecedented candor in a taped and broadcasted interview: "*CPG sucks - it does. It sucks because of the competition*" (Exhibit 6, p.7).

93. Rahal revealed how the acquisition would prevent future competition through exclusionary "moats": "*We have a really defensible business with 3 moats... in three years we're not going to have 10 copy cats, they'll try on protein, but it won't be there in calories.*" (Exhibit 6, p.7). The "moats" analogy described Defendants' strategy to monopolize the high-protein, low-calorie market: competitors can add protein to their products, but without EPG cannot achieve the low-calorie factor that defines certain premium downstream market segments.

*"CPG sucks—it does. It sucks because of the competition. So right, we know there's like 3 moats, there's the brand moat, really abstract and takes a long time so I don't put much merit to it but it's a real thing, then there's like trade secret mode, or distribution and then there's a third moat which is actual IP, so we actually have with our business now and part of the reason we got a really good valuation it's because we have a really defensible business with 3 moats, which allows us to protect our cash flow. And so like you know in three years we're not going to have 10 copy cats, they'll try on protein, but it won't be there in calories."*

David's projected to make around **$140M** in sales at the end of their first year

*Figure 4c. Public admissions by Peter Rahal. Source: snaxshot.com*

94. While claiming Epogee would operate "*at arm's length*" Rahal immediately contradicted himself by stating "*we need it to be serving David as a customer*" revealing that any claimed independence was pretextual (Exhibit 6, p.3).

95. David Protein achieved a $750 million valuation six months after launch. The valuation was based on projected revenues of $140 million in the first year (Exhibit 6, p.7).

96. In the same interview where Rahal admitted "*taking all the supply*," he explained David Protein's extraordinary valuation: "*we have a really defensible business with 3 moats, which allows us to protect our cash flow.*" (Exhibit 6, p.7). This "protection" came not from innovation or efficiency, but from monopolizing the essential input competitors needed to exist.

**E. Pattern of False Statements and Evidence Destruction**

97. In opposing Plaintiffs' motion for a temporary restraining order, Defendants submitted the Declaration of Zachary Ranen (Ranen Decl.), co-founder and president of Linus Technology (David Protein), made under penalty of perjury.

98. Ranen declared that Defendants "*proactively contacted 11 then-active Epogee customers to confirm that we intended to continue fulfilling their orders*" and that "*10 had prospects of meaningful volume consistent with the business's new focus on achieving production scale and financial sustainability.*" (Ranen Decl. ¶ 22).

99. Ranen further declared "*At no point did we "hoard" all available EPG or refuse to sell across the board*".

100. Ten customers who provided sworn declarations, and two of Epogee's longest-standing and largest purchasers known to Plaintiffs—have confirmed receiving similar termination notices: "*While we will fulfill all confirmed purchase orders, we won't be able to accept new orders going forward*" (Exhibit 4, p.14).

101. On June 7, 2025, four days prior to the June 11, 2025 filing of the Ranen Declaration, Defendants, on their public Instagram social media marketing channel, responded to

a customer inquiry of "so you'll still allow other companies access to EPG?" with the categorical admission of "*right now, no—EPG access isn't open to other companies*" (Exhibit 7, p.7).

22. Contrary to plaintiffs' allegations, Epogee did not "cut off" all existing customers following its acquisition. Immediately after the transaction closed, we proactively contacted 11 then-active Epogee customers to confirm that we intended to continue fulfilling their orders. Of those, 10 had prospects of meaningful volume consistent with the business's new focus on achieving production scale and financial sustainability, and one smaller customer had a pre-existing supply agreement that we fully honored, despite its limited size. Our approach was not to categorically eliminate access, but to shift toward serving customers capable of placing consistent, high-volume orders—an essential step for transforming Epogee into a viable business. Customers without purchase commitments, or whose small or intermittent orders resulted in sustained financial losses, were phased out transparently. At no point did we "hoard" all available EPG or refuse to sell across the board, as plaintiffs suggest. Rather, we implemented a rational and commercially necessary shift in customer strategy based on objective economic criteria.

11

Case 1:25-cv-04544-VM Document 22 Filed 06/11/25 Page 12 of 19

*Figure 5a. Sworn Declaration by Zachary Ranen on June 11, 2025 (Dkt. 22).*




*Figure 5b. Defendants' Response to Customer Inquiry Regarding EPG Access, posted June 7, 2025 (and subsequently deleted July 7, 2025). Source: Instagram.*

102. On July 7, 2025, at 6:28 PM Eastern Time, Defendants' counsel responded to Plaintiffs' inquiries regarding Instagram statements contradicting the Ranen Declaration. At 7:09 PM Eastern Time the same day, Plaintiffs discovered that Defendants had deleted their entire Instagram history, destroying 56 posts and hundreds of customer communications about EPG availability (Exhibit 11, p.14-17), including their categorical admission that "right now, no—EPG access isn't open to other companies" (Exhibit 7, p.7), while notably preserving all content on their other social media platforms (Exhibit 11, p.19).

103. The Instagram account's data shows that a single replacement post was created with a timestamp of 2025-07-07T22:28:41.000Z (UTC), which converts to 6:28:41 PM Eastern Time on July 7, 2025 (Exhibit 11, p.18). This timestamp indicates the deletion and replacement of all 56 posts and hundreds of customer comments occurred within seconds of when Defendants' counsel sent their response at 6:28 PM Eastern Time.

On Mon, Jul 7, 2025 at 6:28 PM [redacted] <[redacted]@friedfrank.com> wrote:

```
-base-line-clamp-line-height: 16px; --lineHeight: 16px;">
  ::before
  <time class="_a9ze _a9zf" datetime="2025-07-07T22:28:41.000Z"
  title="Jul 7, 2025">6d</time> == $0
  <div class="html-div xdj266r x14z9mp xat24cr x1lziwak xexx8yu xyri
  2b x18d9i69 x1c1uobl x9f619 xjbqb8w x1rg5ohu x15mokao x1ga7v0g x16
```

*Figure 5c. Top: Timestamp from Defendants' counsel's email reply showing July 7, 2025, 6:28PM. Bottom: Instagram post creation timestamp that replaced 56 deleted posts showing July 7, 2025, 22:28:41 UTC (6:28PM Eastern Time) on bottom.*




*Figure 5c. Defendants' Public Social Media Account Before and After Purging All Posts and Comments on July 7, 2025 at 6:28PM ET. Source: Instagram.*

104. Existing and potential customers criticized Defendants' deleting their comments (Exhibit 11, p.7-13). On June 4, 2025, two days after this lawsuit was filed, customers expressing their disappointment and frustration with statements such as "My original comments was deleted", "A company deleting negative comments about a mess they themselves created is so embarrassing", and "David protein bars are deleting comments because they're trying to monopolize EPG".

105. The statement by Ranen, "*At no point did we "hoard" all available EPG or refuse to sell across the board*", (Ranen Decl. ¶ 22) contradicts the Instagram customer comment "*right now, no—EPG access isn't open to other companies*" (Exhibit 7, p.7) and the termination notices provided to 10 customers: "*While we will fulfill all confirmed purchase orders, we won't be able to accept new orders going forward*" (Exhibit 4, p.14). The termination included companies that had purchased EPG for up to five years.

106. Defendants terminated EPG supply to Bricks Protein, which manufactured protein bars that "directly competed with David Protein's products" (Han Decl. ¶¶ 11-12). Defendants also terminated supply to another customer developing EPG-based protein bars (Uddin Decl. ¶ 6). In the Ranen Declaration, Defendants stated they would continue supplying customers with "meaningful volume consistent with the business's new focus" (Ranen Decl. ¶ 22).

107. This pattern of contradictory representations extended to specific product availability. While claiming EPG scarcity severe enough to justify terminating all customers, Ranen declared that even individual David Protein flavors faced stockouts, stating that "*supply chain issues have caused what we believe to be temporary shortages of EPG due to difficulties sourcing the needed ingredients. As a result, we have run out of stock of two of our most popular flavors of David bars*" (Ranen Decl. ¶ 24). During this same period of claimed shortage, however, these exact flavors—Red Velvet and Cinnamon Roll—remained continuously available through other sales channels (Exhibit 8, p.15-16). These were newly launched flavors (Exhibit 8, p.14) within days of the Ranen Declaration (June 11, 2025), and their website-only unavailability occurred within weeks of launch, when new product demand typically peaks.

108. Following the acquisition closing, Defendants stated that Epogee operated "at arm's length" and that "Epogee continues as a standalone company" (Exhibit 6, p.3,9). During this

same period, the "Success Stories" section of Epogee's website was removed, including pages featuring OWN Your Hunger's "revolutionary nut butter spreads" and other customer products (website before: Exhibit 1, p.1-15; website after: Exhibit 11, p.6). The removed content had celebrated EPG customers' product innovations and market achievements.

> **Epogee continues as a standalone company**
>
> Epogee will continue to operate as a standalone organization, while David's team will assist in optimizing and supporting logistics, manufacturing and regulations, he said.

*Figure 6: Defendant Peter Rahal on Epogee's "arm's length" company relationship. Source: foodnavigator-usa.com.*

**F. Systematic Market Entry Following Competitor Termination**

109. Defendants filed the following trademark applications: ice cream (Serial No. 99013691, filed Jan 21, 2025), brownies (Serial No. 98268169, filed Nov 13, 2023), protein bars (Serial No: 98268169, filed Nov 13, 2023), cookies (Serial No. 98268169, filed Nov 13, 2023), and chips (Serial No. 98268169, filed Nov 13, 2023) (Exhibit 9, p.1-5). At the time of these filings, existing EPG customers operated in these categories: Nick's ice cream, Snack Owl's cookies and chips (Bernett Decl. ¶ 3), Bricks Protein's and Ekko's protein bars (Han Decl. ¶¶ 11-12, Uddin Decl. ¶¶ 1, 6-7).

110. Each new product category requires EPG allocation for development, testing, and production. Defendants' planned expansion into brownies, cookies, chips, and ice cream would require substantial EPG inventory to develop and launch these products while maintaining production of their existing protein bar lines.

111. On March 25, 2025, Defendants announced EPG was unavailable due to "raw material lead times" (Exhibit 4, p.8). During this same period, Defendants claimed insufficient EPG inventory to support even "*a full production run across all David Protein bar flavors*" (Ranen Decl. ¶ 25).

112. Despite claiming severe EPG shortages, David Protein secured a $750 million valuation based on projected $140 million in first-year revenue (Exhibit 6, p.7). Achieving these projections would require maintaining or expanding production of millions of protein bars annually, representing a valuation multiple of 5.4 times projected revenue. Ten competitors who submitted purchase orders during this period received termination notices instead of EPG supply (Sanburg Decl. ¶¶ 6-8; Uddin Decl. ¶¶ 4-5; Fugal Decl. ¶¶ 7-9; Bernett Decl. ¶¶ 5-6; Han Decl. ¶¶ 9-11, 17; Walia Decl. ¶¶ 9-11; Safai Decl. ¶¶ 10-12; Brown Decl. ¶¶ 8-10; Krug Decl. ¶¶ 12-13; Kwak Decl. ¶¶ 12).

113. Prior to the acquisition, at least 4 EPG customers operated in the categories where Defendants filed trademarks: ice cream (Nick's), cookies and chips (Snack Owl), chocolate confections (Defiant Foods), and protein bars (Bricks Protein) (Bernett Decl. ¶ 3; Fugal Decl. ¶ 7; Han Decl. ¶¶ 11-12). After terminating these customers' EPG access, Defendants entered their abandoned markets.

## VIII. ANTICOMPETITIVE EFFECTS

### A. Market Effects and Consumer Harm

114. Following termination of EPG access, manufacturers have: a. exited their existing product markets; b. reformulated their products with different specifications; or c. ceased operations.

115. David Protein bars sell for $3.25 per bar on Defendants' website (Exhibit 8, p.2,12). Quest bars sell for $2.08 per bar on Amazon.com (Exhibit 8, p.13). David Protein bars contain approximately 150 calories and 28 grams of protein per bar. Quest bars contain approximately 190 calories and 20 grams of protein per bar. David bars with EPG are 56% more expensive than Quest bars. Both products are sold through Amazon. David Protein bars are also sold at Wegmans, Central Market, and Vitamin Shoppe (Ranen Decl. ¶ 15).

116. Defendants' website contains a Frequently Asked Question (FAQ) section. One question asks: "*Why are your bars more expensive than other bars?*" The website responds: "*Our bars deliver exceptional value to our customers by offering the highest protein-to-calorie ratio on the market. We are less expensive and more convenient than our closest competitor: boiled cod.*" (Exhibit 8, p.10). In the Ranen Declaration filed June 11, 2025, Defendants stated: "*Quest Bars are cheaper to make and cheaper for consumers*" and identified Quest as David Protein's "*largest competitor*" (Ranen Decl. ¶ 13).

117. Following their public statement that boiled cod is their "*closest competitor,*" (Exhibit 8, p.10) Defendants launched a frozen cod product on July 14, 2025—six weeks after this lawsuit was filed—selling 24-ounce packages for $55 (Exhibit 8, p.8). This purchasable product did not appear on Defendants' website prior to this litigation. The cod listing appears on the same website where Defendants sell David Protein bars, with marketing comparing the protein value between the two products (Exhibit 8, p.2), and price ratios comparing "*boiled cod*" to David protein bars and other protein bars (Exhibit 8, p.6).

118. Whole Foods sells frozen cod fillets for $24.99 per 32-ounce package (Exhibit 8, p.11). At this price, 24 ounces of cod costs $18.72. Defendants sell 24 ounces of frozen cod fillets for $55.00 (Exhibit 8, p.4,8). Quest bars provide 20 grams of protein for $2.08 ($0.10 per

gram of protein). David Protein bars provide 28 grams of protein for $3.25 ($0.12 per gram of protein). The 24 ounces of Whole Foods cod provides approximately 108 grams of protein for $18.72 ($0.17 per gram of protein). The 24 ounces of Defendants' cod provides approximately 108 grams of protein for $55.00 ($0.51 per gram of protein).




*Figure 7. Frozen Cod Pricing Comparison.*

**B. Nick's Forced Exit from "Swedish-style Light Ice Cream" Market After Losing EPG**

119. Prior to the acquisition, Epogee's marketing materials identified EPG as Nick's ice cream's "SECRET INGREDIENT" that "HELPED DRIVE A U.S. EXPANSION AND $160M IN FUNDING" (Exhibit 2, p.28).




*Figure 8a. Defendants' (Deleted) Marketing material for Nick's ice cream on Epogee's Website. Source: www.epogee.com.*

120. Nick's built its entire brand identity around "Swedish-style Light Ice Cream," which the company defined as "All the delicious creamy texture of ice cream without the calories" (Exhibit 10, p.7). This unique market position—combining indulgent creaminess with significant calorie reduction—was only achievable through EPG's properties.




*Figure 8b. Marketing material for Nick's ice cream with caption "Swedish-style Light Ice Cream: All the delicious creamy texture of ice cream without the calories".*

121. Nick's stated, "Usually, low-calorie ice creams will have to use less fat and that is a problem in texture. If the fat is low then the texture is not creamy and pleasant. So the mouthfeel of low-calorie ice creams is usually very icy. [EPG enables] a creamy version that taps into that indulgent feeling consumers request" (Exhibit 1, p.20-21). Epogee's website described EPG as the ingredient that "Helped Drive [Nick's] U.S. Expansion" (Exhibit 2, p.28)

122. After EPG supply termination, Nick's reformulated its products. The reformulated products no longer carry the "Swedish-style Light Ice Cream" designation.

123. Nick's pivoted to the generic "No added sugar" marketing—a crowded market segment where it held no distinctive advantage—while calories increased from 340 to 390 per pint and net carbs jumped from 8g to over 16g. These changes forced Nick's to abandon multiple premium market positions simultaneously (Exhibit 10, p.7-10).




*Figure 8c. Nick's ice cream Packaging, before and after EPG reformulation.*

124. Ketogenic diets typically limit daily carbohydrate intake to under 20g. After reformulation without EPG, Nick's products contain over 16g net carbs per serving.

125. Following Nick's reformulation, multiple customer reviews referenced texture changes, digestive issues, and requests to return to the previous formula (Exhibit 10, p.10).




*Figure 8d. Customer comments on Nick's ice cream after reformulation.*

126. Prior to the acquisition, Epogee's website featured content describing EPG as Nick's $160 million "SECRET INGREDIENT" that "HELPED DRIVE A U.S. EXPANSION" (Exhibit 2, p.28). After the acquisition and termination of customer supply, this content was

removed from Epogee's website. During this same period, Defendants stated that Epogee operated "at arm's length" post-acquisition (Exhibit 6, p.3). Other sections of Epogee's website were notably removed or completely rewritten.

127. Nick's reformulation resulted in the following changes: a. discontinued "Swedish-style Light Ice Cream" product line and exited that market segment; b. increased calories from 340 to 390 per pint despite testing multiple alternative ingredients; c. increased net carbs from 8g to over 16g per serving. Following Nick's exit from the low-calorie creamy ice cream segment, only Defendants retain access to EPG necessary to create such products.

128. Nick's received $160 million in funding prior to losing EPG access. After losing EPG access, Nick's discontinued its "Swedish-style Light Ice Cream" product line. Ten EPG customers have submitted declarations stating that after EPG termination, they tested alternative ingredients but could not maintain their product specifications (Sanburg Decl. ¶¶ 6-8; Uddin Decl. ¶¶ 4-5; Fugal Decl. ¶¶ 7-9; Bernett Decl. ¶¶ 5-6; Han Decl. ¶¶ 9-11, 17; Walia Decl. ¶¶ 9-11; Safai Decl. ¶¶ 10-12; Brown Decl. ¶¶ 8-10; Krug Decl. ¶¶ 12-13; Kwak Decl. ¶¶ 12).

**C. Immediate and Ongoing Irreparable Harm to Plaintiffs**

129. Since March 25, 2025, Plaintiffs have ceased production of all EPG-dependent product lines, terminated multiple employees, and breached delivery commitments to retail customers. Plaintiffs continue to incur $15,000 per month in fixed costs from idle manufacturing facilities while generating no revenue from EPG-based products (Decl. Sanburg, Decl. Fugal, Decl. Safai).

130. Plaintiffs have collectively suffered over $449,000 in sunk research and development investments specific to EPG-based products that cannot be recovered or repurposed for products using other ingredients.

131. Plaintiffs have lost over $107,000 in confirmed sales due to inability to fulfill customer orders, with these losses compounding daily as customers switch to competitors' full-calorie products.

132. Plaintiffs have been forced to write off over $85,000 in specialized inventory, including packaging that prominently features EPG-based calorie claims that would be illegal if used with any other ingredient.

133. Plaintiffs suffer ongoing operational losses exceeding $15,000 per month from idle manufacturing capacity, lease obligations, and fixed costs without corresponding revenue to support operations.

134. Plaintiffs have been forced to terminate multiple employees, including specialized personnel trained in EPG-based formulations and quality control procedures specific to EPG's unique properties.

135. Plaintiff OWN Your Hunger has breached binding delivery commitments to major retail customers due to EPG unavailability, causing irreparable reputational harm and triggering penalty clauses that compound its damages.

136. The destruction of customer relationships built over years, loss of first-mover advantage in EPG innovation, and forced revelation of confidential formulations while attempting to find alternatives constitute irreparable harm beyond monetary calculation.

## IX. DEFENDANTS' OWN DEFINITION OF THE EPG MARKET

### A. Defendants' Marketing of EPG as a Category-Defining Ingredient

137. Defendants have formally and repeatedly defined EPG as "*the category-defining ingredient that eliminates most calories from fat*" in numerous press releases, marketing materials, and investor communications (Exhibit 1, p.27-32).



EPOGEE®

APPLICATIONS TECHNOLOGY ABOUT US

PLANT-BASED FAT ALTERNATIVE EPG FEATURED AT SUPPLY SIDE WEST 2022

Published On: October 20, 2022 Categories: News

INDIANAPOLIS, IN, **(October 20, 2022)** —Epogee® LLC, maker of EPG—the category-defining ingredient that eliminates most calories from fat— announces its plant-based fat alternative has removed over 3 billion calories, in just four years,

EPOGEE NEWS

EPOGEE APPOINTS RON SAVELLI PRESIDENT AND CEO

Published On: February 2, 2023 Categories: News

INDIANAPOLIS **(February 2, 2023)** – Food technology company Epogee® LLC, maker of EPG—the category-defining ingredient that eliminates most calories from fat— announces the appointment of Ron Savelli to President and Chief Executive Officer. Savelli is taking the reins from Founder and Acting President, David Rowe, who will resume his previous role as Chief Technology Officer.

*Figure 9a. Press releases by Epogee defining the EPG market.*

138. Defendants' marketing materials displayed the phrase "Consumer Appeal + Less Calories = New Market Opportunities" above images of 14 FDA-approved food categories (Exhibit 1, p.2).




*Figure 9b: Defendants' (Now Deleted) Marketing Material Showing EPG as Essential Input Across 14 FDA-Approved Food Categories. Source: www.epogee.com.*

139. Defendants used the term "category-defining ingredient" in the following contexts: (1) communications with private equity investors who provided $75 million for the Epogee acquisition; (2) marketing materials distributed to EPG customers, including Plaintiffs, prior to their product development investments; and (3) presentations at industry trade shows including Natural Products Expo (Exhibit 2, p.19-21). These representations occurred between 2020 and May 2025.

140. Defendants formally defined EPG as creating the "global market for EPG supply" through their representations to investors, customers, and at trade shows. EPG functions as an input ingredient enabling products across multiple food categories including protein bars, spreads, sauces, chocolates, cookies, brownies, and ice creams.

141. The geographic market is worldwide, as Epogee is the sole manufacturer of EPG globally and EPG is distributed internationally. Defendants sell EPG-based products in at least the United States and Canada.

**B. The Input Market Nature of This Case**

142. The relevant market is the upstream market for EPG supply, not any downstream market for finished food products. While Plaintiffs' finished products (sauces, spreads, chocolates) do not compete with Defendants' protein bars at the retail level, all EPG-dependent manufacturers compete directly for access to the limited global supply of EPG.

143. EPG functions as an essential input for multiple downstream markets. Food manufacturers producing diverse products - protein bars, ice cream, nut spreads, sauces, chocolates, and confections - all require EPG to create low-calorie versions of their products. These manufacturers compete against each other for access to Epogee's limited EPG production capacity, regardless of whether their finished products compete.

144. Prior to the acquisition, substantial upstream competition existed for EPG. Defendants controlled 90% of EPG supply for their protein bars, while all other manufacturers - including Plaintiffs, Nick's ice cream, and at least five other food companies - competed for the remaining 10% of production capacity.

145. Defendants' own trademark applications demonstrate their recognition of EPG's platform power across markets. Defendants have filed trademarks for EPG-based products in ice cream, brownies, chips, cookies, and spreads (Exhibit 9, p.1-5) - the same downstream markets where Plaintiffs operate. By monopolizing the essential input (EPG), Defendants can exclude competition across all these downstream markets without directly competing in each one.

**C. Single-Ingredient Market Definition**

146. Traditional fats cost $0.60-$2.00 per pound. EPG costs $6.00 per pound. All known EPG customers pay this 400-1000% price premium. No EPG customer known to Plaintiffs has switched to traditional fats despite the price differential.

147. When Epogee raised EPG prices by 50% in 2022 (from $4.35/lb to $6.49/lb), no customer known to Plaintiffs (including Plaintiff OWN Your Hunger) switched to traditional fats priced at one-tenth the cost. When faced with purchasing commodity fats at $2/lb, Defendants paid $75 million to acquire Epogee for exclusive EPG access at $6/lb.

148. Food manufacturers in the following categories purchase EPG at $6.00 per pound: protein bars, ice cream, spreads, sauces, and chocolates. Traditional fats in these same applications cost $0.60-$2.00 per pound. Ten customer declarations state that after testing alternatives, they found no ingredient combination that achieved 92% fat calorie reduction while maintaining taste, texture, and consumer acceptance.

**D. Availability of Reasonably Interchangeable Substitutes**

149. Prior to the acquisition, Epogee's Chief Commercial Officer stated: "*Our technology remains the only one on the market with this unique combination of benefits*" (Exhibit 1, p.33-34).

150. Defendants' marketing materials state that EPG “eliminates most calories from fat” and creates “New Market Opportunities” (Exhibit 1, p.2). The materials describe these opportunities as “new” across 14 FDA-approved food categories.

151. EPG is the only alternative fat that is made from fat and functions like fat, unlike other substances that require sugars to be added back to overcome poor mouthfeel and unpleasant taste (Exhibit 1, p.16).

152. EPG is the only alternative fat that allows up to 150 grams to be ingested per day with no gastrointestinal distress (Exhibit 1, p.16).

153. EPG is the only alternative fat that does not deplete the body nor block the absorption of fat-soluble vitamins (Exhibit 1, p.16).

154. EPG achieves 92% fat calorie reduction while maintaining taste, texture, and mouthfeel - a combination confirmed as unique by Epogee's own marketing statements and executive declarations (Exhibit 1, p.17-19).

155. EPG has FDA GRAS approval in 14 food categories (Exhibit 1, p.2). No other known fat replacement has approval for this range of food categories.

156. FDA regulations require foods to contain 40 calories or less per serving for "low calorie" claims. 21 C.F.R. § 101.60(b)(2). Traditional fats at 9 calories per gram make this mathematically impossible - just 4.4 grams exceeds the limit. EPG at 0.7 calories per gram uniquely enables meaningful fat content while maintaining compliance.

157. Other proposed fat replacements fail to provide EPG's unique combination: MCT oil contains 8.3 calories per gram - barely different from traditional fats. Inulin and fiber-based replacers alter texture and cause severe gastrointestinal distress. Resistant starches provide only texture, not flavor-carrying capacity. Sugar alcohols cause digestive issues and add inappropriate sweetness. Each alternative fails multiple essential criteria.

158. When Epogee raised EPG prices by 50% in 2022 from $4.35/lb to $6.49/lb (Exhibit 4, p.5), not a single customer known to Plaintiffs switched to cheaper alternatives priced at $0.60-$2.00 per pound. Despite traditional fats costing as low as 90% less, every customer continued purchasing EPG at the dramatically increased price, demonstrating that customers view no other ingredient as a substitute.

159. Defendants paid $75 million to acquire Epogee in May 2025 when traditional fats cost $2.00 per pound and EPG cost $6.00 per pound. After acquiring Epogee, Defendants maintained exclusive access to EPG while terminating supply to all other customers.

160. Despite Ranen listing extensive conventional fat options for protein bars ("nut butters, palm oil, palm kernel oil, canola oil") (Ranen Decl. ¶ 12-15), Defendants still chose to monopolize EPG supply, proving these are not functional substitutes.

161. Nick's ice cream reformulated its products after losing EPG access. Prior to reformulation, Nick's marketed "Swedish-style Light Ice Cream" with 340 calories per pint and 8g net carbs. After reformulation without EPG, Nick's products contain 390 calories per pint and over 16g net carbs, and no longer carry the "Swedish-style Light Ice Cream" designation.

**E. Industry-Wide Confirmation That EPG Has No Substitutes**

162. Following the filing of this action, Plaintiffs have obtained sworn declarations from ten EPG customers (including the three Plaintiffs). Each declarant states they tested alternative ingredients but could not replicate EPG's combination of 92% fat calorie reduction while maintaining taste, texture, and mouthfeel.

163. These customers who confirm being excluded from EPG supply have sworn (Sanburg Decl. ¶¶ 6-8; Uddin Decl. ¶¶ 4-5; Fugal Decl. ¶¶ 7-9; Bernett Decl. ¶¶ 5-6; Han Decl. ¶¶ 9-11, 17; Walia Decl. ¶¶ 9-11; Safai Decl. ¶¶ 10-12; Brown Decl. ¶¶ 8-10; Krug Decl. ¶¶ 12-13; Kwak Decl. ¶ 13) they ultimately share the same fate as Nick's - they must either entirely exit the distinct market made possible by the supply of EPG, or attempt to reposition themselves (i.e., through reformulation) with drastically different attributes with a high risk of failure.

164. These declarants represent diverse food categories - sauces (Sanburg Decl.), chocolate (Fugal Decl.), protein bars (Han Decl.), spreads and dessert squares (Safai Decl.) and

South Asian confections (Walia Decl.), among others. Each reached the identical conclusion: EPG's unique combination of properties cannot be replicated by any other ingredient or combination of ingredients. See Sanburg Decl. ¶¶ 6-8, 14-15; Fugal Decl. ¶¶ 7-9, 18-19; Han Decl. ¶¶ 9-11, 17; Walia Decl. ¶¶ 9-11, 19.

165. Each declarant independently tested numerous alternatives both before selecting EPG and again after termination, including traditional fats and fibers. Without exception, all testing failed because no ingredient could simultaneously provide a. "low-calorie" properties; b. proper texture, mouthfeel, and melting properties; c. flavor absorption and distribution capabilities; d. binding and stability functions; and e. consumer acceptance without digestive issues. See Sanburg Decl. ¶¶ 5-6, 14; Fugal Decl. ¶¶ 7-8, 18; Han Decl. ¶¶ 9-10, 17; Walia Decl. ¶¶ 9-10, 19.

166. Declarant Peter Han's company, Bricks Protein, manufactured protein bars that directly competed with Defendant David Protein's products. Han confirmed: "With EPG as our key ingredient, Bricks Protein developed bars that directly competed with David Protein's products...We were one of the few companies that could genuinely compete in the low-calorie, high-protein segment." (Han Decl. ¶¶ 11-12) Defendants eliminated this direct competition by monopolizing EPG.

167. Nick's experience is not unique but representative of the entire industry. Like the ten declarants who confirm no substitutes exist, Nick's—despite $160 million in investment funding—reached the same conclusion: reformulation without EPG means market exit, not substitution.

**F. Defendants' Pricing and Distribution Decisions**

168. Defendants paid $75 million to acquire Epogee in May 2025. At the time of acquisition, traditional fats were priced at $2.00 per pound. EPG was priced at $6.00 per pound. Following the acquisition, Defendants terminated supply to all non-affiliated customers.

169. Prior to the acquisition, Epogee's sales to multiple customers generated revenue and profit, as evidenced by Epogee's September 2024 announcement of price reductions due to improved efficiencies. Following the acquisition, Defendants terminated all non-affiliated customers, forgoing this revenue stream while maintaining exclusive EPG access for their own products.

170. Following the acquisition, David Protein bars with EPG are priced 56% higher than comparable protein bars without EPG. David Protein bars contain approximately 150 calories and 28 grams of protein per bar. Comparable protein bars containing 20 or more grams of protein per serving are sold in the same retail channels where David Protein is sold, including Amazon, Wegmans, Central Market, and Vitamin Shoppe (Ranen Decl. ¶ 15).

171. Defendants excluded all competitors while maintaining their own access and continuing to hoard all available EPG supply. Epogee had been operating profitably with multiple customers, as demonstrated by its September 2024 announcement of price reductions due to improved efficiencies.

172. Prior to the acquisition, Epogee successfully served at least 10 customers through direct periodic purchase orders for over five years. During this period, Epogee managed diverse customer needs without requiring minimum order quantities, tiered pricing structures, or annual purchase commitments—practices commonly used in the ingredient industry to serve smaller customers efficiently.

173. Defendants identified Cargill, Columbus Vegetable Oils, Bunge, ADM (Archer-Daniels-Midland), Wilmar International, and AAK as major companies dominating fat and fat alternative distribution (Ranen Decl. ¶ 14). Following the acquisition, Defendants chose to terminate at least 10 known customers rather than utilize any of these established distribution channels or implement volume-based pricing structures that would have allowed continued market access.

174. Epogee marketed that it "*developed EPG with large-scale commercial production in mind, ensuring it can be cost-effective and quickly adopted by companies*" and actively "*collaborates with food companies to formulate EPG-based products with high market demand*" (Exhibit 1, p.34). Prior to the acquisition, Epogee successfully implemented this large-scale commercial model by serving multiple customers including Nick's ice cream, and at least 10 other food manufacturers simultaneously.

**G. Patent Rights Define, But Do Not Immunize, the Market**

175. No non-infringing alternatives can achieve 92% fat calorie reduction and remaining properties of EPG, because EPG's unique molecular structure and manufacturing process - which enables its function - are protected by numerous patents that prevent any workaround.

176. Defendants acquired Epogee, a company that had been selling EPG commercially to multiple customers for over five years. After encouraging customers to invest in EPG-dependent products, Defendants terminated all non-affiliated customers while maintaining their own access to EPG.

177. Defendants acquired Epogee after it had established commercial relationships with multiple EPG customers, then terminated those relationships while claiming "shortages" that their $750 million valuation contradicts.

178. Prior to the acquisition, Epogee had granted access to its patented EPG technology through commercial sales to approximately 11 customers without requiring licensing agreements or asserting patent rights against any customer.

179. Epogee's business model for over 6 years was based on selling EPG as a commercial ingredient, not licensing patents. The company promoted EPG at trade shows, provided technical support to customers, and celebrated customer innovations using EPG in press releases.

**H. High Barriers to Entry and Essential Facilities Considerations**

180. EPG required 18 years of development from 2007 to 2025 and $150 million in investment. No company has announced development of a similar fat replacement ingredient since EPG's commercial launch in 2018.

181. Four patents protecting EPG production extend through 2035. These patents cover the manufacturing processes and molecular structure necessary to produce EPG.

182. FDA GRAS certification for EPG covers 14 food categories. Obtaining GRAS certification requires extensive safety testing and regulatory review. EPG's GRAS certification was achieved after years of testing as part of the 18-year development process.

183. Defendants acquired Epogee, obtaining 100% control of EPG manufacturing, four patents protecting EPG production through 2035, and EPG inventory with a 24-month expiry date. EPG required 18 years of development (2007-2025) and $150 million in investment. Prior

to the acquisition, Epogee had supplied EPG to at least 10 customers for over five years. Following the acquisition, Defendants terminated all non-affiliated customers.

184. Without access to EPG, food manufacturers cannot compete in multiple market segments that depend on EPG's unique combination of properties. Ten confirmed EPG customers have confirmed that loss of EPG access forced them to either exit their markets entirely or abandon their product lines, as no alternative ingredient can simultaneously provide: a. 92% fat calorie reduction enabling FDA-compliant low-calorie claims; b. flavor absorption and distribution capabilities essential for sauces and spreads; c. binding properties that maintain product stability; d. texture and mouthfeel preservation crucial for chocolates and frozen desserts; and e. heat stability required for baked goods. Each customer's products relied on different combinations of these irreplaceable properties.

185. Multiple food manufacturers built their entire business models around EPG as an essential input, investing millions in EPG-specific equipment, formulations, and FDA-compliant labeling. These businesses cannot operate without EPG access, as reformulation would require them to abandon their core value proposition of providing low-calorie alternatives.

**X. DAMAGES**

186. Plaintiffs seek the following categories of compensable damages, subject to statutory trebling pursuant to 15 U.S.C. § 15(a):

187. Lost research and development investments exceeding $615,000, representing EPG-specific formulation development, specialized equipment modifications, and regulatory compliance investments that cannot be repurposed for any alternative ingredient.

188. Lost revenues totaling $254,000 from March 25, 2025 to July 1, 2025, with continuing losses of approximately $85,000 per month thereafter based on historical sales trajectories and unfulfilled customer demand.

189. Inventory write-offs exceeding $85,000, including EPG raw materials, finished goods, and specialized packaging featuring EPG-based claims that cannot legally be used with other ingredients.

190. Stranded fixed costs of approximately $24,000 per month from idle manufacturing facilities, equipment financing, and quality infrastructure without corresponding revenue to support operations.

191. Destruction of enterprise value estimated between $2 million and $4 million per Plaintiff, to be established through expert testimony using discounted cash flow analysis and comparable company valuations in the specialty food sector.

192. Lost customer relationships and goodwill valued between $500,000 and $1 million based on customer lifetime values, reputational harm from breached commitments, and industry-standard relationship rebuilding costs.

193. Additional consequential damages totaling $179,000, including employee termination costs, lease penalties, equipment liquidation losses, and retail penalties triggered by non-delivery.

194. These damages flow directly from Defendants' anticompetitive conduct and will be proven through established economic methodologies including yardstick analysis comparing businesses with EPG access, market valuations for going concern value, and econometric modeling for future losses through 2035 when EPG patents expire.

195. Defendants' $750 million valuation, achieved through EPG monopolization and representing ten times projected revenue, demonstrates the enormous value extracted from Plaintiffs and other excluded competitors who would have shared in this market absent Defendants' illegal conduct.

196. Plaintiffs seek treble damages pursuant to 15 U.S.C. § 15(a). The conduct at issue includes: (1) Defendant Rahal's recorded statement that Defendants were "taking all the supply" because "CPG sucks because of the competition"; (2) termination of at least ten non-affiliated EPG customers immediately after the $75 million acquisition; (3) representations to this Court that Defendants "intended to continue fulfilling orders" while simultaneously refusing all new customer orders; and (4) deletion of social media posts and website content following the filing of this lawsuit.

## XI. ANTITRUST INJURY

197. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

198. Plaintiffs have suffered antitrust injury, which is injury of the type the antitrust laws were intended to prevent and that flows from that which makes Defendants' acts unlawful.

199. The causal connection between Defendants' anticompetitive conduct and Plaintiffs' injuries is direct and immediate. Plaintiffs' injuries would not have occurred but for Defendants' acquisition of monopoly control over EPG and their subsequent refusal to supply any non-affiliated customers. No intervening factors or alternative market conditions contributed to Plaintiffs' inability to obtain EPG.

200. The antitrust laws are designed to protect competition and prevent the exclusion of competitors through anticompetitive means rather than competition on the merits. Plaintiffs'

injuries result directly from Defendants' exclusion of all competitors from access to EPG, an essential input for producing low-calorie food products.

201. Plaintiffs' injuries flow directly from the anticompetitive aspects of Defendants' conduct. Prior to Defendants' acquisition and exclusionary conduct, Plaintiffs operated profitable businesses using EPG to manufacture unique low-calorie products. Following Defendants' termination of EPG supply, Plaintiffs were forced to cease production, terminate employees, breach retail commitments, and write off specialized inventory and equipment.

202. As direct purchasers of EPG who built businesses dependent on this input, Plaintiffs are efficient enforcers of the antitrust laws. Plaintiffs have suffered direct economic injury through: a. Lost investments in EPG-specific research and development; b. Stranded manufacturing assets and specialized equipment; c. Destroyed customer relationships and distribution networks; and d. Ongoing losses from inability to fulfill customer demand.

203. Plaintiffs' status as competitors in various EPG-dependent markets provides them with proper standing to challenge Defendants' exclusionary scheme. Unlike consumers or other potential plaintiffs, Plaintiffs suffered immediate termination of their EPG supply and were forced to exit their chosen markets entirely. This direct exclusion from competition is precisely the type of injury the antitrust laws seek to prevent.

204. Plaintiffs' injuries reflect harm to competition itself, not merely harm to individual competitors. The termination of EPG supply to all non-affiliated manufacturers has: a. Eliminated an entire tier of competition in EPG-dependent food products; b. Reduced consumer choice by removing unique products from the market; c. Enabled Defendants to charge prices 56% higher than comparable products; d. Prevented innovation in low-calorie food applications; and e. Foreclosed entry into multiple downstream markets.

205. The competitive harm extends beyond Plaintiffs' individual losses. At least ten EPG customers have confirmed they were forced to exit their markets after termination of EPG supply, representing the systematic destruction of competition across multiple food categories. Each foreclosed competitor represents lost consumer choice, reduced price competition, and eliminated innovation that would have occurred in a competitive market. This market-wide exclusion of competitors through control of an essential input exemplifies the anticompetitive conduct that antitrust law prohibits.

## XII. CAUSES OF ACTION

### COUNT I - VIOLATION OF SHERMAN ACT § 1

### (Conspiracy in Restraint of Trade - 15 U.S.C. § 1)

206. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

207. This claim is brought under Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.

208. Beginning in or about February 2025 and continuing through at least May 2025, Defendants Linus Technology, Inc. (David Protein) and Epogee LLC entered into and engaged in a continuing contract, combination, and/or conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act.

209. The conspiracy consisted of an agreement between Defendants to allocate the entire market for EPG supply, whereby Linus Technology would receive 100% of available EPG supply and all other customers would receive 0%.

210. During the relevant period, Linus Technology and Epogee were separate economic entities capable of conspiring within the meaning of Section 1.

211. The agreement was formed and implemented through the following concerted actions: a. Coordinated announcement of EPG "shortages" to non-affiliated customers beginning in March 2025; b. Joint concealment of ongoing acquisition negotiations from February through May 2025; c. Coordinated suppression of media coverage revealing the acquisition on May 27, 2025; d. Simultaneous termination of all non-affiliated customers on May 29, 2025.

212. The object and effect of this conspiracy was to restrain trade unreasonably by: a. Eliminating all competition for access to EPG; b. Preventing competitors from obtaining an essential input; c. Allocating 100% of the relevant market to one conspirator.

213. This agreement constitutes a horizontal market allocation and/or group boycott that is per se unlawful under Section 1 of the Sherman Act.

214. Alternatively, under the rule of reason, this agreement unreasonably restrained trade because: a. It eliminated all competition in the relevant market for EPG supply; b. It lacked any procompetitive justification; c. Any claimed efficiencies could have been achieved through less restrictive means.

215. The conspiracy affected a substantial volume of interstate commerce, as EPG is sold to customers throughout the United States.

216. As a direct and proximate result of Defendants' unlawful conspiracy, Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**COUNT II - VIOLATION OF SHERMAN ACT § 2**

**(Monopolization - 15 U.S.C. § 2)**

217. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

218. This claim is brought under Section 2 of the Sherman Act, which makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

219. The relevant market is the global market for EPG supply.

220. Defendants possess monopoly power in the relevant market, as evidenced by: a. 100% market share following the May 9, 2025 acquisition; b. Complete control over the sole manufacturing facility; c. Ownership of all patents necessary for EPG production;
d. Ability to exclude all competitors from the market; e. Ability to control prices and output.

221. Defendants willfully acquired their monopoly power through exclusionary conduct rather than through growth or development as a consequence of a superior product, business acumen, or historic accident.

222. Defendants' exclusionary conduct included: a. Acquiring the sole supplier of an essential input; b. Immediately terminating supply to all competitors; c. Refusing to deal with historic customers on any terms; d. Coordinating false representations about supply availability.

223. Defendants willfully maintain their monopoly power through continued exclusionary conduct, including: a. Refusing to supply EPG to any non-affiliated entity; b. Expanding into downstream markets abandoned by foreclosed competitors; c. Preventing entry by controlling all means of production.

224. Defendants' conduct lacks any legitimate business justification and has anticompetitive effects that outweigh any procompetitive benefits.

225. Defendants' monopolization has resulted in: a. Complete foreclosure of competitors from the EPG market; b. Elimination of EPG-dependent products from commerce; c. Reduced innovation in low-calorie food products; d. Higher prices for consumers.

226. As a direct and proximate result of Defendants' willful acquisition and maintenance of monopoly power, Plaintiffs have been injured in their business and property in an amount to be determined at trial.

## COUNT III - VIOLATION OF CLAYTON ACT § 7

### (Illegal Acquisition - 15 U.S.C. § 18)

227. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

228. This claim is brought under Section 7 of the Clayton Act, which prohibits acquisitions where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

229. On or about May 9, 2025, Defendant Linus Technology, Inc. acquired all assets of Defendant Epogee LLC for approximately $75 million.

230. The acquisition involved the purchase of: a. All EPG manufacturing facilities and equipment; b. All intellectual property related to EPG production; c. All inventory and work in process; d. All customer relationships and supply contracts.

231. Prior to the acquisition, Linus Technology and Epogee participated in the same relevant market - the market for EPG supply - with Linus Technology as purchaser and Epogee as seller.

232. The relevant market affected by this acquisition is the global market for EPG supply.

233. The acquisition eliminated actual competition between the merging parties and potential competition from Epogee's other customers.

234. The anticompetitive effects of the acquisition include: a. Creation of a monopoly in the EPG market; b. Elimination of all independent sources of EPG supply; c. Foreclosure of competitors from an essential input; d. Substantial increase in barriers to entry; e. Elimination of innovation competition.

235. The acquisition has substantially lessened competition by: a. Reducing the number of EPG suppliers from one to zero for all non-affiliated entities; b. Increasing market concentration to 100% control by Defendants; c. Eliminating all competitive constraints on pricing and output.

236. No cognizable efficiencies justify the anticompetitive effects of this acquisition.

237. The acquisition may be presumed unlawful under the Clayton Act based on: a. The increase in market concentration to monopoly levels; b. The elimination of all independent competitors; c. The foreclosure effects on downstream competition.

238. As a direct and proximate result of this illegal acquisition, Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**COUNT IV - VIOLATION OF NEW YORK DONNELLY ACT**

**(Monopolization - N.Y. Gen. Bus. Law § 340)**

239. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

240. This claim is brought under the New York Donnelly Act, N.Y. Gen. Bus. Law § 340 et seq., which prohibits monopolization and contracts, agreements, arrangements or combinations in restraint of trade.

241. The Donnelly Act applies because: a. Defendants Linus Technology, Inc. and Peter Rahal maintain their principal place of business in New York; b. The anticompetitive conduct was directed from New York; c. The conduct has substantial effects on commerce within New York.

242. Defendants have engaged in conduct constituting monopolization under N.Y. Gen. Bus. Law § 340(1) by: a. Acquiring monopoly power in the relevant market; b. Willfully maintaining that power through exclusionary conduct; c. Restraining competition in the EPG market.

243. Defendants have entered into a contract, agreement, arrangement or combination in restraint of competition in violation of N.Y. Gen. Bus. Law § 340(1).

244. The relevant market under the Donnelly Act is the same as under federal law: the global market for EPG supply, which affects commerce in New York.

245. Defendants' violations of the Donnelly Act have directly injured competition within New York by: a. Preventing New York businesses from accessing EPG; b. Eliminating competing products from New York commerce; c. Enabling monopoly pricing in New York.

246. Defendants' conduct under the Donnelly Act lacks any legitimate business justification under New York law.

247. As a direct and proximate result of Defendants' violations of the Donnelly Act, Plaintiffs have been injured in their business and property.

248. Pursuant to N.Y. Gen. Bus. Law § 340(5), Plaintiffs are entitled to treble damages for injuries sustained by reason of Defendants' violations of the Donnelly Act.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Adjudge and decree that Defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

B. Adjudge and decree that Defendants have violated Section 7 of the Clayton Act, 15 U.S.C. § 18;

C. Adjudge and decree that Defendants have violated the New York Donnelly Act, N.Y. Gen. Bus. Law § 340;

D. Permanently enjoin Defendants from continuing to exclude Plaintiffs and other historic EPG customers from access to EPG;

E. Order Defendants to provide EPG to Plaintiffs and other historic customers on fair, reasonable, and non-discriminatory (FRAND) terms at prices not exceeding those in effect on January 1, 2025;

F. Order structural relief if necessary to restore competition, including but not limited to divestiture of Epogee or licensing of EPG manufacturing rights;

G. Award Plaintiffs damages in an amount to be proven at trial, automatically trebled pursuant to 15 U.S.C. § 15(a) and N.Y. Gen. Bus. Law § 340(5);

H. Award Plaintiffs their costs of suit, including reasonable attorneys' fees pursuant to 15 U.S.C. § 15(a);

I. Award Plaintiffs pre-judgment and post-judgment interest as provided by law;

J. Order Defendants to preserve all remaining documents, communications, and electronic evidence related to EPG supply, customer relationships, and the Epogee acquisition, with daily monetary sanctions for any further spoliation;

K. Appoint a special master or forensic examiner to investigate the scope of Defendants' evidence destruction and recover any retrievable deleted materials;

L. Grant such other and further relief as the Court deems just and proper.

## XIV. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: July 17, 2025,

By: *<u>/s/ Brittany Meyer-Belnap</u>*
Brittany Meyer-Belnap
1121 14th Street NW #1010
Washington DC 20009
Tel. 202-550-5700
bmeyer@tmdstrategies.com

*Attorney for Plaintiffs*