USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___2/4/26___

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

OWN YOUR HUNGER LLC, LIGHTEN UP FOODS, and DEFIANT FOODS LLC,

                    Plaintiffs,

            - against -

LINUS TECHNOLOGY, INC., EPOGEE LLC, and PETER RAHAL,

                    Defendants.

---

**25-CV-4544 (VM)**

**DECISION AND ORDER**

---

**VICTOR MARRERO, United States District Judge.**

Plaintiffs OWN Your Hunger LLC ("OWN"), Lighten Up Foods, LLC ("Lighten Up"), and Defiant Foods, LLC ("Defiant Foods" and, collectively, "Plaintiffs") bring this antitrust case against defendants Linus Technology, Inc., d/b/a "David Protein" ("David Protein"), Epogee LLC ("Epogee"), and Peter Rahal ("Rahal" and, collectively, "Defendants"). Plaintiffs allege claims under Section 1 of the Sherman Act ("Section 1"), 15 U.S.C. § 1, Section 2 of the Sherman Act ("Section 2"), 15 U.S.C. § 2, Section 7 of the Clayton Act ("Section 7"), 15 U.S.C. § 18, and New York's Donnelly Act, N.Y. Gen. Bus. Law § 340. (See "Second Amended Complaint" or "SAC", Dkt. No. 41.) Before the Court is Defendants' motion to dismiss (Dkt. No. 60) and Plaintiffs' motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 (Dkt. No. 70). For the reasons stated below, the Court **GRANTS**

Defendants' motion to dismiss and **DENIES** Plaintiffs' motion for a preliminary injunction.

## I.    BACKGROUND[1]

This litigation arises out of the May 9, 2025, acquisition of Epogee, the sole producer of a plant-based "fat alternative" known as esterified propoxylated glycerol ("EPG"), by David Protein, the manufacturer of a line of protein bars that incorporate EPG as an ingredient. (See SAC ¶ 1.)

The Plaintiffs are three producers of "low-calorie" food products. (Id. at ¶¶ 20-22.) OWN manufactures and sells low-calorie peanut butters and hazelnut spreads and "protein dessert squares." (SAC ¶ 20.) Lighten Up manufacturers and sells low-calorie sauces. ("Sanburg Decl.", Dkt No. 41-1 at ¶ 1; SAC ¶ 21.) Defiant manufacturers and sells low-calorie chocolate products. ("Fugal Decl.", Dkt No. 41-3 at ¶ 1; SAC ¶ 22.) All three companies manufacture their products using EPG, which provides many of the functional qualities of a traditional fat but contains 0.7 calories per gram as compared to the approximately 9 calories per gram in traditional fats.

---

[1] The following facts are taken from Plaintiff's Second Amended Complaint, which the Court takes as true for the purpose of resolving Defendants' motion to dismiss. See Safka Holdings LLC v. iPlay, Inc., 42 F. Supp. 3d 488, 491 (S.D.N.Y. 2013). Where indicated, the Complaint's factual allegations are supplemented by facts and information drawn from documents appended to the Complaint. See Tannerite Sports, LLC v. NBCUniversal Media LLC, 135 F. Supp. 3d 219, 225 n.1 (S.D.N.Y. 2015).

(See Sanburg Decl. at ¶¶ 4-10; Fugal Decl. at ¶¶ 4-5; "Walia Decl.", Dkt. No. 41-6 at ¶¶ 8-9.)

EPG was developed by Epogee, which holds four patents on EPG's manufacturing process. (See SAC ¶ 38.) Prior to the events that gave rise to this litigation, Plaintiffs and David Protein all purchased EPG from Epogee, which was the sole producer and supplier of EPG. (See SAC ¶ 30.)

In February 2025, David Protein and Epogee began negotiations in anticipation of David Protein's acquisition of Epogee. (See SAC ¶ 78.) On March 25, 2025, Epogee sent a notice to Plaintiffs stating that it would not be accepting new orders for EPG from Plaintiffs due to a "stock out situation" and "unexpectedly high lead times for raw materials." (Dkt. No. 41-14 at 9; SAC ¶ 79.) On May 9, 2025, David Protein completed its acquisition of Epogee for $75 million. (See SAC ¶ 70.) On May 29, 2025, Defendants sent letters to Plaintiffs stating that Defendants were "wind[ing] down support for [Plaintiffs'] account[s]" and would not accept new orders for EPG from Plaintiffs in the future. (See Dkt. No. 41-14 at 14.) In an interview shortly after the acquisition, Rahal, one of the founders of David Protein, stated that David "will be taking all the supply" of EPG. (SAC ¶ 90.) Beginning with the March 25, 2025, letter through

3

the present, Defendants have not accepted any new orders for EPG from Plaintiffs.

On June 2, 2025, Plaintiffs commenced this action by filing their original complaint along with a motion for an *ex parte* temporary restraining order ("TRO") and preliminary injunction ("PI"). In their operative complaint, Plaintiffs allege that Defendants violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 340 of New York's Donnelly Act, N.Y. Gen. Bus. Law. § 340. (See SAC ¶¶ 206-48.) Plaintiffs allege that Defendants violated the various antitrust statutes by engaging in an unlawful exclusive dealing relationship prior to the merger, whereby Epogee agreed to provide only David with EPG at the exclusion of other buyers, and by merging and subsequently refusing to supply Plaintiffs with EPG. (See id.)

On June 4, 2025, this Court declined to grant Plaintiffs' motion for a TRO *ex parte*. (See Dkt. No. 11.) Following service on Defendants along with full briefing and oral argument, this Court denied Plaintiffs' motion for a TRO on June 17, 2025, finding that Plaintiffs had failed to demonstrate a likelihood of success on the merits of any of their claims. (See Dkt. No. 27.)

On September 22, 2025, Defendants filed their motion to dismiss the SAC along with a supporting memorandum of law. (See Dkt. Nos. 60, 61.) Plaintiffs filed a memorandum in opposition on October 16, 2025. (See "Opposition" or "Opp'n", Dkt. No. 66.) On October 30, 2025, Defendants filed a reply memorandum in support of their motion. (See Dkt. No. 68.)

On November 7, 2025, Plaintiffs filed their motion for a PI along with a memorandum of law, supporting exhibits, and a proposed PI order. (See Dkt. Nos. 70, 71, 72, 73.) Plaintiffs seek a PI enjoining Defendants from refusing to sell EPG to Plaintiffs and requiring them to continue fulfilling Plaintiffs' EPG purchase orders at prices and quantities analogous to those previously provided. (See Dkt. No. 73.) Defendants filed a memorandum of law in opposition on November 25, 2025. (See Dkt. No. 74.) Plaintiffs filed a reply memorandum on December 5, 2025. (See Dkt. No. 75.) On December 14, 2025, Plaintiffs requested that the Court decide its Motion without oral argument or an evidentiary hearing. (See Dkt. No. 76.)

## II.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 570 (2007)). A claim is plausible if the complaint states "'enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct" — there is not "a probability requirement at the pleading stage." Lynch v. City of New York, 952 F.3d 67, 75 (2d Cir. 2020) (quoting Twombly, 550 U.S. at 556); see Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "In other words, a complaint should not be dismissed when the factual allegations sufficiently 'raise a right to relief above the speculative level.'" Liboy v. Russ, No. 22-CV-10334, 2023 WL 6386889, at *4 (S.D.N.Y. Sept. 29, 2023) (quoting Twombly, 550 U.S. at 555).

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (citation omitted). The Court may also "consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings in order to determine if a complaint should survive a [Rule] 12(b)(6)

6

motion." <u>Garcia v. Lewis</u>, No. 05-CV-1153, 2005 WL 1423253, *3 (S.D.N.Y. June 16, 2005); <u>see</u> <u>also</u> <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) ("[W]e may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

### III. <u>DISCUSSION</u>

Plaintiffs bring claims under Sections 1 and 2 of the Sherman Act, Section 7 of the Clayton Act, and the Donnelly Act. Plaintiffs have failed to state a claim for which relief can be granted because they have not plausibly alleged that Defendants' conduct harmed competition in the relevant market Plaintiffs identify.

All of Plaintiffs' claims require Plaintiffs to show harm to competition within a relevant market. Section 1 of the Sherman Act proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of [interstate] trade or commerce." 15 U.S.C. § 1. "To prove a Sherman Act Section One violation, a plaintiff must show first that there were 'concerted actions between at least two legally distinct economic entities' which evince 'a conscious commitment to a common scheme designed to achieve an unlawful

objective.'" Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs., 403 F. Supp. 3d 191, 201 (S.D.N.Y. 2019) (quoting United States v. Apple, Inc., 791 F.3d 290, 313, 315 (2d Cir. 2015)). Then, plaintiffs must show that the concerted action "constituted an unreasonable restraint of trade." Anderson News, LLC v. Am. Media, Inc., 899 F.3d 87, 97 (2d Cir. 2018) (internal quotation omitted). "Courts presumptively apply a rule of reason analysis to challenged agreements to determine whether they restrain trade." Fed. Trade Comm'n v. Shkreli, 581 F. Supp. 3d 579, 624 (S.D.N.Y. 2022). "[U]nder the rule of reason, a plaintiff must identify the relevant market that is subject to the restraint and then demonstrate the restraint's adverse effects on competition in that market." Caruso Mgmt., 403 F. Supp. 3d at 201.

The Sherman Act Section 2, the Clayton Act Section 7, and the Donnelly Act also require plaintiffs to identify the relevant market affected. Section 2 of the Sherman Act proscribes "monopoliz[ing] any part of the [interstate] trade or commerce," 15 U.S.C. § 2, and includes two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966).

Section 7 of the Clayton Act prohibits acquisitions when their effect "may be substantially to lessen competition, or to tend to create a monopoly," 15 U.S.C. § 18, and requires that competition be harmed or monopoly power acquired in a defined market. See United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593 (1957) ("Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition. Substantiality can be determined only in terms of the market affected."); see also Saint Francis Hosp. & Med. Ctr., Inc. v. Hartford Healthcare Corp., 655 F. Supp. 3d 52, 68 (D. Conn. 2023) ("[T]he standards of liability under [the Sherman Act and the Clayton Act] are largely the same.").

Under the Donnelly Act, any contract, agreement, or arrangement that forms a monopoly or restrains competition in trade is illegal. See N.Y. Gen. Bus. Law. § 340(1). A party alleging a violation of the Donnelly Act must satisfy several elements: "(1) identify the relevant product market; (2) describe the nature and effects of the purported conspiracy; (3) allege how the economic impact of that conspiracy is to restrain trade in the market in question; and (4) show a conspiracy or reciprocal relationship between two or more

9

entities." Altman v. Bayer Corp., 125 F.Supp.2d 666, 672 (S.D.N.Y. 2000).

The relevant market for antitrust purposes is the "area of effective competition within which the defendant operates." Concord Assocs., L.P. v. Ent. Props. Tr., 817 F.3d 46 (2d Cir. 2016) (internal quotation marks and citation omitted). The market includes "all products reasonably interchangeable by consumers for the same purposes." Regeneron Pharms., Inc. v. Novartis Pharma AG, 96 F.4th 327, 338 (2d Cir. 2024) (internal quotation omitted). "Two products are reasonably interchangeable where there is sufficient cross-elasticity of demand — that is, where consumers would respond to a slight increase in the price of one product by switching to another product." Id. (internal quotation omitted).

In their Second Amended Complaint Plaintiffs allege that the relevant market for all their claims is the "global market for EPG supply." (SAC ¶¶ 219, 232, 244.) Defendants argue that Plaintiffs' proposed market definition improperly excludes fats and fat substitutes with which EPG competes. (See Dkt. No. 61 at 8-13) The Court need not decide whether Plaintiffs have alleged a plausible market definition. Even accepting that the "global market for EPG supply" constitutes a relevant market for antitrust purposes, Plaintiffs have

10

failed to allege that Defendants' actions harmed competition in that market.

In addition, despite alleging in their Second Amended Complaint that the relevant market is the "global market for EPG supply," (SAC ¶¶ 219, 232, 244), Plaintiffs have elsewhere identified various downstream product markets as the "relevant market that is subject to the restraint" and thus where competition is harmed. Caruso Mgmt., 403 F. Supp. 3d at 201. At the oral argument concerning Plaintiffs' motion for a TRO, Plaintiffs stated "[t]he relevant market here is the ultra-low-calorie indulgence market." (Dkt. No. 32 at 10:19–20.) Further, in their Opposition, Plaintiffs argue that "downstream markets for EPG-based food products" are the "zone of effective competition where Defendants' anticompetitive conduct causes competitive harm and monopoly profits are extracted." (Opp'n at 19.)

In their Second Amended Complaint as well as their Opposition to Defendants' motion, Plaintiffs use different terms for the relevant downstream markets: the "EPG-based protein bars" market (Opp'n at 35), the "downstream protein bar market" (Opp'n at 31), the "downstream food markets including protein bars, ice creams, brownies, cookies, and chips" (Opp'n at 24), the market for "EPG-based products in ice cream, brownies, chips, cookies, and spreads" (SAC ¶ 145),

11

and the market for "EPG-dependent food products" (SAC ¶ 204). In addition to providing varying and overlapping definitions of the relevant downstream markets, Plaintiffs fail to allege the bounds of those markets and the reasonably interchangeable products within them.[2] For example, Plaintiffs do not allege that consumers view Lighten Up's EPG-containing sauces as reasonably interchangeable with David's protein bars. Nor do Plaintiffs allege that consumers view David's bars as not reasonably interchangeable with protein bars that do not include EPG. See Regeneron Pharms., 96 F.4th at 339 (describing the evidence that courts look to in determining the boundaries of a proposed market). Having failed to allege the reasonable interchangeability of products within the downstream product markets, Plaintiffs have failed to define those markets. See, e.g., Planetarium Travel, Inc. v. Altour Int'l, Inc., 97 F. Supp. 3d 424, 429 (S.D.N.Y. 2015), aff'd, 622 F. App'x 40 (2d Cir. 2015) (rejecting a proposed market where the plaintiff had "offered

---

[2]  In its Decision and Order denying Plaintiffs' motion for a temporary restraining order, this Court previously highlighted Plaintiffs' failure to define the downstream markets. (See Dkt. No. 27 at 10–11 ("If the relevant market is the United States market for low-calorie indulgence foods, Plaintiffs have provided no explanation as to why a consumer would respond to a slight increase in price of Plaintiffs' low-calorie sauces, nut spreads, and chocolates by switching to Defendants' protein bars.").) None of Plaintiffs' filings following that Decision and Order have provided that missing explanation. Plaintiffs' only attempt in the vein of downstream market definition is a single paragraph in its SAC stating that David Bars are 56% more expensive than a single brand of non-EPG-containing protein bars. (See SAC ¶ 115.)

no facts regarding the size of this proposed market, market participants, market shares, or any information to guide the Court in assessing its validity"); Gianna Enterprises v. Miss World (Jersey) Ltd., 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982) ("The Court cannot accept the market boundaries offered by plaintiff without at least a theoretically rational explanation for excluding [potential substitutes].").

Plaintiffs argue that they need not define these downstream markets because they are not the "relevant market for market definition purposes" but instead the "zone of effective competition where Defendants' anticompetitive conduct causes competitive harm and monopoly profits are extracted." (Opp'n at 19.) That argument mistakes the role of market definition in antitrust law. The "relevant market" for antitrust purposes *is* the "area of effective competition." Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328 (1961). The purpose of defining that market is to establish the line of commerce and geographic area in which a defendant holds market power and competition may be harmed. See, e.g., Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc., 386 F.3d 485, 496 (2d Cir. 2004) ("The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output."); Phillip E. Areeda & Herbert

13

Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 531a, LexisNexis (database updated Sept. 2025) ("Finding the relevant market and its structure is typically not a goal in itself but a mechanism for considering the plausibility of antitrust claims that the defendants' business conduct will create, enlarge, or prolong market power."). Plaintiffs' failure to define the downstream product markets undermines all of their claims as their theory of harm across all of their claims is that Defendants' actions will harm competition in those markets.

A.    SHERMAN ACT SECTION 1 CLAIM

In their Section 1 claim, Plaintiffs allege that, before Epogee and David merged, the two then-separate firms agreed that Epogee would sell EPG only to David and cease supplying Plaintiffs and other purchasers. (See SAC ¶ 209.) In their Second Amended Complaint, Plaintiffs allege that this agreement was a "horizontal market allocation and/or group boycott" that is *per se* unlawful or, in the alternative, unlawful under the rule of reason. (SAC ¶ 49.) Plaintiffs have failed to allege facts sufficient to support either of these theories.

As an initial matter, Plaintiffs' allegations make clear that any agreement between Epogee and David was vertical, not horizontal, as Epogee and David did not compete in any market

14

but engaged in the sale of EPG as supplier and consumer. See, e.g., Anderson News, L.L.C., v. Am. Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012) ("Agreements within the scope of § 1 may be either horizontal, *i.e.*, agreements between competitors at the same level of the market structure, or vertical, *i.e.*, combinations of persons at different levels of the market structure, *e.g.*, manufacturers and distributors."); Moccio v. Cablevision Sys. Corp., 208 F. Supp. 2d 361, 378 (E.D.N.Y. 2002) ("Vertical refusals to deal are agreements among persons or organizations at different levels of the market structure not to deal with other market participants.").

Vertical group boycotts, also known as concerted refusals to deal, are generally subject to the rule of reason. See Moccio, 208 F. Supp. 2d at 379; NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 135 (1998) ("[P]recedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors.").[3] Accordingly, such agreements do not violate antitrust law absent a showing that the agreement had "an *actual* adverse effect on competition as

---

[3] The agreement might also be understood as an exclusive dealing agreement between Defendants. As a vertical exclusive dealing agreement, Defendants' conduct would similarly be subject to the rule of reason. See Maxon Hyundai Mazda v. Carfax, Inc., No. 13-CV-2680, 2014 WL 4988268, at *9 (S.D.N.Y. Sept. 29, 2014). The difference in label therefore does not affect the Court's analysis.

a whole in the relevant market." <u>Virgin Atl. Airways Ltd. v. Brit. Airways PLC</u>, 257 F.3d 256, 264 (2d Cir. 2001) ("The fact that the defendant's actions prevent a plaintiff from competing in a market is not enough, standing alone, to satisfy this initial burden of proof."). A plaintiff can demonstrate the adverse effect directly, such as by showing reduced output or higher prices. <u>See, e.g.</u>, <u>North American Soccer League</u>, 883 F.3d at 42. Alternatively, a plaintiff can meet his or her burden indirectly, "by showing that the defendant has sufficient market power to cause an adverse effect on competition" and "other grounds for believing the challenged restraint harms competition." <u>Id.</u> "These other grounds might include price increases, reduced output or market quality, significantly heightened barriers to entry, or reduced consumer choice." <u>Id.</u>

Plaintiffs do not allege direct evidence of harm to the market for EPG supply. The Second Amended Complaint does not allege that, as a result of Defendants' agreement, EPG output has declined, EPG prices have gone up, or EPG quality has been reduced. Plaintiffs' elimination as purchasers of EPG does not constitute reduced output in the economic sense. <u>See</u> <u>Discon Inc. v. NYNEX Corp.</u>, 86 F. Supp. 2d 154 (W.D.N.Y. 2000) ("[Plaintiff's] elimination from the market simply does not equate to 'reduced output.'"). Plaintiffs allege that David

16

purchased and put to use the EPG that would have otherwise gone to Plaintiffs. (See SAC ¶ 209.)

Instead, Plaintiffs allege that Defendants' pre-merger agreement had an adverse effect on competition by excluding them from obtaining EPG and thus forcing them to "exit their markets," including by reformulating their products to replace EPG. (SAC ¶ 184.) As Plaintiffs explain their theory of harm in their Opposition, the Defendants' "vertical agreement eliminated competition in the downstream protein bar market." (Opp'n at 31.) But an antitrust plaintiff must show adverse effects on competition *in the relevant market*. See Spinelli v. Nat'l Football League, 903 F.3d 185, 212 (2d Cir. 2018). Reduced output or lessened consumer choice of "EPG-containing products" is an adverse effect on competition in the downstream product markets, not the market for EPG supply.

Plaintiffs' failure to define the relevant downstream markets undermines their attempts to show harm to competition within those markets. Plaintiffs do not show direct harm to competition in those markets. Plaintiffs offer one allegation that Defendants charge 56 percent more for their protein bar than a single competitor. (See SAC ¶ 115.) But Plaintiffs do not allege any connection between the exclusive dealing agreement and Defendants' higher price. Plaintiffs do not

17

allege that the competitor in question used EPG prior to the exclusive dealing agreement or would have used EPG but for the agreement.

Nor do plaintiffs sufficiently allege indirect harm to competition in those downstream product markets. In order to do so, they would need to first allege that Defendants have sufficient market power in a downstream product market. See, e.g, North American Soccer League, 883 F.3d at 42; Moccio, 208 F. Supp. 2d at 380 ("To claim that [Defendants] reduced output or erected entry barriers, Plaintiffs would had to have first defined the relevant market."). But, having failed to define the markets in which Defendants compete, Plaintiffs cannot establish Defendants' market power in those markets. For example, if as Defendants argue, David Protein bars compete in a protein bar market with robust competition, including from competitors that do not use EPG, that competition may restrain Defendants' ability to raise prices or restrict output. On the other hand, if David Protein competes in a market for "EPG-dependent food products," Defendants' exclusive control over EPG may, as Plaintiffs argue, allow Defendants to harm competition in that market. Either way, "[w]ithout a definition of [the relevant] market there is no way to measure [Defendants'] ability to lessen or destroy competition." Walker Process Equip., Inc. v. Food

18

Mach. & Chem. Corp., 382 U.S. 172, 177 (1965); Ohio v. American Express Co., 585 U.S. 529, 543 n.7 (2018) ("Vertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market."). Having failed to define the downstream market or markets at issue — the markets in which they argue Defendants' actions will harm competition — Plaintiffs have failed to sufficiently allege their Section 1 claim.

B.   SHERMAN ACT SECTION 2 CLAIM

Plaintiffs' Section 2 claims fails to state a claim for similar reasons. Section 2 makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States or with foreign nations." 15 U.S.C. § 2. A viable claim under Section 2 "must, like a Section 1 claim, show a harm to competition." E & L Consulting, 472 F.3d at 31.

Plaintiffs' Section 2 claim primarily challenges Defendants' decision to cease supplying EPG to Plaintiffs.[4]

---

[4] To the extent that Plaintiffs' Section 2 claim also challenges Defendants' merger, that claim mirrors Plaintiffs' Clayton Act Section 7 claim and fails to state a claim for the reasons discussed concerning the Section 7 claim. Cf. Saint Francis Hosp., 655 F. Supp. at 68 ("[T]he standards of liability under [the Sherman Act and the Clayton Act] are largely the same.").

That claim is properly dismissed for similar reasons as Plaintiffs' Section 1 claim, even without consideration of whether Plaintiffs have alleged the requirements for a refusal to deal claim as described by the Supreme Court in Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985) and Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, 540 U.S. 398 (2004). Simply put, Defendants' post-merger decision to cease supplying EPG to Plaintiffs had no effect on competition in the market for EPG. A fact makes clear the lack of anticompetitive effect on the EPG supply market of Defendants' refusal to sell Plaintiffs EPG: even were the Court to grant Plaintiffs their requested injunctive relief and order Defendants to meet their EPG needs, Defendants would remain a monopolist with 100 percent share of the EPG market. That monopoly is the result of the patents on EPG's production, the legality of which Plaintiffs do not contest, and David's acquisition of Epogee, the anticompetitive nature of which Plaintiffs have failed to demonstrate, as explained below in relation to Plaintiffs' Clayton Act Section 7 claim.

Regarding the downstream product markets, Plaintiffs allege that Defendants have "expand[ed] into downstream markets abandoned by foreclosed competitors" and "prevent[ed] entry by controlling all means of production." (SAC ¶ 223.)

20

In their Opposition, Plaintiffs describe this theory as "two-tier market monopolization" or "market leveraging," whereby Defendants "monopolized EPG supply upstream, then leveraged that control to monopolize downstream markets." (Opp'n at 35.)

"Within the context of [Section] 2 claims, the Supreme Court has recognized the impropriety of monopoly leveraging, *i.e.*, the use of monopoly power in one market to strengthen a monopoly share in another market." Virgin Atlantic Airways Ltd. v. British Airways PLC, 257 F.3d 256, 272 (2d Cir. 2001). To state a claim for monopoly leveraging, a plaintiff must allege that the defendant "(1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage . . . in another distinct market; and (3) caused injury by such anticompetitive conduct." Id. Additionally, the plaintiff must allege "a 'dangerous probability of success' in monopolizing [the] second market." Verizon Commc'ns, 540 U.S. at 415 n.4 (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993)); see In re Google Digital Advert. Antitrust Litig., 721 F. Supp. 3d 230, 266 (S.D.N.Y. 2024).

Plaintiffs' failure to define the downstream markets at issue dooms their monopoly leveraging claim. To state a claim for monopoly leveraging, Plaintiffs must allege that

Defendants' conduct "threatens the second market with the higher prices or reduced output or quality associated with the kind of monopoly that is ordinarily accompanied by a large market share." AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 230 (2d Cir. 1999) (quoting Phillip E. 3 Areeda *et al.*, Antitrust Law ¶ 652, at 90 (alterations accepted)). But Plaintiffs cannot establish that Defendants have a "dangerous probability" of acquiring monopoly power in downstream markets, or that competition will be harmed in those markets, without first defining the markets at issue. See Geneva Pharms., 386 F.3d at 496. Again, "[w]ithout a definition of [the relevant] market there is no way to measure [defendant's] ability to lessen or destroy competition." Walker Process, 382 U.S. at 177; see Moccio, 208 F. Supp. 2d at 377 ("To plead both actual and attempted monopolization claims, plaintiffs must allege the scope and boundaries of the relevant market sought to be monopolized.").

Plaintiffs have therefore failed to state a claim as to their Section 2 claim. See Elecs. Commc'ns Corp., 129 F.3d at 244, 246 ("Nor is it a violation of the antitrust laws, without a showing of an actual adverse effect on competition market-wide, for a manufacturer to terminate a distributor . . . and to appoint an exclusive distributor.").

C.    CLAYTON ACT SECTION 7 CLAIM

Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. In assessing Section 7 claims challenging vertical mergers, courts generally apply a burden-shifting approach. See FTC v. IQVIA Holdings Inc., 710 F. Supp. 3d 329, 351 (S.D.N.Y. 2024); Illumina, Inc. v. FTC, 88 F. 4th 1036, 1048 (5th Cir. 2023).[5] Under this approach, the plaintiff must first "make a fact-specific showing that the proposed merger is likely to be anticompetitive." AT&T, 916 F.3d at 1032. If the plaintiff does so, "the burden shifts to the defendant to present evidence that the *prima facie* case inaccurately predicts the relevant transaction's probable effect on future competition or to sufficiently discredit the evidence underlying the *prima facie* case." Id. (internal quotation marks and citation

---

[5] The burden-shifting framework is "less entrenched in the context of vertical mergers" than in horizontal merger cases. IQVIA Holdings, 710 F at 351. In fact, "[t]here is a dearth of modern judicial precedent on vertical mergers and a multiplicity of contemporary viewpoints about how they might optimally be adjudicated and enforced." United States v. AT&T, Inc., 916 F.3d 1029, 1037 (D.C. Cir. 2019). But the burden-shifting approach has been adopted in the horizontal merger context by the Second Circuit, see In re AMR Corp., No. 22-901, 2023 WL 2563897, at *2-3 (2d Cir. Mar. 20, 2023), and in the vertical merger context by courts of appeals that have addressed the issue, see AT&T, 916 F.3d at 1037; Illumina, 88 F. 4th at 1048.

omitted). If the defendant is successful, "the burden of producing additional evidence of anticompetitive effects shifts back to the [plaintiff] and merges with the ultimate burden of persuasion." IQVIA Holdings, 710 F. Supp. 3d at 351.

One important fact differentiates the plaintiff's initial burden in vertical merger cases from that in actions challenging horizontal mergers. "A vertical merger, unlike a horizontal one, does not eliminate a competing buyer or seller from the market." Fruehauf Corp. v. FTC, 603 F.2d 345, 351 (2nd Cir. 1979). "It does not, therefore, automatically have an anticompetitive effect or reduce competition." Id. (citation omitted). The "competitive significance of a vertical merger" therefore "results primarily from the degree, if any, to which it may increase barriers to entry into the market or reduce competition by (1) foreclosing competitors of the purchasing firm in the merger from access to a potential source of supply, or from access on competitive terms, (2) by foreclosing competitors of the selling firm . . . from access to the market or a substantial portion of it, or (3) by forcing actual or potential competitors to enter or continue in the market only on a vertically integrated

24

basis because of advantages unrelated to economies attributable solely to integration." Id. at 352.[6]

The "ultimate objective" of the evaluation of a vertical merger is "to determine whether and how the particular merger in issue may lessen competition, *i.e.*, what its anticompetitive effect on the market, if any, is likely to be." Id. Plaintiffs have failed to allege facts sufficient to satisfy that inquiry.

In the first instance, Plaintiffs allege that the merger harmed competition via "[e]limination of all independent sources of EPG supply." (SAC ¶ 234.) Plaintiffs further argue that "Defendant's acquisition transformed an already concentrated market into an absolute monopoly, moving from 90% to 100% control." (Opp'n at 7.) That argument is wrong in fact and in law. According to Plaintiffs own theory of the case, the merger had no effect on concentration in the EPG market: prior to the merger that market was entirely controlled by Epogee, and after the merger it remains a

---

[6] In the words of a leading antitrust treatise: "A vertical merger standing alone does not alter concentration either in the supplier's market or in its customers' markets, and hence adds nothing to whatever market position either firm previously had. . . . Accordingly, any anticompetitive effects of a vertical merger must arise from other structural or behavioral consequences, such as increased entry barriers, the elimination of unintegrated rivals by foreclosure, or the raising of rivals' costs." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1000a, LexisNexis (database updated Sept. 2025).

monopoly controlled now by David. That makes sense as David and Epogee were not competitors in the EPG market but customer and supplier. As explained, a vertical merger between a customer and supplier does not directly cause any change in market concentration. See Fruehauf, 603 F.2d at 351.

In the alternative, Plaintiffs again focus on harm to downstream markets. Plaintiffs allege that the merger will have "foreclosure effects on downstream competition." (SAC ¶ 235.) In their Opposition, Plaintiffs argue that David's control over EPG has enabled them to "refuse all external sales of EPG" and "extract[] 56% price premiums in the downstream Consumer Package Goods markets they directly compete in." (Opp'n at 8.)[7]

Plaintiffs' theory of harm is consistent with Fruehauf's guidance that a vertical merger may "reduce competition by . . . foreclosing competitors of the purchasing firm in the merger from access to a potential source of supply, or from access on competitive terms." 603 F.2d at 352. But, as Fruehauf held, "[t]he Supreme Court's insistence that each merger challenges under [Section 7] be viewed in the context of its particular industry, and that the Clayton Act protects

---

[7] The 56% price premium figure is a reference to the difference in price between David's protein bar and the protein bar of a single competitor. (See Opp'n at 8; SAC ¶ 115.) That price difference alone is plainly insufficient to show harm to competition.

competition, not competitors, contravenes the notion that a significant level of foreclosure is itself the proscribed effect." Id. at 352-53 (cleaned up). Instead, "[a] showing of some probable anticompetitive impact is still essential." Id. at 353. Plaintiffs' theory of harm makes clear that that impact will occur in whatever downstream markets David competes in. That theory is consistent with the approach taken by other courts in considering the effects on downstream competitors of a vertical merger between a purchaser and a supplier. See id. at 354-55; Illumina, 88 F. 4th at 1051-55; AT&T, 916 F.3d at 1035-38. Because Plaintiffs have failed to define the downstream markets or otherwise allege how the merger will harm competition therein, they have failed to state a claim for relief on their Clayton Act Section 7 claims.

Consideration of other Clayton Act Section 7 cases addressing vertical mergers demonstrates the weakness of Plaintiffs' claim. For example, in Federal Trade Commission v. Microsoft Corp., 136 F.4th 954 (9th Cir. 2025), the Ninth Circuit considered the Federal Trade Commission's ("FTC") motion to preliminarily enjoin the merger of Microsoft, a producer of video game consoles, and Activision, the developer of certain video games. 136 F.4th at 958-59. As part of its theory of harm, the FTC argued that, after the

merger, Microsoft would make certain Activision video games exclusive to its console, resulting in substantial harm to competition in the downstream market for video game consoles. See id. at 970. The Ninth Circuit rejected this argument, as the FTC had failed to show a likelihood that exclusivity would harm competition in the console market. See id. at 970-71 ("The mere fact that, after a vertical merger, a company might make some of its newly acquired intellectual property exclusive to its platforms does not, without more, show a substantial lessening of competition.") As the Ninth Circuit explained, "[i]t is in the nature of intellectual property rights that the holder ultimately has exclusive control over them, and the question under [Section] 7 is whether there is a reasonable probability that, if Microsoft acquires such exclusivity rights with respect to the relevant intellectual property, Microsoft will exercise such rights in a manner that *substantially lessens competition* in the pertinent market, *i.e.*, the console market." Id. at 971. Demonstrating the required competitive harm "requires something more than merely showing that some of the rights acquired will be made exclusive." Id.

Plaintiffs' allegations here fall far short of the FTC's showing in Microsoft that the merger and resulting exclusivity will substantially lessen competition. Before the

28

district court in Microsoft, the FTC offered evidence, including pricing information and evidence of industry recognition, establishing the bounds of the console market. See FTC v. Microsoft Corp., 681 F. Supp. 3d 1069, 1086–87 (N.D. Cal. 2023). The FTC also offered evidence, albeit which the district court and Ninth Circuit found to be insufficient, to show that making certain video games exclusive to Microsoft's console would be profitable and result in harm to competition in the console market. See Microsoft, 136 F.4th at 967–69. Although Plaintiffs need not present evidence at this stage, they must make allegations from which the Court can assess the harm they allege will occur. As explained, Plaintiffs here have failed to offer even a consistent definition of the downstream markets at issue, much less allege how harm will result from Defendants' conduct. Accordingly, Plaintiffs have failed to state a claim as to their Clayton Act Section 7 claim.

D.    DONNELLY ACT CLAIM

Plaintiffs' Donnelly Act claim challenges the same conduct as their federal law claims and alleges the same relevant market. (See SAC ¶¶ 239–48 ("The relevant market under the Donnelly Act is the same as under federal law: the global market for EPG supply[.]").) The Donnelly Act requires "identical basic elements of proof for claims of

monopolization" as the Sherman Act, including the definition of a relevant market and a showing that the "economic impact of [the] conspiracy is to restrain trade in the market in question." Altman v. Bayer Corp., 125 F. Supp. 2d 666, 672 (S.D.N.Y. 2000). Accordingly, Plaintiffs have failed to state a sufficient claim as to their Donnelly Act action for the reasons explained above.

* * * * *

In sum, Defendants' actions have cut off Plaintiffs' supply of EPG. However, "antitrust is not concerned with denial of access in the abstract, but only with denial of access that foreseeably results in an output reduction and attendant increase in price." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1821c, LexisNexis (database updated Sept. 2025). Plaintiffs have not sufficiently alleged facts to show that Defendants' actions are capable of resulting in such harm to competition in the market they define — the global EPG supply market — or defined the markets in which they allege these harms will occur.

E.   MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs have moved for a preliminary injunction requiring Defendants to supply them with EPG. "A party seeking a preliminary injunction must show (1) irreparable harm; (2)

30

either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." North American Soccer League, 883 F.3d at 37 (2d Cir. 2018).

To establish a likelihood of success on the merits in support of a preliminary injunction, a Plaintiff "must clear a much higher hurdle" than is required to defeat a motion to dismiss. Stewart v. Metro. Transportation Auth., 566 F. Supp. 3d 197, 213 (E.D.N.Y. 2019). For the same reasons that Plaintiffs have failed to allege their entitlement to relief on their antitrust claims, they have failed to establish a likelihood of success on the merits or serious questions going to the merits of those claims.

## IV.  ORDER

For the foregoing reasons, it is hereby

**ORDERED** that the motion (Dkt. No. 60) of defendants Linus Technology, Inc., d/b/a "David Protein", Epogee LLC, and Peter Rahal to dismiss the Second Amended Complaint (Dkt. No. 41) is **GRANTED.** The Second Amended Complaint is hereby **DISMISSED.** Plaintiffs OWN Your Hunger LLC, Lighten Up Foods, LLC, and Defiant Foods, LLC's (collectively "Plaintiffs") may file, within ten days of the date of this Order, a letter brief not to exceed five pages seeking leave to file an

31

amended complaint, and showing factually how they would amend the complaint to overcome the deficiencies identified in this Decision and Order. Defendants may file a response of equal length within five days of the Plaintiffs' filing. It is further

**ORDERED** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 70) is **DENIED.**

**SO ORDERED.**

Dated:    4 February 2026
          New York, New York

_____
Victor Marrero
U.S.D.J.