UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OWN YOUR HUNGER LLC, LIGHTEN UP FOODS LLC, DEFIANT FOODS LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>LINUS TECHNOLOGY, INC., EPOGEE LLC, PETER RAHAL,<br><br>*Defendants*. | Case No. 1:25-cv-04544-VM<br><br>**THIRD AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE ANTITRUST LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs OWN Your Hunger LLC, Defiant Foods LLC, and Lighten Up Foods LLC bring this civil action for injunctive relief and treble damages arising under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 7 of the Clayton Act, 15 U.S.C. § 18, and the New York Donnelly Act, N.Y. Gen. Bus. Law § 340, and allege as follows:

## I. NATURE OF THE CASE

1. Defendant Linus Technology, Inc., operating under the trade name "David Protein," paid $75 million in May 2025 for Epogee LLC ("Epogee"), the sole manufacturer of Esterified Propoxylated Glycerol ("EPG"), and cut off EPG supply to every other buyer. EPG is the only ingredient that enables a protein bar to exceed the physical ceiling for calories from protein ("CFP") achievable with traditional fats. Before the acquisition, at least five firms besides David were developing high-CFP protein bars with EPG. After the acquisition, only David sells a protein bar above that ceiling.

2. Before the deal closed, Linus Technology entered into a seven-year exclusive supply agreement with Epogee, committing 100% of EPG output to David while the two companies were still separately owned. During acquisition negotiations, Epogee shared its confidential customer records with David, including order histories, pricing, product development details, and customer identities. Weeks before the acquisition closed, Epogee announced that EPG was unavailable due to "raw material lead times." No supply shortage had been announced in Epogee's six years of commercial operation.

3. The three Plaintiffs and two non-party declarants had purchased EPG from Epogee for up to six years, had collectively invested hundreds of thousands of dollars in product development, and were preparing to bring competing high-CFP protein bars to market at prices significantly below David's. Epogee had never offered long-term supply contracts to these customers or required them. After the acquisition, every one of these firms received the same termination notice.

4. Defendant Peter Rahal, David's founder, has openly described the strategy in public interviews. Rahal stated that Defendants intended to take "all the supply" of EPG, that competitors would "cease supply," and that the goal was to build "a really defensible business" that would prevent rivals from matching David's protein-to-calorie performance. He described securing exclusive control of EPG as "mission critical" and stated that Defendants would not supply EPG "to a customer with a directly competitive product." When asked about the competitors who lost access, Rahal said they should have secured supply contracts that Epogee had never offered.

5. No competitor can replicate David's product without EPG. Traditional fats contain approximately 9 calories per gram, making it physically impossible to push a protein bar

above approximately 50% CFP without destroying its form and taste. EPG reduces calories from fat by over 90%, extending the achievable range to approximately 75% CFP. Between those two limits, no protein bar can exist without EPG. No other known protein bar using a quality protein source exceeds 50% CFP.

6. EPG is manufactured through proprietary technology protected by patents extending through 2032. Its development required over a decade of research and more than $150 million in investment. No other company has produced or commercially sold EPG, and no viable substitute exists.

7. David Protein bars retail at premiums of 44-171% over conventional protein bars across every major retail channel. Defendants have not reduced prices despite the continuous availability of cheaper conventional protein bars through the same retailers. The foreclosed competitors had planned retail prices as low as 40% below David's.

8. Plaintiffs do not challenge the validity of Defendants' EPG patents. Plaintiffs challenge Defendants' acquisition of the sole EPG manufacturer and their use of that acquired control to eliminate every emerging competitor in the high-CFP protein bar market. Before the acquisition, Epogee supplied EPG to at least ten food manufacturers for over six years, and Plaintiffs collectively invested over $615,000 in EPG-based product development. Plaintiffs seek treble damages and injunctive relief to restore competition.

## II. JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, which grant district courts jurisdiction over antitrust actions.

10. This Court has personal jurisdiction over each Defendant because each transacts substantial business in this District and maintains offices in this District. Defendant Linus Technology, Inc. maintains its principal place of business in New York City, New York. Defendant Epogee LLC is now a wholly-owned subsidiary of Linus Technology, Inc. Defendant Peter Rahal resides in New York City, New York. The acquisition at issue was negotiated and executed substantially within this District.

11. Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c), because Defendants reside in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District. New York City is David Protein's primary advertising market: the company displays its products on large billboards throughout the city, runs advertisements on subway trains and in subway stations, and operates at least eleven branded trucks that generate millions of monthly impressions throughout New York City neighborhoods year-round (Exhibit 8, p.11).

12. This Court has supplemental jurisdiction over Plaintiffs' claim under the New York Donnelly Act, N.Y. Gen. Bus. Law § 340, pursuant to 28 U.S.C. § 1367(a) because that claim is so related to the federal antitrust claims that it forms part of the same case or controversy.

## III. THE PARTIES

**Plaintiffs**

13. OWN Your Hunger LLC ("OWN") is a Delaware limited liability company that has been in the protein bar market since 2018. OWN holds a federal trademark for "high-protein cereal bars" (USPTO Reg. No. 5651473; Exhibit 10, p.6). OWN collaborated with Epogee

beginning in approximately 2019 and was developing a high-CFP protein bar when Defendants terminated EPG supply. OWN's competitive activities are described in detail below.

14. Lighten Up Foods LLC ("Lighten Up") is a Delaware limited liability company. Lighten Up was developing a high-CFP protein bar with a CFP target of approximately 70% when Defendants cut off EPG supply. Lighten Up's founder has over 500,000 social media followers focused on high-CFP food analysis. Lighten Up's competitive activities are described in detail below.

15. Defiant Foods LLC ("Defiant") is a Utah limited liability company. Defiant was developing an EPG-based high-CFP protein bar with a CFP target exceeding 50% when Defendants cut off EPG supply. Defiant had already produced and sold EPG-based hybrid chocolate/protein bars containing 15 grams of protein per serving (Exhibit 10, p.13). Defiant's competitive activities are described in detail below.

**Defendants**

16. Linus Technology, Inc. ("Linus Technology") is a Delaware corporation with its principal place of business in New York City, New York.

17. Linus Technology, Inc., also known as Linus Technology MergerSub, LLC, operates under the trade names David ("David") and David Protein ("David Protein") and manufactures protein bars and other food products.

18. Epogee LLC ("Epogee") is an Indiana limited liability company and was, until its acquisition by Defendants, the sole manufacturer of EPG worldwide. Its principal place of business is in New York City, New York.

19. Epogee is now a wholly-owned subsidiary of Defendants.

20. Peter Rahal ("Rahal") is the founder and controlling person of Linus Technology, Inc., and a resident of New York City, New York.

21. Plaintiffs reserve the right to amend this complaint to add additional defendants as their identities and roles in the anticompetitive conduct alleged herein become known through discovery and investigation.

## IV. INTERSTATE AND INTERNATIONAL COMMERCE

22. At all relevant times, Defendants manufactured, marketed, distributed, and sold EPG and EPG-containing products, including protein bars, in interstate commerce throughout the United States.

23. Prior to Defendants' acquisition of Epogee, both Plaintiffs and Defendants purchased EPG in interstate commerce and sold their products, including protein bars and protein bar precursor products, to customers throughout the United States.

24. Defendants also sell their products internationally, including in Canada.

25. EPG is distributed from Shakopee, Minnesota, and shipped across state lines to food manufacturers throughout the United States. Prior to the acquisition, Epogee shipped EPG to customers in multiple states and to customers in Canada. Following the acquisition, Defendants terminated all interstate EPG shipments to non-affiliated customers, affecting interstate commerce.

26. The termination of EPG supply to all non-affiliated manufacturers eliminated multiple product lines sold in interstate commerce, including EPG-based products already distributed to retailers in multiple states, and foreclosed the launch of products in active development, including Plaintiffs' high-CFP protein bars.

## V. EPG: THE CRITICAL INPUT

### A. EPG Properties and Development

27. EPG achieves a 92% reduction in calories from fat. It is the only commercially available ingredient that enables a protein bar to exceed the physical CFP barrier.

28. The development of EPG required 18 years of continuous research and development from 2007 to 2025, and an investment of over $150 million in research, testing, and regulatory approvals (Exhibit 1, pp. 4-5).

29. EPG is manufactured through proprietary technology protected by patents owned by Epogee (Exhibit 1, p. 5; Ranen Decl. ¶ 11). Defendant Rahal confirmed that Epogee holds "process patents and application patents" covering both EPG production and its use in food products (Exhibit 6, p. 16). These patents extend through 2032.

30. EPG has received FDA "Generally Recognized as Safe" (GRAS) certification for use in 14 food categories (Exhibit 1, p. 8).

31. Prior to the acquisition, Epogee's Chief Commercial Officer Jayme Caruso publicly stated: "There is currently nothing like this on the market" and that while other plant-based fat technologies "may have a good mouthfeel, texture, and taste, they do not have the added nutritional benefit of EPG's reduced calorie count" (Exhibit 1, pp. 19, 24).

32. In a January 28, 2026 interview published in *Vanity Fair*, Defendant Rahal stated: "EPG is not a commodity; it's a proprietary ingredient" (Exhibit 19, p.3). In a March 12, 2026 public Q&A session published in the *Feed Me* newsletter, Rahal stated: "In the food industry and with the FDA, EPG is viewed as the holy grail. It has enormous public-health potential and solves the biggest issue in the American diet" (Exhibit 6, p. 22).

33. Traditional fats used in protein bars contain approximately 9 calories per gram. EPG contains 0.7 calories per gram. No other commercially available fat or fat substitute approaches EPG's caloric profile. MCT oil, the lowest-calorie conventional fat, contains 8.3 calories per gram. Inulin and fiber-based replacers alter texture and cause gastrointestinal distress. Resistant starches provide some texture but lack the flavor-carrying capacity and binding properties necessary for a protein bar. Sugar alcohols cause digestive issues and add sweetness inappropriate for protein bars. Olestra, a discontinued fat replacer, is FDA-approved only for savory snack foods and cannot legally be used in protein bars. Defendant Rahal described Olestra as "a big Enron of food" that "shouldn't have been commercialized" and where "people got in trouble" (Exhibit 6, p. 17).

34. Defendant Rahal confirmed the absence of viable fat substitutes in a September 17, 2025 interview published in *Men's Health*. Rahal stated that his team "considered everything from almond butter to beef tallow, but they all had drawbacks, whether it was a strong taste or health concerns." Upon discovering EPG, Rahal stated: "My god, what an innovation. You're delivering all the benefits of fat without any of the caloric impact!" Rahal further noted that at the time David adopted EPG, "no sizable brand anywhere was using it yet" (Exhibit 14, p.10).

35. Large brands such as Nick's have been using EPG since 2019 for its EPG-based ice creams. In 2021, Nick's secured a total of $160 million in funding and became one of the top brands in the better-for-you ice cream category, and attributed its U.S. expansion in part to EPG sourced from Epogee. Nick's founder Niclas Luthman stated: "We have looked into hundreds of patented technologies and ingredients . . . EPG is probably the most exciting ingredient technology I will come across in my career" (Exhibit 2, p.28).

36. When Epogee raised EPG prices by 50% in 2022 (from $4.35/lb to $6.49/lb), no customer known to Plaintiffs switched to traditional fats priced at $0.60-$2.00 per pound (Exhibit 4, pp.4-5). Despite Defendants' co-founder listing "nut butters, palm oil, palm kernel oil, canola oil" as conventional fat options for food products (Ranen Decl. ¶¶ 12-13), Defendants paid $75 million to acquire Epogee for exclusive EPG access.

37. Defendants' own co-founder acknowledged EPG's indispensability that Quest bars "chose to use ground almonds and cocoa butter instead of EPG. As a result Quest Bars have about 40 more calories than David bars" (Ranen Decl. ¶ 13).

38. Defendants' website describes David Protein bars as consisting of four engineered component systems: a "Protein system," a "Binding system," a "Fat system," and a "Flavor system" (Exhibit 8, p.2). The "Fat system" and "Binding system" are the two components fulfilled by EPG; without EPG, a protein bar cannot simultaneously deliver the taste, texture, and structural integrity of traditional fats while maintaining EPG's caloric density of 0.7 calories per gram.

**B. Patent Protection and Barriers to Entry in EPG Production**

39. No company has announced development of a similar fat replacement ingredient since EPG's commercial launch in 2018. Beyond the patent and cost barriers described above, Defendant Rahal has identified a further structural barrier: large food companies, the only entities with resources to develop an EPG competitor, will not do so because, as Rahal stated in a CNBC interview on January 16, 2025, "Any expensive ingredient like this will dilute earnings per share or disrupt their portfolio."

40. Replicating the knowledge required to formulate EPG-based products independently, even without patent barriers, would require approximately two years and substantial funding (Safai Decl. ¶ 28).

**C. Epogee's Commercial Supply History and Business Model**

41. Throughout its commercial operations prior to the May 2025 acquisition, Epogee pursued a growth-oriented business strategy centered on cultivating food manufacturers and consumer brands as customers for EPG. Rather than focusing on immediate profitability from its existing customer base, Epogee invested in expanding the number of companies incorporating EPG into their products, viewing each new manufacturer and brand as a vehicle for growing EPG's overall market penetration and driving long-term revenue growth. To this end, Epogee actively recruited food companies across multiple product categories, provided formulation guidance and research and development assistance, supplied sample quantities for product development, and maintained accessible pricing and ordering terms designed to lower barriers to adoption.

42. For more than six years, from approximately 2019 through May 2025, Epogee supplied EPG to its customers exclusively through individual purchase orders. During that entire period, Epogee did not offer Plaintiffs, nor to Plaintiffs' knowledge any other customer, a long-term supply agreement, minimum order commitment, annual purchase commitment, or advance notice provision (Safai Decl. ¶ 40). Epogee maintained no standard supply contract and did not present supply contracts as an available option to any customer known to Plaintiffs.

43. On December 2, 2024, Epogee's Chief Commercial Officer, Jayme Caruso, sent a formal letter on Epogee letterhead to all EPG customers establishing Epogee's ordering framework for the coming year (Exhibit 4, p.8). The letter stated that Epogee would "continue to

ship smaller orders, less than 5,000 pounds of EPG, without a deposit and within our traditional lead time of as close to 7 to 10 business days as possible." For orders of 5,000 pounds or greater, the letter required "a 50% deposit before confirming all Purchase Orders" and "receipt of a PO and deposit 90 days before requested delivery date." The letter attributed these terms to "increasing demand for EPG" and the need to "align this demand with commitments to our suppliers."

44. The December 2 letter offered customers one option to secure future inventory: "If you would like to make arrangements to ensure we have floor stock available for you, please contact me to discuss setting up a floor stock agreement" (Exhibit 4, p.8). A floor stock agreement is an arrangement to pre-reserve inventory for a specific customer. No long-term supply contract, volume guarantee, or multi-year commitment was offered or referenced in the letter.

45. This letter was sent less than one month before David Protein and Epogee executed a seven-year exclusive supply agreement in January 2025 committing 100% of Epogee's available EPG output to David (Exhibit 16, p.11). The letter contained no reference to supply constraints, capacity limitations, impending ownership changes, or any need to secure long-term supply arrangements.

46. Epogee also affirmatively reassured customers that supply was secure. In a private meeting on June 21, 2022 in Calgary, Alberta, Canada, Epogee's founder and president expressed to OWN's founder that "OWN need only be concerned with growing its EPG-based product portfolio, and not to worry about EPG supply" (Exhibit 3). On September 30, 2024, Epogee announced supply chain improvements and a 5% price reduction to all customers

(Exhibit 4, p.6). These reassurances continued through December 2, 2024, when Epogee established the purchase-order-based ordering framework described above.

47. In verified interrogatory responses dated October 6, 2025, Defendants identified eleven “then-active” Epogee customers (Exhibit 16, p.9). Of the eleven customers, only one non-affiliated customer, a privately held American chocolate business (Company J), held a supply agreement, and that was a pre-existing contract running from December 2020 through December 2025 (Exhibit 16, p.11). Every other non-affiliated customer’s supply agreement status was listed as “N/A” (Exhibit 16, p.9). David Protein was the only entity to receive a new supply agreement: a seven-year exclusive agreement running from January 2025 through December 2031.

48. On January 28, 2026, *Vanity Fair* published an article based on interviews with Defendant Rahal, in which Rahal stated that Epogee “supplied at least 12 makers” before the acquisition (Exhibit 19, p.2). This figure exceeds the eleven “then-active” customers identified in Defendants’ verified interrogatory responses by at least one. Of the ten non-David customers identified in Exhibit 16, seven had placed zero EPG orders since the acquisition as of October 6, 2025 (Exhibit 16, Response to Interrogatory No. 1). In the same article, Rahal stated he was “currently working on a supply agreement with three international CPG companies” (Exhibit 19, p.3). Of the ten non-David customers Defendants had identified under oath as having been contacted about continuing supply, discussions had narrowed to three multinational corporations, none of which had signed a supply agreement. The three entities Rahal described as “international CPG companies” are multinational food corporations. None of Epogee’s original small and mid-size customers, including the companies that had purchased EPG for up to six years and were developing competing products, were among the three.

49. Despite this record, Defendant Rahal stated in public interviews following the acquisition that EPG customers should have secured supply contracts to protect their access. On July 27, 2025, Rahal told *The New York Times* that "customers who find themselves out of luck should have had long-term commercial agreements in place to avoid this scenario" (Exhibit 12, p.9).

50. Defendants did not set minimum order quantities, raise prices for small-volume purchasers, require purchase commitments, or allocate any portion of EPG output to non-affiliated manufacturers. Every known non-affiliated customer received the same permanent termination notice on May 29, 2025 (Exhibit 4, p.14). No customer was offered alternative terms. The termination applied equally to firms making protein bars, chocolate bars, sauces, and spreads.

51. Defendants have not disclosed a single company name or category description of any other entity that actively produces, or is close to releasing, any food product made with EPG, let alone a protein bar.

**D. Pre-Acquisition Market Structure**

52. Prior to the May 2025 acquisition, Epogee LLC was the sole manufacturer of EPG worldwide, holding all patents and proprietary knowledge necessary for EPG production.

53. David Protein became Epogee's dominant customer sometime in 2024, purchasing approximately 90% of Epogee's total EPG production capacity for use in its protein bars (Exhibit 6, p.3). All other EPG customers combined, including Plaintiffs and at least seven other food manufacturers, shared the remaining approximately 10% of Epogee's production capacity.

54. Rahal stated the acquisition would create "a really defensible business with 3 moats" that would prevent "10 copy cats" from competing (Exhibit 6, p.7).

55. Epogee is the sole manufacturer of EPG worldwide and has been since EPG's commercial launch. No other company has produced or commercially sold EPG. EPG is the only commercially available ingredient that enables a protein bar to exceed the physical CFP barrier described below. EPG production is protected by process and application patents extending through 2032 (Exhibit 6, p.16). Developing a competing fat replacement ingredient would require over a decade of research, more than $150 million in investment, and separate FDA GRAS certification (Exhibit 1, pp. 4-5, 8). No company has announced development of such an alternative since EPG's commercial launch in 2018. Defendants acquired 100% of this market through their May 2025 purchase of Epogee and now control all production capacity, patents, and trade secrets necessary for EPG manufacturing.

## VI. THE RELEVANT MARKET: HIGH-CFP PROTEIN BARS SOLD IN THE UNITED STATES

### A. Market Definition: The Physical CFP Barrier

56. The relevant product market for this action is High-CFP Protein Bars, defined as protein bars that exceed the physical CFP (Calories From Protein) ceiling achievable with traditional fats and fall within the physical CFP ceiling achievable with EPG. These two physical limits bound the market at approximately 50% CFP (the point at which traditional fats can no longer be reduced without the bar losing structural form or acceptable taste) and approximately 75% CFP (the point at which even EPG reaches the same physical constraint). No protein bar using a quality protein source can enter this range without EPG, and no protein bar using EPG can exceed it. Defendants hold 100% of sales in this market.

57. CFP measures the percentage of a food product's total calories derived from protein. A protein bar with 150 total calories and 28 grams of protein has a CFP of approximately 75% (28 grams × 4 calories per gram = 112 protein calories; 112 ÷ 150 = 74.7%). Pure Protein's Chocolate Deluxe bar, one of the best-selling protein bars in the United States, contains 190 total calories and 20 grams of protein, yielding a CFP of approximately 42% (20 grams × 4 calories per gram = 80 protein calories; 80 ÷ 190 = 42.1%) (Exhibit 8, p.19).

58. Defendants' co-founder stated under oath that David Protein was founded "[s]eeking to distinguish the David bar from other protein bars" by "increas[ing] the percentage of calories in our bar coming from protein" (Ranen Decl. ¶ 7). To achieve that distinction, Defendants selected EPG "in lieu of other fats and fat substitutes" (Ranen Decl. ¶ 7).

59. David Protein's Gold bar contains approximately 150 calories and 28 grams of protein, yielding a CFP of approximately 75%. David Protein's Bronze bar contains approximately 150 calories and 20 grams of protein, yielding a CFP of approximately 53%. The Bronze bar was not designed to maximize CFP; it was designed to deliver an enhanced eating experience through a chocolate enrobement and cereal flakes, trading protein density for taste and texture variety. David's Gold bar, at 75% CFP, represents the product line optimized for protein efficiency and is the appropriate reference point for measuring the gap between EPG-based and conventional protein bars. Conventional protein bars also make formulation tradeoffs favoring taste and texture, yet their CFP ranges from 35% to 49%; even with those same concessions, EPG permits the Bronze bar to remain above the physical barrier that no conventional bar has crossed.

60. Quest Nutrition is owned by The Simply Good Foods Company, a publicly traded corporation. Quest bars are formulated with whey protein isolate and milk protein isolate,

complete proteins containing all essential amino acids, and are sold with protein content as the lead nutritional claim. Quest's Blueberry Muffin bar contains 20 grams of protein and 180 calories, yielding approximately 44% CFP (Exhibit 21, p.4). Quest's highest-CFP product, the Chocolate Brownie bar, contains 20 grams of protein and 170 calories, yielding approximately 47% CFP. No known protein bar formulated with complete protein and traditional fats has exceeded 47% CFP. The gap between Quest at 47% and David Bronze at 53% is six percentage points.

61. The physical barrier that defines this market arises from the caloric density of fats used in protein bar formulation. Traditional fats contain approximately 9 calories per gram; EPG contains 0.7 calories per gram. The same physical phenomenon (the point at which reducing fats further causes the bar to lose structural form or acceptable taste) caps performance at both boundaries. The only difference is the caloric density of the fat: traditional fats reach that constraint at approximately 50% CFP, while EPG extends the range to approximately 75% CFP before the same constraint applies. This physical relationship between fat content, structural integrity, and taste is described in Epogee's own published patent applications, which identify the functional limitations of conventional fats in high-protein food formulations and describe EPG as a solution to those limitations.

62. This barrier is a mathematical consequence of traditional fat's caloric density. A protein bar with a 200-calorie budget targeting 50% CFP requires 100 calories from protein (25 grams at 4 calories per gram). The remaining 100 calories must cover every non-protein component: fats for taste, texture, mouthfeel, and structural binding; carbohydrates; fiber; and flavoring. Traditional fats contain 9 calories per gram. At that density, 10 grams of traditional fat, a modest quantity for a bar that must hold its shape and deliver acceptable taste, consumes 90

of those 100 remaining calories, leaving 10 calories for all other non-protein ingredients combined. Pushing CFP above 50% requires shifting calories from fat to protein, but each gram of traditional fat removed frees only enough caloric budget for 2.25 additional grams of protein (9 calories ÷ 4 calories per gram), while progressively degrading the bar's structure and taste. EPG, at 0.7 calories per gram, changes this arithmetic: 10 grams of EPG consume 7 calories instead of 90, freeing 83 calories for approximately 21 additional grams of protein.

63. The ceiling of the high-CFP protein bar market at approximately 75% CFP is likewise set by physics. When asked whether David could increase the protein-to-calorie ratio beyond its current levels, Defendant Rahal stated: "That biophysics, we've maxed it out. And if you start to do more, it doesn't form into a bar or you have bad taste" (Exhibit 6, p. 17). David's Gold bar, at approximately 75% CFP, represents the maximum achievable with EPG. The same physical constraint that caps non-EPG bars at approximately 50% CFP caps EPG-based bars at approximately 75% CFP. In a July 27, 2025 interview published in *The New York Times*, Defendant Rahal stated: "We knew we could do more. The question is, what's the upper limit?" (Exhibit 12, p.2). The article reported that the market-leading protein bars derive 40 to 50 percent of their calories from protein, and that David targeted 75% CFP (Exhibit 12, p.8).




*Figure 1: Defendant Peter Rahal on CNBC Squawk Box (Exhibit 6, p. 17).*

64. Conventional protein bars fall below the physical CFP barrier and are excluded from the relevant market. Among bars formulated with complete protein and traditional fats, the highest CFP is approximately 47% (Quest), followed by Pure Protein (42% CFP) and Barebells (40% CFP). Built Puff reaches 49% CFP using collagen, an incomplete protein, as its primary protein source, as described below. David Protein and these conventional protein bars are continuously available through the same retail channels, including Amazon, grocery chains, and health food stores (Ranen Decl. ¶ 6; Ranen Decl. ¶ 15). Despite this continuous availability and substantially lower prices, consumers purchasing David Protein bars do not switch to conventional protein bars; nor do consumers purchasing conventional protein bars switch to David despite its availability on the same shelves and websites.

65. Independent verification of published nutrition labels for the brands Defendants identify as their competitive set confirms that no complete-protein bar approaches the physical

CFP barrier. Quest's highest-CFP bar achieves approximately 47% CFP (Exhibit 21, p.4). Pure Protein's Chocolate Deluxe bars contain 20 grams of protein and 190 calories, yielding approximately 42% CFP (Exhibit 8, p.19). Barebells bars contain 20 grams of protein and 200 calories, yielding 40% CFP (Exhibit 21, p.3). Each of these brands uses complete protein sources and traditional fats. No known complete-protein bar sold in the United States exceeds approximately 47% CFP. Defendants' homepage displays a CFP comparison chart covering "the leading products of the top 20 high-protein bar brands available in mass retail." Every brand on that chart falls below the physical CFP barrier (Exhibit 8, pp.2, 6, 8).

66. CFP measures how much of a food's caloric content derives from protein but does not measure protein quality. Protein quality is assessed by the protein digestibility-corrected amino acid score (PDCAAS), the internationally recognized standard for evaluating protein quality adopted by the World Health Organization and the Food and Agriculture Organization of the United Nations. PDCAAS ranges from 0 to 1.0; a score of 1.0 indicates a complete protein containing all essential amino acids in adequate proportions for human nutrition. David Protein bars use a protein blend that achieves a PDCAAS of 1.0 (Exhibit 8, p.2, 27). Under FDA nutrition labeling regulations, protein's contribution to the Daily Value must be corrected for PDCAAS; a protein source scoring 0 on PDCAAS contributes 0% of the Daily Value for protein regardless of gram weight (21 CFR § 101.9(c)(7)(ii)). Defendants print both metrics on every David Protein Gold bar wrapper: "75% CFP = Calories from Protein / Total Calories" and "PDCAAS = 1.0" with the PDCAAS score accompanied by a checkmark (Exhibit 8, p.27).




*Figure 2: David Protein Gold bar wrapper (Exhibit 8, p.27).*

67. The single non-EPG protein bar nearest to the physical CFP barrier is Built Puff, at approximately 49% CFP (17 grams of protein, 140 calories) (Exhibit 21, p.1). Built Puff reaches this proximity through the use of collagen as its primary protein source (Exhibit 21, p.1). Collagen is an incomplete protein that lacks tryptophan, an essential amino acid necessary for muscle protein synthesis, and scores 0 on PDCAAS, contributing 0% of the Daily Value for protein under FDA labeling standards regardless of gram weight (21 C.F.R. § 101.9(c)(7)(ii)). David's Gold bar contains 28 grams of complete protein with a PDCAAS of 1.0. If Built reformulated with a complete protein source while maintaining the same caloric and macronutrient profile achievable with traditional fats, its CFP would fall well below 49%, closer to the approximately 47% ceiling that no known complete-protein bar has exceeded. The gap between the highest complete-protein conventional bar (Quest at 47%) and the lowest EPG bar (David Bronze at 53%) is six percentage points.

68. No known protein bar reaches anywhere near David's Gold bar at 75% CFP. The gap between conventional protein bars and David's products is not a numerical line chosen for this litigation but a physical limitation imposed by food chemistry. As described above, at the caloric density of traditional fats, any attempt to push CFP above approximately 50% causes the bar to lose structural form or produce unacceptable taste. This barrier is not a marketing

distinction but a chemical one: without EPG, a bar formulated beyond the physical limit ceases to be a solid bar. With EPG, the same formulation constraint extends to approximately 75% CFP. No non-EPG manufacturer has crossed this barrier despite substantial economic incentive to do so: David charges $3.25 per bar, projects $300 million in annual revenue, and faces no competitor above the barrier.

69. No known manufacturer produces a commercially viable protein bar using a complete protein source within the approximately 50% to 75% CFP range without using EPG. Before Defendants acquired Epogee, multiple firms were developing EPG-based protein bars with CFP targets above the barrier, including the three Plaintiffs and at least two non-party firms described below. After Defendants terminated their EPG supply, none could proceed. David is currently the sole participant in the high-CFP protein bar market not because the market was defined around a single brand, but because Defendants' conduct eliminated every other firm that was developing competing products. Defendant Rahal acknowledged this position: "if you want the highest-protein, lowest-fat bar, there's one place to go" (Exhibit 14, p.22). The high-CFP protein bar market emerged when EPG became commercially available for food use following FDA GRAS certification. Before EPG's commercial availability, no protein bar could exceed the physical CFP barrier because no commercially available ingredient permitted it. Multiple firms independently recognized the opportunity to compete in this market and began developing products, as described below.

70. Defendants' own marketing materials confirm the market boundary described above. Defendants created and published a CFP comparison chart on their homepage, before this litigation was filed, with a horizontal reference line at approximately 50% CFP, plotting both David products above the line and every named brand below it (Exhibit 8, p.6). Defendants

identify "boiled cod," not any protein bar, as their "closest competitor" (Exhibit 8, p.4). These marketing materials are described in detail below. Defendants' co-founder stated under oath that "[w]e consider our competitive set to be nutrition bars that contain at least 12 grams of protein per serving" (Ranen Decl. ¶ 5), yet no bar in that competitive set achieves CFP above the physical barrier.

71. The relevant geographic market is the United States. EPG has received "Generally Recognized as Safe" (GRAS) certification from the United States Food and Drug Administration for use in 14 food categories (Exhibit 1, p. 8). No other country's food safety authority has approved EPG for use in food products. Because EPG is the only ingredient that enables a protein bar to exceed the physical CFP barrier, and because EPG is approved for food use only in the United States, the United States is the only country where high-CFP protein bars can be lawfully sold for human consumption.

**B. Defendants' Own Competitive Analysis Confirms the Market Boundary**

72. Defendant Rahal stated in the September 17, 2025 *Men's Health* interview that Defendants created CFP as their defining competitive metric: "We wanted to create a more intellectual view on evaluating basic processed food quality, so we came up with the concept of CFP: calories from protein" (Exhibit 14, p.10). In a March 12, 2026 public Q&A, Rahal reiterated that "CFP (calories from protein) is a really important metric when thinking about snacks" and that "[w]hat people want in a protein bar is the most protein with the least amount of other nutrients. Protein is the key nutrient" (Exhibit 6, p. 23).

73. Defendants' website features a comparison chart ranking "the leading products of the top 20 high-protein bar brands available in mass retail" by CFP (Exhibit 8, p.6). David's Gold and Bronze bars appear at the top. Every other listed product falls below the physical CFP

barrier. The chart's y-axis includes an explicit reference line at 50%, the approximate point of the physical CFP barrier, with David's two products above the line and every other listed brand below it (Exhibit 8, p.6). As of February 5, 2026, this chart remained on Defendants' homepage.




*Figure 4: David Protein Website (Exhibit 8, p.6)*

74. Defendants represent on their website that their CFP is "~50% higher than any other bar" (Exhibit 8, p.2).

75. Defendants' website identifies Built, Quest, and Barebells as Defendants' primary competitive benchmarks, and compares David's CFP to each of theirs. Defendants state that David offers "the highest protein-to-calorie ratio on the market" to justify higher prices (Exhibit 8, p.4).

76. On individual product pages, Defendants display a comparison chart under the heading "Not all protein is created equal. David perfected it." The chart on the Fudge Brownie product page compares David Gold (28g protein, 150 calories, 0g sugar, 75% CFP) and David Bronze (20g protein, 150 calories, 0g sugar, 53% CFP) against a column labeled "Our

Predecessors," which lists conventional protein bars at 12g-32g protein, 170-410 calories, 0g-28g sugar, and 18%-47% CFP (Exhibit 8, p.8). Defendants use the term "Our Predecessors," rather than competitors, as their label for all conventional protein bar brands (Exhibit 8, p.3, 8).

77. In the Ranen Declaration filed June 11, 2025 ("Ranen Decl", Dtk. 22), Defendants' co-founder and president described David's founding objective as building a product that would "help consumers increase muscle and decrease fat by maximizing the calories coming from protein and minimizing the calories coming from fats and carbohydrates, while still offering an appealing taste and texture" (Ranen Decl. ¶ 2). Ranen further stated that Defendants "consider our competitive set to be nutrition bars that contain at least 12 grams of protein per serving" (Ranen Decl. ¶ 5).

78. Defendants' website FAQ (Frequently Asked Questions) asks: "Why are your bars more expensive than other bars?" and answers: "Our bars deliver exceptional value to our customers by offering the highest protein-to-calorie ratio on the market. We are less expensive and more convenient than our closest competitor: boiled cod" (Exhibit 8, p.4).




*Figure 5: David Protein Website (Exhibit 8, p.4)*

79. Defendants extended the cod comparison beyond a website FAQ into a commercial marketing campaign. Defendants placed large-format billboards in New York City bearing the headline "Boiled cod." followed by the tagline "Slightly more protein per calorie than our bars." (Exhibit 8, p.10). Defendants simultaneously launched David Protein-branded frozen cod fillets as a commercial product, priced at approximately $52.49 per four-pack at

Happier Grocery in New York City and $55 per four-pack online (Exhibit 8, pp.14-15). The cod fillets contain 23 grams of protein and 100 calories, yielding a CFP of approximately 92%. The billboard, the retail product, and the website FAQ all present the same comparison: David's bars measured against boiled cod, not against any protein bar.




*Figure 6: David Protein Billboard (Exhibit 8, p.10)*

80. In a July 24, 2025 interview published in *The Wall Street Journal*, Defendant Rahal explained the origin of the cod comparison. Rahal stated that to "contextualize that product performance against the broader food landscape, processed or unprocessed," David put a

comparison table on its website. Rahal stated: "Our chief science officer was like, 'Well, what has a better protein-to-calorie ratio than our bar?' We started searching, and he found boiled cod" (Exhibit 8, p.15). Defendants' chief science officer searched across all foods, processed and unprocessed, and the only food identified with a higher protein-to-calorie ratio than David's bars was boiled cod (Exhibit 8, p.15).

81. In the Ranen Declaration filed June 11, 2025, Defendants stated: "Quest Bars are cheaper to make and cheaper for consumers" and identified Quest as David Protein's "largest competitor" (Ranen Decl. ¶ 13). While Defendants' co-founder attempts to broadly refer Quest as David's 'largest competitor' in this declaration, Defendants' own product pages simultaneously classify Quest as merely one of 'Our Predecessors' (Exhibit 8, p.3, 8), and Defendant Rahal along with numerous marketing campaigns publicly identify 'boiled cod' as David's 'closest competitor' (Exhibit 8, pp. 7, 10, 15). The Quest bar variant referenced in the Ranen Declaration has a CFP of approximately 47%.

82. Each competitive comparison Defendants have published, including the CFP chart on their homepage (Exhibit 8, pp.2), the "Our Predecessors" comparison on product pages (Exhibit 8, p.3, 8), the "boiled cod" FAQ (Exhibit 8, p.7), the frozen cod billboard and marketing campaign (Exhibit 8, p.10), and Ranen's identification of Quest at 47% CFP as David's "largest competitor" (Ranen Decl. ¶ 13), places every named brand below the physical CFP barrier and both David products above it. In none of these comparisons do Defendants identify any protein bar as a meaningful CFP rival to David. Defendants invested in billboard advertising, branded frozen cod products, and a sustained marketing campaign built on this comparison before this litigation was filed.

**C. CFP as a Recognized Metric in Nutritional Science**

83. The percentage of total calories derived from protein, the metric Defendants brand as "CFP," is a recognized measure in nutritional science, federal dietary policy, and international public health. The USDA defines recommended protein intake by percentage of total calories, setting the Acceptable Macronutrient Distribution Range for protein at 10% to 35% of total caloric intake. The World Health Organization, the Food and Agriculture Organization of the United Nations, and the United Nations University have employed the identical metric, known as "protein-to-energy ratio" or "P:E%," in expert consultations on protein and amino acid requirements since at least 1985 (Exhibit 20, p.2). A 2025 meta-analysis of 52 randomized controlled trials found that measurable differences in metabolic response between higher-protein and lower-protein dietary groups occurred only when the difference in protein percentage between groups exceeded 20 percentage points; when the gap was smaller, no significant difference was observed (Exhibit 20, p.1). The gap between the conventional protein bar category (35-47% CFP) and David's products (53-75% CFP) exceeds that clinically documented threshold at every comparison point: the midpoint of the conventional range (~40% CFP) and David's Gold bar (75% CFP) are separated by approximately 35 percentage points.

84. The consumer base that evaluates food by protein-to-calorie ratio is large and growing rapidly. According to the International Food Information Council's 2025 Food and Health Survey, 23% of Americans reported following a high-protein diet in 2025, up from 4% in 2018, making high-protein diets the most commonly followed eating pattern in the United States for three consecutive years. The United States protein bar market generated approximately $5.47 billion in sales (Fortune Business Insights, 2026). These consumers do not treat all protein bars as interchangeable; they compare products by the ratio of protein to total calories, the same

metric Defendants brand as "CFP" and place at the center of their marketing. Independent fitness and nutrition communities on Reddit, YouTube, and social media rank and compare protein bars by the same protein-to-calorie ratio, without reference to Defendants' "CFP" branding.

**D. Cross-Elasticity of Demand and Pricing Evidence**

85. David Protein's high-CFP protein bars sell for $3.25 per bar on Defendants' website (Exhibit 8, pp.2, 12). Conventional protein bars such as Quest bars sell for $2.08 per bar on Amazon.com (Exhibit 8, p.20). Barebells bars sell for $2.25 per bar on Amazon.com (Exhibit 8, p.18). Pure Protein bars sell for $1.41 per bar on Amazon.com ($16.94 for a 12-count pack) (Exhibit 8, p.19) and $1.20 per bar on Costco.com ($29.99 for a 25-count variety pack) (Exhibit 21, p.9). Kirkland Signature protein bars, Costco's private-label brand and one of the highest-volume protein bars sold in the United States, sell for $1.33 per bar on Costco.com ($26.49 for a 20-count variety pack) (Exhibit 21, p.7). Costco is the third-largest retailer in the United States with over 130 million cardholders purchasing products at consumer retail prices.

86. David bars are priced at a 56% premium over Quest, a 44% premium over Barebells, a 130% premium over Pure Protein on Amazon.com, a 144% premium over Kirkland Signature at Costco, and a 171% premium over Pure Protein at Costco (Exhibit 21, pp.7, 9). Pure Protein's Chocolate Deluxe bar holds an "Amazon's Choice" designation, carries over 77,000 customer reviews, and sells over 20,000 units per month on Amazon.com (Exhibit 8, p.19). Kirkland Signature protein bars carry over 800 customer reviews on Costco.com and are available both online and in Costco's approximately 600 U.S. warehouse locations (Exhibit 21, p.7). Despite these products' mass-market popularity and substantially lower prices, consumers seeking high-CFP protein bars do not switch to Pure Protein, Quest, Kirkland, or Barebells when confronted with David's higher prices: those products cannot deliver equivalent CFP.

87. David Protein bars are sold through Amazon, Wegmans, Central Market, and Vitamin Shoppe (Ranen Decl. ¶ 15). Quest bars are available through many of the same channels, including Amazon (Ranen Decl. ¶ 6). Despite their availability through overlapping retail channels, consumers pay the substantial David premium rather than switching to Quest or other lower-CFP protein bars.

88. David has maintained its $3.25 per-bar price since commercial launch despite Quest's continuous availability at an average of approximately $2.08 per bar through the same retailers. David has not reduced its price in response to Quest or any other lower-priced conventional bar. David does not offer Black Friday promotions, seasonal discounts, or other promotional pricing of the type routinely used by conventional protein bar brands. Quest, Barebells, Pure Protein, and Kirkland Signature protein bars are regularly offered through Amazon Lightning Deals, Subscribe & Save discounts, retailer coupons, and holiday promotions.

89. Independent third-party price-tracking data confirms that David has never reduced its pricing toward the levels charged by mass market conventional protein bars. *CamelCamelCamel*, a widely used Amazon price-monitoring service, has tracked the retail price of David's twelve-bar packs since November 2024 (Exhibit 8, p.25). During that period, the per-bar price has ranged from a low of $3.17 to a high of $3.75, at no tracked point falling below a 43% premium over Quest's per-bar price on the same platform during the same period (Exhibit 8, p.26). In August 2025, the third-party price rose to $3.75 per bar ($45.00 for a twelve-bar pack), a 15% increase over the standard $3.25 price and an 80% premium over Quest. Quest bars remained available on the same platform at prices ranging from approximately $1.77 to $2.21 per bar throughout. Despite this 15% price increase, David's pricing did not decline toward conventional protein bar levels, and no competitive response from conventional bar

manufacturers was identified on the same platform. At no point during the tracked period did David's price decline toward conventional protein bar pricing, and no price reduction followed the August 2025 increase other than a return to the original $3.25 level.




David High Protein Bars - 0g of Sugar, Low Carb, Gluten Free - 28g of Protein, 150 Calories - On-The-Go Snack - Blueberry Pie Flavor, Pack of 12

**ASIN:** B0DJWJ632V • **UPC:** 850064303063 • **EAN:** 0850064303063 • **PRODUCT GROUP:** Grocery • **CATEGORY:** Unknown Binding • **MANUFACTURER:** David • **MODEL:** 210000011193

View all sizes / colors

**Amazon Price History**

This is our record of Amazon price changes for **David High Protein Bars - 0g of Sugar, Low Carb, Gluten Free - 28g of Protein, 150 Calories - On-The-Go Snack - Blueberry Pie Flavor, Pack of 12 (B0DJWJ632V)** since we began monitoring it on on Nov 15, 2024.

1 Month | 3 Months | 6 Months | 1 Year | **All** — Amazon | New | Used




| Price Type | Lowest Ever | Highest Ever | Current + | Average |
|---|---|---|---|---|
| Amazon | - | - | - | - |
| 3rd Party New | $37.99 (Feb 26, 2026) | $45.00 (Aug 07, 2025) | $39.00 (Mar 01, 2026) | $39.03 |



Quest Nutrition Blueberry Muffin Protein Bars, 20g Protein, 2g Sugar, 5g Net Carb, High Fiber, Gluten Free, Keto Friendly, 12 Count

ASIN: B01LPCLEWY • UPC: 888849004638 • EAN: 0888849004638 • PRODUCT GROUP: Drugstore • CATEGORY: Health and Beauty • MANUFACTURER: Quest Nutrition • MODEL: QPBBM12M12

View all sizes / colors

**Amazon Price History**

This is our record of Amazon price changes for **Quest Nutrition Blueberry Muffin Protein Bars, 20g Protein, 2g Sugar, 5g Net Carb, High Fiber, Gluten Free, Keto Friendly, 12 Count (B01LPCLEWY)** since we began monitoring it on on Sep 10, 2016.

1 Month | 3 Months | 6 Months | **1 Year** | All

Amazon | New | Used




| Price Type | Lowest Ever | Highest Ever | Current + | Average |
|---|---|---|---|---|
| Amazon | $15.08 (Feb 27, 2019) | $41.88 (Nov 14, 2021) | $26.36 (Mar 28, 2026) | $25.44 |
| 3rd Party New | $14.61 (Jan 22, 2019) | $52.95 (Dec 01, 2021) | - | $31.17 |

*Figure 3: CamelCamelCamel historical price charts for David Protein Bars (top) and Quest Protein Bars (bottom) (Exhibit 8, pp.25-26).*

90. The absence of substitution operates in both directions. Over 99% of protein bar consumers choose conventional bars at 35-47% CFP rather than David's products at 53-75% CFP, even where both are available on the same shelf or webpage (Ranen Decl. ¶ 6). If conventional bar consumers treated David as a substitute, David's prices would have been

competed down to conventional levels; if David's consumers treated conventional bars as substitutes, David could not sustain premiums of 44-171% while holding less than 1% of overall protein bar sales. Neither has occurred.

91. Third-party resellers on Amazon.com sell variety packs of David Protein bars at prices as high as $6.75 per bar ($26.99 for a 4-bar variety pack), with over 100 units purchased per month at that price (Exhibit 8, p.13). Quest bars are available on the same platform for approximately $2.20 per bar. Consumers purchasing David bars at $6.75 per bar are willing to pay a 207% premium over Quest through the same retailer to access a variety pack. The continued sale of David bars at these prices, on a platform where Quest is one click away, confirms that consumers do not treat Quest as a substitute for David.

92. Consumers in the high-CFP protein bar market independently track and rank protein bars by their protein-to-calorie ratio. Fitness and nutrition communities on Reddit, YouTube, and social media regularly publish comparison charts and spreadsheets that rank protein bars by this metric (Exhibit 21, p.5). One such chart, posted to the subreddit of David Protein's former Chief Science Officer, renowned physician Dr. Peter Attia, before David Bronze was commercially available, ranked 55 protein bars by protein-to-calorie ratio and received over 400 upvotes and 250 comments. That chart and others like it consistently show the same pattern: David bars cluster at the top of the rankings at 0.19 protein per calorie, with the next-closest bars (Pure Protein at 0.12 and Quest at 0.11) clustered far below, and no bar occupying the range between 0.12 and 0.19. The gap that appears across these consumer-generated rankings is the same gap produced by the physical CFP barrier described above: the point beyond which traditional fats cannot be further reduced without the bar losing structural form or acceptable taste. These independent consumer rankings, created without reference to this

litigation, consistently treat products above and below the gap as belonging to separate tiers rather than as a continuous spectrum of competing options.

93. The protein bar market exhibits a structural discontinuity at the physical CFP barrier. Below the barrier, dozens of brands compete across a continuous spectrum of CFP and price. Above the barrier, a single firm sells two products at a single price. No commercially available protein bar occupies the range between the two tiers. This pattern is visible on Defendants' own published charts (Exhibit 8, p.6), in independent consumer-generated rankings (Exhibit 21, p.5), and in the pricing data of every major retail channel where protein bars are sold. No retail pricing data, consumer survey, or third-party ranking identified in this Complaint shows consumers treating any protein bar below the physical CFP barrier as a substitute for any protein bar above it.

94. During periods when David Protein bars were out of stock (including stockouts that Defendants acknowledged in sworn filings (Ranen Decl. ¶ 24)), Quest, Barebells, Pure Protein, and Kirkland Signature protein bars remained continuously available through the same retail channels at prices that David bars exceed by 44% to 171%. Defendants maintained a subscriber email list and sent notifications when David bars returned to availability (Exhibit 15, p.1). During those same stockout periods, consumers purchased David bars from third-party Amazon resellers at the premium prices described above rather than purchasing conventional protein bars available on the same platform.

95. Verified purchasers of David Protein bars on Amazon.com evaluate the product primarily on its protein-to-calorie efficiency rather than on flavor, texture, or price. One reviewer described the product as "the holy grail we have been waiting for" because "the efficiency of the protein-to-calorie ratio is simply unbeaten in the current market," and reported that it

"completely replaced my previous go-to snacks" on that basis (Exhibit 17, p.2). Another stated: "Perfect protein-to-calorie ratio if you're tracking seriously," and acknowledged that "[t]aste isn't the absolute best out there, that's the trade-off for these macros" (Exhibit 17, p.5). A third described the combination of "28g of protein" in "only 150 calories" as "super rare" (Exhibit 17, p.4). These reviews, each marked as a verified purchase, evaluate David against a nutritional performance standard that no conventional protein bar can meet, rather than against competing protein bars on flavor, texture, or price.

**E. Interchangeability Within the Relevant Market**

96. David Gold (75% CFP) and David Bronze (53% CFP) are priced identically at $3.25 per bar, sold through the same website, the same Amazon storefront, and the same retail locations, and offered together in mixed variety packs. Despite a 22-percentage-point CFP difference between Gold and Bronze, Defendants charge the same price for both. Consumers purchasing variety packs receive bars spanning the range from 53% to 75% CFP in a single box at a single price point.

97. Both David Gold and Bronze bars use EPG as their differentiating ingredient and achieve their CFP through the same formulation mechanism of replacing traditional fats with EPG. Defendants do not segment their marketing, distribution channels, or pricing between 53% CFP and 75% CFP.

98. Each firm developing a high-CFP protein bar before Defendants' foreclosure targeted CFP between 50% and 75%: EkkoBar at 70% (Exhibit 10, p.15; Uddin Decl. ¶¶ 1-2), Bricks Protein at 71% (Han Decl. ¶ 11), and OWN at approximately 70%. Each used EPG to exceed the physical barrier, targeted the same protein-conscious consumers, and set its pricing against David's $3.25 per bar rather than against any conventional bar. These firms viewed each

other and David as their competitive set. Within the high-CFP range, consumers would have chosen among these products based on price, flavor, and brand, just as consumers in the conventional protein bar market choose among Quest, Barebells, and Pure Protein.

99. Before Defendants foreclosed all competing entry, each firm developing a high-CFP protein bar set its pricing against David's $3.25 per bar. EkkoBar planned to retail its 70% CFP bar at $2.00-$2.50 per bar with free shipping (Exhibit 10, pp.17-18; Uddin Decl. ¶¶ 1-2). EkkoBar's public announcement stated: "we created the best protein bar to ever exist at half the price of the competition!" (Exhibit 10, p.14). Bricks Protein planned to sell its 71% CFP bar "often at more competitive prices" than David's products and had secured commitments from several major retailers (Han Decl. ¶ 11). OWN planned to sell its approximately 70% CFP bar at $2.30 per bar. No foreclosed competitor's business plan, public announcement, or sworn declaration identifies Quest, Barebells, Built, Pure Protein, or any conventional protein bar as a pricing benchmark or competitive target.

100. As described above, David has sustained premiums of 44-171% over conventional protein bars across major retail channels without any identified consumer switching to those lower-priced conventional protein bars. Consumers who do not switch from David to Quest at $2.08 despite a $1.17-per-bar savings would not switch to Quest at any smaller price difference. EkkoBar at $2.00-$2.50, Bricks Protein below $3.25, and OWN at $2.30 would each have been priced below David's $3.25 per bar. No consumer had yet been offered a competing product above the physical CFP barrier at a lower price than David's; every foreclosed competitor planned to offer exactly that.

101. The market boundary holds from the supply side as well. Conventional protein bar manufacturers cannot reformulate to exceed the physical CFP barrier because EPG is the

only ingredient that breaks through it, Defendants control 100% of worldwide EPG supply, and EPG patents extend through 2032. No manufacturer of conventional protein bars can respond to David's pricing by producing a competing high-CFP bar.

**F. Market Participants, Size, and Defendants' Market Power**

102. David Protein was valued at $750 million following the May 29, 2025 acquisition, with projected sales of $140 million by the end of September 2025 (Exhibit 6, p. 7).

103. On November 7, 2025, Rahal confirmed on Bloomberg Television's *Wall Street Week* that David achieved $150 million in sales in its first year and projected $300 million the following year (Exhibit 18, pp. 1, 2).

104. High-CFP protein bars are David's primary revenue generator. David's only other products are frozen cod fillets and an announced EPG-based ice cream that has not yet been released (Exhibit 9, p. 1). In a March 12, 2026 public Q&A, Rahal confirmed that cod sales averaged "one unit per day" and described the product as "a funny move" rather than a commercial venture (Exhibit 6, p. 23).

105. The United States protein bar market is valued at approximately $5.47 billion (Fortune Business Insights, 2026). Defendants' co-founder stated under oath that "David Protein's share of the protein bar market was less than 1% of sales in 2024" (Ranen Decl. ¶ 6). David's projected $300 million in second-year revenue (Exhibit 18, p. 2) would represent over 5% of the total protein bar market by revenue. Despite holding what Defendants describe as less than 1% of overall protein bar sales, David sustains price premiums of 44-171% over conventional protein bars across major retail channels.

106. Before Defendants' acquisition of Epogee, at least six firms were producing or developing high-CFP protein bars using EPG: David Protein (producing and selling Gold at 75%

CFP and Bronze at 53% CFP), OWN (developing a bar at approximately 70% CFP for 2026 launch), Defiant Foods (developing a bar exceeding 50% CFP for release by March 2027), Lighten Up Foods (developing a bar well above the physical CFP barrier for mid-to-late 2026 launch), Bricks Protein (producing bars at 71% CFP (Han Decl. ¶ 11)), and EkkoBar (developing a bar at 70% CFP (Exhibit 10, p. 16)). Since the May 2025 acquisition, David Protein has been the sole remaining participant. No other firm produces, sells, or develops a high-CFP protein bar.

107. David Protein's reported revenue represents the entire observed revenue of the high-CFP protein bar market, because David is the only firm selling in it (Exhibit 18, pp. 1, 2). Those figures establish the minimum size of this market, not its competitive potential. As described above, each of the five foreclosed firms was developing a competing high-CFP protein bar at planned retail prices substantially below David's, with production capacity already secured. Each of these firms' additional sales, had they not been foreclosed, would have expanded total market revenue beyond what a single firm generates alone.

108. Since the May 2025 acquisition, Defendants have held 100% of sales in the high-CFP protein bar market. No other firm can sell a protein bar above the physical CFP barrier. Defendants have sustained price premiums averaging approximately 109% over conventional protein bars and premiums of 30-63% over the prices the foreclosed competitors had planned to charge for comparable products. No firm can enter this market without EPG, which Defendants control through patents extending through 2032 and exclusive ownership of the sole manufacturing facility worldwide. In the more than ten months since Defendants terminated all competitor EPG access, no firm has entered the high-CFP protein bar market, no firm has announced plans to do so, and Defendants have not reduced their $3.25 per-bar retail price.

## VII. PLAINTIFFS AS COMPETITORS IN THE HIGH-CFP PROTEIN BAR MARKET

### A. Competitor Overview and Background

109. In the Ranen Declaration filed June 11, 2025, Defendants' co-founder stated: "None of the plaintiffs in this case are companies that we consider to be competitors of David Protein. All of them make other food products, not high protein bars" (Ranen Decl. ¶ 29). At the time of this statement, Epogee's food scientists had been providing OWN with formulation support for EPG-based protein products since approximately 2022, had signed mutual NDAs with Lighten Up for formulation confidentiality, and had provided Defiant with "technical assistance with chocolate-specific applications" (Fugal Decl. ¶ 13) for protein-enhanced products.

110. Each Plaintiff's EPG-based business extended beyond protein bars to include sauces, spreads, and chocolates, all of which relied on the same Epogee EPG supply and served different consumer segments. As described below, each Plaintiff was simultaneously developing a high-CFP protein bar using the same EPG, the same Epogee food-science support, and in several cases the same manufacturing capabilities. Those protein bar development activities were underway throughout the period described in this complaint and were known to Epogee's food scientists who assisted in that development.

111. Each Plaintiff and non-party competitor described below maintained a direct commercial and development relationship with Epogee, operated or had access to manufacturing facilities equipped to process high-CFP protein bars, invested substantial capital in EPG-based product development, and took concrete steps toward market entry before Defendants terminated their EPG access.

**B. OWN Your Hunger**

112. OWN has been in the protein bar market since 2018. OWN holds a federal trademark for "high-protein cereal bars" (USPTO Reg. No. 5651473; Exhibit 10, pp.5-6). The United States Patent and Trademark Office accepted OWN's Section 8 and Section 15 declarations for this trademark in August 2025, confirming continued use in commerce for protein-bar-related products.

113. Beginning in approximately 2019, OWN collaborated with Epogee to develop EPG-based food products. OWN invested over $320,000 in EPG-specific research and development. Epogee provided food scientists and formulation support for OWN's EPG-based products.

114. OWN placed regular EPG purchase orders with Epogee for at least five years. In a fourteen-month snapshot before the supply foreclosure, from January 22, 2024 through March 27, 2025, OWN placed eleven separate EPG orders, averaging one order every forty-three days (Exhibit 3, p.34). These orders included both EPG Confectionery and EPG Spreadable formulations. OWN's final order was placed on March 27, 2025, two days after Epogee's March 25, 2025 announcement that EPG was unavailable due to "raw material lead times" (Exhibit 4, p.9). Epogee rejected this order on the ground that it was not a "confirmed" purchase order. At the time of this rejection, David Protein and Epogee were separately owned companies, and David Protein was receiving EPG under its supply agreement with Epogee (Exhibit 16, Response to Interrogatory No. 1).

115. OWN had previously designed, developed, manufactured, and sold a conventional protein bar (Exhibit 10, p.4). This protein bar was similar to David's Gold bar in format and market positioning but, without EPG, could not exceed the physical CFP barrier.

116. As a successor to its conventional protein bars, OWN developed, manufactured, and sold EPG-based protein dessert squares through retail channels (Exhibit 10, pp.1-2). Epogee selected OWN's protein squares as a showcase product for industry trade shows, featuring them to prospective customers as a demonstration of EPG's ability to deliver high flavor at low calorie counts. Sales of OWN's protein squares were substantially increasing in the period before Defendants terminated EPG supply, with consumer demand exceeding available supply.

117. OWN also developed and sold a line of EPG-based spreads, originally formulated as a base ingredient for its protein bars, that gained independent commercial traction as a low-calorie peanut butter replacement (Exhibit 10, p.3).

118. Drawing on that formulation platform, OWN developed "MarvelCube," a 60-gram high-CFP protein bar based on its existing 42-gram protein square that was already commercially produced and sold. The larger format and increased EPG concentration shifted the calorie-to-protein ratio substantially in favor of protein. By the final stages of development, OWN's bar had reached approximately 70% CFP, comparable to David's Gold bar at 75% CFP and well above David's Bronze bar at 53% CFP. The product was at that stage of development and testing when Defendants terminated EPG supply. OWN expected to launch the product in 2026 through retail channels where it had established distribution at a target retail price of $2.30 per bar.

119. In addition to the MarvelCube product line, OWN had begun testing formulation modifications to its existing protein squares to increase their CFP ratio for the high-CFP protein bar tier.

120. OWN operated its own Canadian Food Inspection Agency-approved and FDA-compliant manufacturing facility equipped with machinery custom-modified to process EPG.

OWN's facility was capable of producing EPG-based food products at commercial scale without reliance on a third-party co-packer. OWN's six years of continuous EPG formulation work, spanning protein squares, spreads, and protein bars, gave OWN direct experience with EPG's processing requirements, including temperature sensitivity, mixing parameters, and shelf-stability optimization. Epogee recognized OWN's EPG expertise by relying on OWN to conduct European Union shelf-life testing and by featuring OWN's products in marketing materials and at industry trade shows (Exhibit 2, pp. 5-6, 22-28). OWN also provided EPG-based formulation assistance to other Epogee customers, including Lighten Up Foods, and offered to produce EPG-based products for those customers at OWN's facility (Exhibit 10, pp.7-12).

**C. Defiant Foods**

121. Defiant produced and commercially sold EPG-based hybrid chocolate/protein bars ranging from 12 to 17 grams of protein per serving (Exhibit 10, p.13). Defiant's existing bars all exceed the threshold to be considered a protein bar, based on Defendants' own definition that a bar with 12 grams of protein qualifies as a protein bar (Ranen Decl. ¶ 5).

122. Defiant was concurrently developing an alternative EPG-based, high-CFP protein bar with a CFP target exceeding 50%, above the physical barrier described above. This competing product was planned for release within two years of the March 2025 foreclosure (i.e., by March 2027) at a price competitive with David's high-CFP protein bars.

123. Defiant's planned high-CFP protein bar would pair a protein-dense core with an EPG-based chocolate enrobing, the same technique used in David Protein's own Bronze bars.

124. Epogee provided Defiant with "technical assistance with chocolate-specific applications" (Fugal Decl. ¶ 13).

125. Defiant produced its bars in its own manufacturing facility, and its EPG-based products were backed by investors.

**D. Lighten Up Foods**

126. Lighten Up's founder has over 500,000 followers on social media and has analyzed and published reviews for nearly a hundred food products by their ratio of calories from protein, with a substantial focus on protein bars. Lighten Up's business model was built around developing EPG-based foods that maximize caloric efficiency for this consumer base.

127. Epogee was directly involved in Lighten Up's product development. Epogee's Chief Commercial Officer remembered Lighten Up's founder from approximately a year earlier and expressed eagerness to move forward, citing the commercial potential of Lighten Up's large social media following for EPG market adoption. Epogee's Applications Scientist reviewed Lighten Up's EPG formulations, provided technical guidance on EPG processing, and shared Epogee's own internally-developed EPG formulas with Lighten Up's contract manufacturer (Exhibit 3, pp.15-32). By mid-February 2025, Lighten Up's contract manufacturer reported that its EPG formulation was nearly complete. Epogee and Lighten Up executed mutual Non-Disclosure Agreements for formulation confidentiality, and Epogee sent EPG pails at no cost during R&D phases, expecting payment only for production orders. Defendants' co-founder confirmed under oath that Epogee shipped three separate EPG shipments to Lighten Up and its contract manufacturer in January, February, and April 2025 (Ranen Decl. ¶ 30). The April 2025 shipment occurred less than six weeks before Defendants terminated all non-affiliated EPG customers.

128. With EPG formulation capability established through its collaboration with Epogee, Lighten Up concurrently pursued entry into the high-CFP protein bar market. On

January 16, 2025, OWN and Lighten Up negotiated terms over a video conference call under which OWN would provide a modified version of its high-CFP protein bar formulation to Lighten Up for commercial sale under the Lighten Up brand. OWN's formulation had already reached approximately 70% CFP and was in the final stages of development. Lighten Up would bring its established consumer audience and retail distribution channels; OWN would supply the formulation and manufacturing in exchange for a one-time payment, ongoing royalties, or marketing services for OWN's EPG-based products.

129. Because OWN's formulation was already developed, Lighten Up's version required only minor modifications to tailor it to the protein preferences of its audience, with a CFP target well above the physical barrier described above. Lighten Up expected to launch its high-CFP protein bar in mid-to-late 2026.

130. In reliance on continued EPG access, Lighten Up invested over $38,000 in co-packer validation, production capacity deposits, and marketing for its EPG-based products (Sanburg Decl.).

**E. Non-Party Competitors**

131. At least two confirmed non-party firms were developing directly competing, high-CFP protein bars using EPG when Defendants foreclosed their access.

132. Bricks Protein, founded by Peter Han, developed EPG-based protein bars containing 30 grams of protein at 170 calories with zero sugars (Exhibit 10, p.20), a CFP ratio of approximately 71%, well above the physical CFP barrier. On July 10, 2025, Bricks Protein publicly posted samples of these bars, confirming they had reached the production-sample stage (Exhibit 10, p.20). Bricks Protein planned to sell these bars "often at more competitive prices" than David's products and had secured commitments from several major retailers (Han Decl. ¶

11). Han confirmed that EPG enabled Bricks Protein to "match David Protein's nutritional profile" and that Bricks was "one of the few companies that could genuinely compete in the low-calorie, high-protein segment" (Han Decl. ¶¶ 11-12). On May 29, 2025, Bricks Protein received a termination letter confirming Epogee would no longer accept orders due to the acquisition (Han Decl. ¶ 27). Bricks Protein attempted to reformulate without EPG but failed to find an equivalent substitute; its reformulated bars "cannot compete with David Protein's EPG-based products" (Han Decl. ¶¶ 28-30).

133. EkkoBar, founded by Emtiaz Uddin, was developing a high-CFP protein bar using EPG that would have achieved 28 grams of protein at just 160 calories, a CFP ratio of 70%, well above the physical CFP barrier (Uddin Decl. ¶¶ 1-2). EkkoBar planned to sell its bars at $2.00 to $2.50 per bar with free shipping (Exhibit 10, pp.17-18), 23% to 38% below David Protein's $3.25 per-bar price. On January 17, 2025, before Defendants acquired Epogee, an EkkoBar team member publicly posted a video from EkkoBar's contract manufacturer's facility, stating that the facility would "allow us to produce up to 12 million protein bars per shift" (Exhibit 10, p.16). The post confirmed the product's specifications ("28 protein, 160 calories! Collagen free! No added sugar! 4g fiber!") and stated: "we created the best protein bar to ever exist at half the price of the competition!" (Exhibit 10, p.14). A consumer responded: "Hopefully it's better price then David. I bought a box when they launched for $20. never bought more. Just to[o] expensive for my taste" (Exhibit 10, p.19). On May 14, 2025, Epogee informed EkkoBar's manufacturer that it would not fulfill EkkoBar's EPG order and would not be taking on new orders (Uddin Decl. ¶ 3). EkkoBar abandoned its product entirely rather than reformulate with inferior substitutes (Uddin Decl. ¶ 5).

**F. Course of Dealing and Collective Investment**

134. Throughout the approximately six-year commercial relationship described above, Epogee provided Plaintiffs and other EPG customers with food scientists, formulation support, and regulatory guidance at no additional charge, and helped customers secure intellectual property protection for EPG-based innovations. Despite holding applicable patents covering the use of EPG in food products (Exhibit 6, p. 16), Epogee never sought to enforce those patents to restrict customers' use of EPG. Epogee fostered brand adoption by sending prospective customers EPG pails free of charge during R&D phases and investing directly in building customers' commercial presence (Exhibit 2, pp. 3, 22-25; Exhibit 1, pp. 12-14).

135. Epogee requested OWN's anticipated EPG volume needs each calendar year, beginning as early as January 2021 (Exhibit 3, p.33). OWN provided these projections, including its plans to develop protein bars with EPG-based formulations, and Epogee incorporated them into its production campaign planning and raw material procurement scheduling. This annual planning cycle continued through the duration of the relationship.

136. Plaintiffs collectively invested over $615,000 in research and development for EPG-based formulations, specialized equipment, and business infrastructure built around EPG as an input, at Epogee's active encouragement.

137. When Defendants acquired Epogee on May 9, 2025, Defendants acquired Epogee's detailed knowledge of each Plaintiff's product formulations, development stages, and target markets, along with the manufacturing assets and patents. Through the years of direct R&D collaboration described above, Epogee's technical staff knew that OWN was developing a high-CFP protein bar at approximately 70% CFP and that Defiant was developing a high-CFP protein bar exceeding 50% CFP, because Epogee had helped develop each of those products.

Epogee also knew that Lighten Up was actively developing EPG-based food products for the same high-CFP consumer base.

## VIII. DEFENDANTS' ANTICOMPETITIVE CONDUCT

### A. The Exclusive Supply Agreement

138. As of late 2024, Epogee supplied EPG to at least ten non-affiliated customers, including companies that had purchased EPG continuously for up to six years. David Protein and Epogee were separately owned and independently operated companies. On September 30, 2024, Epogee announced improving supply conditions and price reductions to its customers (Exhibit 4, p.6), and on December 2, 2024, sent a formal letter to all EPG customers establishing ordering procedures for the coming year (Exhibit 4, p.8). Neither communication referenced supply constraints, capacity limitations, impending ownership changes, or the need for long-term supply agreements.

139. In January 2025, David Protein and Epogee entered into a seven-year EPG supply agreement running from January 2025 through December 2031 (Exhibit 16, Response to Interrogatory No. 1). In Defendants' verified interrogatory responses, only one non-affiliated customer, a privately held American chocolate business (Company J), held a supply agreement with Epogee, and that agreement was a pre-existing contract running from December 2020 through December 2025 that predated any relationship between David Protein and Epogee (Exhibit 16). Every other non-affiliated customer's supply agreement duration was listed as "N/A" (Exhibit 16). No non-affiliated customer received a new supply agreement. David Protein was also the only entity listed as "No" under "Independent Entity," while every other customer, Companies A through J, was listed as "Yes" (Exhibit 16). At the time this agreement was executed, David Protein and Epogee were separately owned and independently operated

companies: Epogee was not a subsidiary of David Protein, operated under separate management, and continued to hold itself out to its existing customers as an independent EPG supplier.

140. As described above, Epogee had maintained a broad, multi-customer supply model throughout its commercial history. The exclusive agreement allocated 100% of Epogee's available output to a single customer in a single product category for seven years, ending the multi-customer model Epogee had maintained since approximately 2019 and was still actively operating as of the December 2, 2024 ordering framework letter described above.

141. In February 2025, approximately one month after executing the exclusive supply agreement, David Protein and Epogee began negotiating for David Protein to acquire Epogee. Neither the supply agreement nor the acquisition negotiations were disclosed to EPG customers. During this period, Epogee continued to hold pending orders from non-affiliated customers without disclosing that it had entered into a supply agreement with David Protein. David Protein and Epogee remained separately owned companies throughout the negotiation period. The supply agreement's seven-year term extended more than six years beyond the acquisition closing date, and its exclusive allocation of 100% of Epogee's output operated independently of whether any acquisition occurred.

142. During the acquisition negotiations and due diligence process, while David Protein and Epogee remained separately owned companies, Epogee provided David Protein with its confidential customer records, including order histories, pricing, customer identities, and product development details from Epogee's R&D collaborations with those customers (Ranen Decl. ¶ 21). David Protein reviewed these records and assessed each of Epogee's customers. Defendants' co-founder later stated under penalty of perjury that this review led to the conclusion that Epogee "was consistently incurring losses on sales to businesses that placed

sporadic, low-volume orders without any long-term purchase commitments" (Ranen Decl. ¶ 21). Defendants further concluded that "none of the plaintiffs in this case are companies that we consider to be competitors of David Protein" because "[a]ll of them make other food products, not high protein bars" (Ranen Decl. ¶ 29). At the time of this assessment, OWN held a federal trademark for "high-protein cereal bars" (Exhibit 10, p.6), was commercially selling EPG-based protein products developed in collaboration with Epogee (Exhibit 10, pp.1-3), and was developing a high-CFP protein bar, as described above.

21. As negotiations and diligence into the proposed acquisition progressed, it became clear that Epogee could not achieve profitability under its then-current business model. In particular, Epogee was consistently incurring losses on sales to businesses that placed sporadic, low-volume orders without any long-term purchase commitments—such as the plaintiffs in this case. In almost all instances, the pricing extended to these customers was **below Epogee's cost of production**, resulting in negative margins on each sale. Additionally, Epogee was distributing significant quantities of EPG free of charge in an effort to stimulate demand and encourage adoption. For example, plaintiff Lighten Up Foods LLC received three complimentary sample shipments of EPG but according to Epogee's records has never placed a single paid order for the ingredient. We concluded that to be profitable, Epogee needed to alter its strategy and target large food companies that could place orders for millions of pounds of

10

Case 1:25-cv-04544-VM Document 22 Filed 06/11/25 Page 11 of 19

*Figure 7: Ranen Declaration ¶ 21 (Dkt 22, p.10), filed June 11, 2025. Highlights added.*

143. The Ranen Declaration describes this pre-acquisition review in the first-person plural: "[a]s negotiations and diligence into the proposed acquisition progressed," Defendants examined Plaintiffs' accounts and "[w]e concluded that to be profitable, Epogee needed to alter

its strategy and target large food companies" (Ranen Decl. ¶ 21). The declaration identifies Plaintiffs by name, stating that Epogee was incurring losses on "businesses that placed sporadic, low-volume orders without any long-term purchase commitments—such as the plaintiffs in this case," and details specific customers' records, including that "plaintiff Lighten Up Foods LLC received three complimentary sample shipments of EPG but, according to Epogee's records, has never placed a single paid order" (Ranen Decl. ¶ 21).

**B. The Pre-Acquisition Supply Cutoff**

144. Epogee manufactured EPG in 24-month production campaigns, with each run supplying the market for the following 24 months (Safai Decl. ¶ 41). Shipping containers of EPG bear manufacture dates of March 2023 (Safai Decl. ¶ 41), placing the next production campaign at approximately March 2025.

145. As described above, on December 2, 2024, Epogee sent a formal letter to all EPG customers establishing ordering procedures for the coming year, citing "increasing demand for EPG" and inviting customers to arrange floor stock agreements (Exhibit 4, p.8). The letter confirmed that smaller orders would continue to ship within Epogee's "traditional lead time." The letter contained no reference to supply constraints, raw material shortages, or anticipated production delays.

146. In January 2025, two months before the next production campaign was due to commence, David Protein entered into the seven-year exclusive EPG supply agreement with Epogee described above (Exhibit 16, p.11). This agreement was executed while acquisition negotiations were ongoing and David Protein and Epogee remained separately owned companies.

147. On or about March 25, 2025, when the next production campaign would typically have commenced, Epogee announced to its non-affiliated customers that EPG was unavailable due to raw material lead times (Exhibit 4, p.9). The announcement provided estimates of "2-3 months" for restoration but did not identify any specific raw materials or suppliers affected. David Protein continued to receive EPG throughout this period under the January 2025 agreement.

148. Prior to March 25, 2025, in six years of continuous commercial dealings with Plaintiffs, Epogee had never announced a supply shortage, delivery delay, or raw material disruption of any kind.

149. The claimed shortage occurred less than six months after Epogee's September 30, 2024 announcement of improving supply conditions and price reductions. No force majeure events, natural disasters, supplier bankruptcies, or publicized raw material disruptions occurred between September 2024 and March 2025.

150. During the six-week period between the March 25, 2025 announcement and the May 9, 2025 acquisition, while David Protein and Epogee remained separately owned companies, ten non-affiliated customers, including companies that had purchased EPG for up to six years, could not place new orders or secure supply commitments.

151. Among the ten non-affiliated customers who lost EPG access beginning March 25, 2025, at least two, Bricks Protein and EkkoBar, were already in the production phase of high-CFP protein bars as described above (Han Decl. ¶¶ 11, 27; Uddin Decl. ¶¶ 1-2, 6; Exhibit 10). Epogee, as their sole EPG supplier, maintained records of their orders, volumes, and product applications, and shared those records with David Protein during the pre-acquisition due diligence described above (Ranen Decl. ¶ 21).

152. OWN, Defiant, and Lighten Up were each developing high-CFP protein bars with CFP targets above the physical barrier. All five firms lost access to the sole ingredient necessary to produce high-CFP protein bars while David Protein and Epogee remained separately owned companies operating under the January 2025 exclusive supply agreement.

153. As the sole EPG supplier to each Plaintiff, Epogee participated directly in their product development and maintained records of their orders and product applications. Defiant and Lighten Up were each working with Epogee on product development under mutual non-disclosure agreements.

**C. Epogee Acquisition**

154. On May 9, 2025, David Protein completed its acquisition of Epogee (Ranen Decl. ¶ 19) for $75 million, obtaining complete control over the worldwide EPG supply and all related patents and trade secrets. By that date, the exclusive supply agreement described above had been in effect since January 2025, and Epogee had announced that EPG was unavailable to non-affiliated customers since March 25, 2025, approximately six weeks before the acquisition closed, while David and Epogee remained separately owned companies.

155. Defendants did not disclose the acquisition to EPG customers. On May 27, 2025, an industry website briefly published an article revealing the acquisition; the article was removed within hours (Exhibit 5, pp.1-3). Despite direct inquiries from Plaintiffs who had seen the article and demanded transparency about their submitted orders (Exhibit 4, p.11), Epogee maintained silence for two additional days. On May 29, 2025, twenty days after the acquisition closed, all ten known non-affiliated customers, including all three Plaintiffs, received notices stating: "While we will fulfill all confirmed purchase orders, we won't be able to accept new orders

going forward" (Exhibit 4, p.14). These ten customers have provided sworn declarations confirming receipt of these termination notices.

**D. Post-Acquisition Refusal to Deal and Competitor Termination**

156. In opposing Plaintiffs' motion for a temporary restraining order, Defendants submitted the Declaration of Zachary Ranen (Dkt. 22, "Ranen Decl."), co-founder and president of Linus Technology (David Protein), made under penalty of perjury.

157. Ranen declared that Defendants "proactively contacted 11 then-active Epogee customers to confirm that we intended to continue fulfilling their orders" and that "10 had prospects of meaningful volume consistent with the business's new focus on achieving production scale and financial sustainability" (Ranen Decl. ¶ 22).

158. Ranen further declared: "At no point did we 'hoard' all available EPG or refuse to sell across the board" (Ranen Decl. ¶ 22).

159. Ranen also declared that "supply chain issues have caused what we believe to be temporary shortages of EPG due to difficulties sourcing the needed ingredients. As a result, we have run out of stock of two of our most popular flavors of David bars" (Ranen Decl. ¶ 24). During this same period, these exact flavors, Red Velvet and Cinnamon Roll, remained continuously available through other sales channels (Exhibit 8, pp.22-24).

160. In the same Declaration, Ranen described OWN as selling "peanut butter-like spreads" and "chocolate squares" (Ranen Decl. ¶ 39) and stated that Defendants did not consider any Plaintiff to be a competitor of David Protein (Ranen Decl. ¶ 29). As described above, OWN held a federal trademark for "high-protein cereal bars" (Exhibit 10, p.6) and was commercially selling EPG-based protein squares (Exhibit 10, pp.1-2) at the time of this Declaration.

161. Two of the ten terminated customers were among Epogee's longest-standing and largest purchasers known to Plaintiffs.

162. In their verified October 6, 2025 interrogatory responses, Defendants identified these eleven "then-active" customers by anonymized description (Exhibit 16, p.9). Of the eleven, one was David Protein itself, not an independent customer. Of the remaining ten non-affiliated customers, seven placed zero orders for EPG after the acquisition. Only three non-affiliated customers placed any order: Company D placed one order in August 2025; Company E was "working towards" a multi-year agreement with only "smaller sample orders for R&D purposes in the near term"; and Company H ordered "a small quantity of EPG in June 2025 to test future applications" (Exhibit 16, p.10). David Protein was the sole entity described as having placed "numerous orders" (Exhibit 16, p.11).

163. Defendants also disclosed that a thirteenth potential customer, Company M, a publicly traded multinational confectionery company with revenues over $10 billion, "expressed interest in a supply agreement in September 2025, but ultimately declined to enter into a contract on the terms proposed by Epogee" (Exhibit 16, p.11). Even a $10 billion multinational could not obtain EPG on terms Defendants were willing to offer.

164. On June 7, 2025, four days prior to the June 11, 2025 filing of the Ranen Declaration, Defendants responded to a customer inquiry on their public Instagram account asking "so you'll still allow other companies access to EPG?" with: "right now, no—EPG access isn't open to other companies" (Exhibit 7, p.7).




*Figure 8: Instagram, June 7, 2025 (Exhibit 7)*

165. On July 7, 2025, after Defendants' counsel responded to Plaintiffs' inquiries regarding the Instagram statements contradicting the Ranen Declaration, Defendants deleted their entire Instagram history, destroying 56 posts and hundreds of customer communications about EPG availability (Exhibit 11, pp. 5-16). The account's metadata shows the deletion and replacement occurred within seconds of counsel's response (Exhibit 11, p. 16). Defendants preserved all content on their other social media platforms (Exhibit 11, p. 17).

166. Among the deleted posts was a statement that David Protein would not offer Black Friday promotions or similar discounts, citing the premium nature of its product. David has not participated in Black Friday sales, seasonal promotions, Amazon Lightning Deals, or other promotional discounting since its commercial launch, while the conventional protein bars

Defendants label "Our Predecessors," including Quest, Barebells, and Pure Protein, are routinely offered at promotional discounts through those same channels.

167. Defendants terminated EPG supply to Bricks Protein and EkkoBar, the two non-party firms already producing or developing high-CFP protein bars above the physical CFP barrier, as described above (Han Decl. ¶¶ 11, 27; Uddin Decl. ¶¶ 2, 6; Exhibit 10). In the Ranen Declaration, Defendants stated they would continue supplying customers with "meaningful volume consistent with the business's new focus" (Ranen Decl. ¶ 22).

168. In a January 28, 2026 *Vanity Fair* article (Exhibit 19), Defendant Rahal disclosed that prior to the acquisition, he asked Jared Smith to merge his EPG-based chocolate company, Hormbles Chormbles, into David Protein. Smith is Rahal's "longtime childhood friend and business partner at Rx," with whom Rahal co-founded RxBar and sold it for $600 million. Smith had developed Hormbles Chormbles "with Rahal's help after selling Rx" and was using EPG to manufacture chocolate bars, not protein bars. When Smith declined to merge, Rahal terminated his EPG supply. Rahal acknowledged: "It's definitely caused a bit of a rift. But he's like my brother" (Exhibit 19, p.3).

169. Hormbles Chormbles manufactured candy bars, not protein bars. After losing EPG access, Hormbles Chormbles was forced to reformulate without EPG. The resulting product contained 50% more calories (Exhibit 10, pp.21-23). Six weeks before this disclosure, Defendant Rahal had told *The New York Times* that David would not supply EPG "to a customer with a directly competitive product" (Exhibit 12, p.10). Five months before this disclosure, Defendants' co-founder had declared under penalty of perjury that Defendants did not "'hoard' all available EPG or refuse to sell across the board" (Ranen Decl. ¶ 22).

170. Korey Zelda, now a David employee, previously operated Kori's EPG Ice Cream, an EPG-based ice cream brand based in Chicago. On May 8, 2025, one day before David Protein completed its acquisition of Epogee, Zelda announced on Instagram that he was "stepping away from Kori and leaving Chicago" to join "some of the brightest minds in the industry to help build something big" (Exhibit 13, pp. 9-10). Zelda abandoned his independent brand to join David Protein. At the time Zelda joined, the January 2025 exclusive supply agreement had already committed 100% of Epogee's EPG output to David Protein, and the acquisition was scheduled to close the following day. Twenty-one days later, every non-affiliated EPG customer received identical permanent termination notices. Kori's EPG Ice Cream manufactured ice cream, not protein bars.

171. In a September 17, 2025 interview published by *Men's Health*, Rahal stated that Epogee has the capacity to manufacture 3 million pounds of EPG per year, but that David's annual demand alone, based on its summer 2025 sales rate, was already 4 million pounds per year (Exhibit 14, p.15). David's demand for EPG exceeded Epogee's entire annual production capacity by one-third, leaving zero capacity available for any other manufacturer.

172. Defendants' verified October 6, 2025 interrogatory responses confirmed under oath the seven-year exclusive EPG supply agreement described above, with no other non-affiliated customer receiving any supply agreement of defined duration (Exhibit 16, Response to Interrogatory No. 1).

173. In those same verified responses, Defendants confirmed that Epogee's pre-acquisition production capacity was 2.4 million pounds of EPG per year, and that following the acquisition, Defendants increased expected production to approximately 8.6 million pounds over the next twelve months, a 3.6-fold increase (Exhibit 16, Response to Interrogatory No. 2).

Despite this production expansion, Defendants stated under oath that they had "zero pounds of EPG readily available to supply to third-party customers" because "all reasonably anticipated EPG supply is already allocated to upcoming production runs for David Protein" (Exhibit 16, Response to Interrogatory No. 2).

174. In their verified October 6, 2025 interrogatory responses, Defendants disclosed that Walmart and Target had "recently lowered their anticipated needs for our initial shipments of David Bars" and that Defendants planned to "redirect excess product back to our own website and Amazon" and expected "to be back in stock of most flavors within the next week" (Exhibit 16, Response to Interrogatory No. 2). Despite this reduction in demand from Defendants' two largest retail partners, Defendants maintained that "zero pounds of EPG" were available for any third-party customer (Exhibit 16).

175. As of the date of this filing, no company other than David Protein is producing new EPG-based products. No high-CFP protein bar other than David's is commercially available in the United States. The only EPG-based products from other companies that remain on the market were manufactured using EPG purchased before Defendants terminated supply. Once that pre-foreclosure inventory is exhausted, no non-David EPG-based product of any kind can be produced.

176. Following the acquisition, Defendants stated Epogee operated "at arm's length" and that "Epogee continues as a standalone company" (Exhibit 6, pp.3, 9; Exhibit 13, pp. 1-2). During this same period, the "Success Stories" section of Epogee's website was removed, including pages featuring OWN's products and other customer products (website before: Exhibit 1, pp. 2-17; website after: Exhibit 11, p. 4).

177. Prior to the acquisition, Epogee's leadership team included six senior executives: Ron Savelli (President & CEO), Jayme Caruso (Chief Commercial Officer), Andy Bolt (Chief Financial Officer), David Rowe (Founder & Chief Technology Officer), Brent Campbell (Commercial Director), and Lindsey Egan (Vice President) (Exhibit 13, p. 3). Ron Savelli's LinkedIn profile reflects that his role as President & CEO of Epogee ended in May 2025, the month the acquisition closed, and that he began a new position in June 2025 (Exhibit 13, pp. 5-6). By late July 2025, the Epogee team page had been reduced to three individuals: the founder, the Chief Commercial Officer, and an applications scientist (Exhibit 13, p. 4). On or about July 28, 2025, Chief Commercial Officer Jayme Caruso posted a farewell message on LinkedIn, identifying herself as "Former Chief Commercial Officer at Epogee LLC" and expressing gratitude for "an incredible 6-year journey" (Exhibit 13, pp. 7-8). By that date, every member of Epogee's pre-acquisition commercial leadership had departed or been terminated, and had been replaced by newly hired staff.

**E. Defendants' Expansion Amid Claimed Shortages**

178. Defendants filed a trademark application for protein bars (Serial No. 98268169, filed November 13, 2023) (Exhibit 9, p.3). At the time of this filing, Bricks Protein and EkkoBar were already producing or developing EPG-based protein bars at approximately 70-71% CFP, as described above (Han Decl. ¶¶ 11-12; Uddin Decl. ¶¶ 1, 6-7; Exhibit 10).

179. During the same period that Defendants announced that EPG was unavailable to non-affiliated customers as described above, Defendants claimed that EPG inventory was insufficient to support even "a full production run across all David Protein bar flavors" (Ranen Decl. ¶ 25).

180. Despite claiming severe EPG shortages, David Protein secured a $750 million valuation based on projected first-year revenue of $140 million (Exhibit 6, p.7). Achieving these projections requires maintaining or expanding production of millions of protein bars annually.

**F. Defendants' Statements Confirming Competitive Strategy**

181. In public interviews with industry news channels snaxshot.com and TBPN on May 29, 2025, Defendant Peter Rahal made the following statements.

182. When asked what Defendants would do with the entire EPG supply, Rahal stated: "We will be taking all the supply" (Exhibit 6, p.7).

# "We will be taking all the supply"

Peter Rahal's betting it all on EPG

SNAXSHOT
MAY 29, 2025

9 3 Share




Earlier this week we posted about David's latest raise and acquisition of EPOGEE, since then we have also learned that the brand is now being valued at $750M, and we have gotten the long awaited response from Peter Rahal himself, what are they going to do with the entire EPG supply?

*"We will be taking all the supply"* he messaged me while sharing the official funding news.

*Figure 9: Defendant Rahal on snaxshot.com and TBPN, May 29, 2025*

183. When asked about existing brands that use EPG, Rahal stated that given the supply situation, he would cease supply to them (Exhibit 6, p.7).

184. Rahal stated: “CPG sucks. It does. It sucks because of the competition” (Exhibit 6, p.7).

185. Rahal stated: “We have a really defensible business with 3 moats . . . in three years we’re not going to have 10 copy cats, they’ll try on protein, but it won’t be there in calories” (Exhibit 6, p.7).

186. While claiming Epogee would operate “at arm’s length,” Rahal stated “[w]e need it to be serving David as a customer” (Exhibit 6, p.3).

187. Rahal stated: “[t]he dependency on a single source of supplier is a huge risk, so de-risking that situation by acquiring Epogee and having full control over the production and supply of a patented ingredient was paramount to us to ensure that we could grow the brand, and we did not have meaningful out of stocks” (Exhibit 6, p.9). Rahal reiterated this rationale to *Men’s Health*: “In business, I’m hypersensitive to dependencies. I’m thinking about ‘Who’s going to kill me? How am I going to die?’ And I think that’s a really important mindset: You need to protect any sort of dependency you have as a brand” (Exhibit 14, p.16).

188. On July 27, 2025, *The New York Times* published an article based on interviews with Defendant Rahal conducted at David Protein’s offices in Manhattan (Exhibit 12). In that interview, Rahal stated that once EPG production increased, David planned for Epogee to resume selling EPG to other food companies, “though not, he said, to a customer with a directly competitive product” (Exhibit 12, p.10). At the time of this statement, Defendants had already terminated EPG supply to every firm known to be developing high-CFP protein bars.

7/27/25, 9:44 PM David Bars Have Had Breakout Success. Can the Protein Craze Last? - The New York Times

Developing a new protein bar at the David lab. Amir Hamja for The New York Times

Experimenting with a chocolate-chip bar. Amir Hamja for The New York Times

Once E.P.G. production is up to speed, Mr. Rahal said that David plans for Epogee to resume selling the ingredient to other food companies — though not, he said, to a customer with a directly competitive product.

*Figure 10: The New York Times, July 27, 2025 (Exhibit 12)*

189. *The New York Times* article described Epogee's production capacity as "the choke point" in David's ability to scale up protein bar production to meet demand (Exhibit 12, p.8). Approximately two months before the article's publication, Defendants had acquired Epogee for $75 million and terminated all non-affiliated EPG customers.

190. On August 28, 2025, *The Best One Yet* podcast published an interview with Defendant Rahal conducted while this litigation was pending (Exhibit 6, pp. 12-16).

191. On August 28, 2025, in a recorded podcast interview, Defendant Rahal stated that David held a contract for Epogee's entire available EPG output: "David has a contract to buy all the available supply" (Exhibit 6, p. 15). Rahal described the contractual supply lockup and the acquisition as sequential steps in a single strategy: "Securing the supply, buying them and scaling the manufacturing of EPG was like mission critical" (Exhibit 6, p. 15). Rahal confirmed the absence of alternative sources: "It's not like you can go to other places to buy this ingredient" (Exhibit 6, p. 15). This contract for all available EPG supply was executed while David and Epogee were separately owned companies, and was in effect during the entire period when Epogee told non-affiliated customers that EPG was unavailable due to "raw material lead times" (Exhibit 4, p.9).

192. When asked whether Defendants would sell EPG to other companies, Rahal offered only a conditional future promise: "Once we get supply and capacity, we plan to run

[E]pogee as its own business with its own goals" (Exhibit 6, p. 16). Three months had passed since Defendants terminated all ten non-affiliated customers, and Defendants had not resumed EPG sales to any competitor.

193. Rahal confirmed that Epogee holds "process patents and application patents" protecting EPG production and that Epogee is "the only one who can make this stuff" (Exhibit 6, p. 16).

194. On September 17, 2025, in an interview published by *Men's Health*, Defendant Rahal explained the acquisition: "The decision to acquire Epogee came after the launch of our bars, when it became clear that demand was rapidly outpacing our supply — and that Epogee lacked the plans and capital to scale manufacturing on its own. Given how critical EPG is to our product and our growth trajectory, the acquisition was a move to ensure we could scale production to meet demand" (Exhibit 14, p.15).

195. On September 17, 2025, *Men's Health* published an article based on an interview with Defendant Rahal conducted during the summer of 2025, while this litigation was pending (Exhibit 14, p.2). Rahal stated that Epogee "will open back up to other customers, possibly as soon as 2026," but that David would have "most-favored nation" status with Epogee, "meaning its needs will always come over those of potential competitors" (Exhibit 14, p.22). As of the date of this filing, Defendants have not resumed EPG sales to any existing non-affiliated customer.

> Rahal's counterpoint is obvious enough: Bars are easier to carry around and eat on the run. And if you want the highest-protein, lowest-fat bar, there's one place to go. Eventually, he says, when Epogee has ramped up production, it will open back up to other customers, possibly as soon as 2026. Though he maintains that David will have "most-favored nation" status with Epogee, meaning its needs will always come over those of potential competitors.

*Figure 11: Men's Health, September 17, 2025 (Exhibit 14, p.22)*

196. Rahal told *Men's Health* that his company would "continue to supply EPG to all previous customers who had supply contracts with Epogee prior to the acquisition," but declined to identify those customers or state how many there were (Exhibit 14, p.4). Every known non-affiliated customer received a termination notice on May 29, 2025 (Exhibit 4, p.14).

197. Defendants' own website stated: "We thank our predecessors in the protein industry. We'll take it from here" (Exhibit 8, p.3).

198. On January 28, 2026, *Vanity Fair* published an article based on in-person interviews with Defendant Rahal conducted at David Protein's offices during this litigation (Exhibit 19, p.1).

199. Rahal stated that he was "currently working on a supply agreement with three international CPG companies and would've considered doing the same with the plaintiffs" (Exhibit 19, p.3). This statement was published on January 28, 2026. On October 6, 2025, Defendants had stated under oath that they had "zero pounds of EPG readily available to supply to third-party customers" because "all reasonably anticipated EPG supply is already allocated to upcoming production runs for David Protein" (Exhibit 16, p.12). Seven days later, on October 13, 2025, David sent a marketing email to consumers announcing "We are back in stock" across all eight product lines, advertising "The highest protein-to-calorie ratio on the market" and "75% CFP" (Exhibit 15, p.1). On March 12, 2026, when asked in a public Q&A "Why won't u let other people use EPG?" Rahal stated: "We will sell it, and open for business. That narrative ran because content creators get more views with that story" (Exhibit 6, p. 21). Defendants had terminated EPG supply to every non-affiliated customer approximately nine months earlier and

had not resumed sales to any of them, despite having been fully "Back in stock" for five months.

---

**We are back in stock.**
1 message

---

**David** contact@davidprotein com — Mon, Oct 13, 2025 at 6 20 PM
To: [redacted]@gmail.com>




*Figure 12: David Protein marketing email, October 13, 2025 (Exhibit 15, p.1).*

200. When asked about the impact of the acquisition on Plaintiffs, Rahal stated: “Do I feel bad? Yes. Do I think they were prudent, diligent business people? Absolutely not.” Rahal added: “Their naivety is not my fault” (Exhibit 19, p.3).

## IX. COMPETITIVE HARM IN THE HIGH-CFP PROTEIN BAR MARKET

### A. Output Reduction

201. Before Defendants' acquisition of Epogee, at least six firms were producing, developing, or preparing to launch high-CFP protein bars using EPG: David Protein itself (producing and selling), the three Plaintiffs (OWN, Defiant, and Lighten Up, each developing bars with CFP targets above the physical barrier), Bricks Protein (developing a bar at 71% CFP), and EkkoBar (developing a bar at 70% CFP).

202. After Defendants acquired Epogee and terminated all competitor EPG supply, only David Protein remains in the high-CFP protein bar market. The number of high-CFP protein bar products available or in development fell from multiple planned product lines across six firms to two products (David Gold and David Bronze) from a single firm.

203. Of the five firms other than David, two, Bricks Protein and EkkoBar, had already reached the production-sample or commercial-sale stage, as described above. After Defendants terminated all competitors' EPG supply, none could continue development or production.

204. No firm can produce a protein bar in the approximately 50% to 75% CFP range without EPG. Defendants control 100% of the global EPG supply. There is no alternative ingredient and no alternative supplier. EPG patents extend through 2032.

205. Despite the production capacity increase described above, Defendants allocated "zero pounds" of EPG to any firm other than David Protein (Exhibit 16, p.12), destroying all other competitive output.

### B. Sustained Supracompetitive Pricing

206. David Protein's $3.25 per-bar price reflects sustained premiums against two distinct baselines. Against the conventional protein bars Defendants call "Our Predecessors,"

David charges 56% more than Quest ($2.08 on Amazon), 44% more than Barebells ($2.25 on Amazon), 130% more than Pure Protein ($1.41 on Amazon), 144% more than Kirkland Signature ($1.33 at Costco), and 171% more than Pure Protein at Costco ($1.20) (Exhibit 8, pp.18-20; Exhibit 21, pp.7, 9; Ranen Decl. ¶ 15). Against the firms that were developing directly competing high-CFP protein bars before Defendants terminated their EPG supply, David charges 30-63% more than the prices those firms planned to charge for bars with comparable or superior CFP. No firm currently constrains David's pricing.

**C. Heightened Barriers to Entry**

207. Before Defendants' acquisition of Epogee, the pathway to entering the high-CFP protein bar market was accessible to firms of all sizes. Epogee sold EPG on individual purchase orders without requiring long-term contracts or minimum volumes (Safai Decl. ¶ 40). At least five firms other than David used this pathway to begin producing or developing high-CFP protein bars. Beginning with the March 25, 2025 supply cutoff described above and continuing through the post-acquisition permanent termination of all non-affiliated customers, Defendants replaced this open supply model with a blanket refusal to sell EPG to any competitor, allocating "zero pounds" to non-David firms despite the more than threefold production capacity expansion described above (Exhibit 16, Response to Interrogatory No. 2).

208. Defendants' stated supply policy reinforces the impossibility of competitive entry. In their verified interrogatory responses, Defendants stated they would consider supplying EPG only to "a large company capable, in the longer term, of placing sizable orders pursuant to a long term supply contract" (Exhibit 16, Response to Interrogatory No. 2). Emerging competitors and small-to-mid-size firms developing high-CFP protein bars cannot obtain EPG under this policy,

regardless of their willingness to pay market prices. A new entrant to the high-CFP protein bar market would not yet have the scale of operations that Defendants' policy requires.

209. Defendants' supply policy creates a circular barrier to competitive entry: to obtain EPG, a firm must already be "a large company" placing "sizable orders," but no firm can achieve that scale in the high-CFP protein bar market without first obtaining EPG, the sole ingredient that enables production above the physical CFP barrier. Developing an alternative to EPG is independently foreclosed by Epogee's process and application patents, which extend through 2032 (Exhibit 6, p. 16).

**D. Quality Degradation**

210. After terminating EPG supply to all non-affiliated manufacturers, David changed the sweetener system in its protein bars from stevia and monk fruit to sucralose and acesulfame potassium, artificial sweeteners that cost substantially less than the natural sweeteners they replaced, without reducing its retail price (Exhibit 22, pp. 1–3). Consumer reviews on Reddit and Amazon documented the substitution of artificial for natural sweeteners and reported declining physical quality, including the presence of unmelted EPG in finished bars (Exhibit 22, pp. 3–6).

211. Despite these ingredient changes and consumer complaints, David's retail price remained at $3.25 per bar, and no consumers switched to a competing high-CFP protein bar because none existed.

**E. Absence of Competitive Constraint**

212. Since March 25, 2025, no firm has entered the high-CFP protein bar market, no firm has announced development of a competing product, and Defendants have not reduced their pricing, made EPG available to any potential competitor, or altered their product offerings in response to any market participant (Safai Decl. ¶¶ 59-62).

**F. Ongoing Harm to Plaintiffs**

213. Since March 25, 2025, Plaintiffs have ceased production of all EPG-dependent product lines (including protein bar development), terminated multiple employees, and breached binding delivery commitments to major retail customers. Plaintiffs continue to incur over $41,000 per month in combined stranded fixed costs and lost revenue from idle manufacturing facilities and production capacity while generating no revenue from EPG-based products (Sanburg Decl.; Fugal Decl.; Safai Decl.).

214. Plaintiffs have collectively suffered over $449,000 in sunk research and development investments specific to EPG-based products, including protein bar formulations, that cannot be recovered or repurposed for products using other ingredients.

215. Plaintiffs have lost over $107,000 in confirmed sales due to inability to fulfill customer orders.

216. Plaintiffs have been forced to write off over $85,000 in specialized inventory, including packaging that features EPG-based calorie claims that would be inaccurate if used with any other ingredient.

217. Each Plaintiff's protein bar development was halted at the point of foreclosure: OWN was in final development of a 70% CFP bar for 2026 launch; Defiant was developing a 50%+ CFP bar planned for launch in the near term and now faces complete business failure without EPG access; Lighten Up had access to OWN's already-developed high-CFP bar formulation and expected to launch a variant in mid-to-late 2026, and now faces potential permanent closure without EPG access. None can resume development without EPG.

## X. DAMAGES

218. Plaintiffs seek the following categories of compensable damages, subject to statutory trebling pursuant to 15 U.S.C. § 15(a).

219. Plaintiffs suffered lost research and development investments exceeding $615,000, representing EPG-specific formulation development for protein bars and other products, specialized equipment modifications, and regulatory compliance investments that cannot be repurposed for any alternative ingredient.

220. Plaintiffs suffered lost revenues totaling $254,000 from March 25, 2025 to July 1, 2025, with continuing losses of approximately $85,000 per month thereafter based on historical sales trajectories and unfulfilled customer demand, including protein bar pre-orders and development milestones.

221. Plaintiffs incurred inventory write-offs exceeding $85,000, including EPG raw materials, finished goods, and specialized packaging featuring EPG-based claims that cannot legally be used with other ingredients.

222. Plaintiffs incurred stranded fixed costs of at least $27,000 per month from idle manufacturing facilities, equipment financing, and quality infrastructure without corresponding revenue.

223. Plaintiffs suffered destruction of enterprise value estimated between $1 million and $4 million per Plaintiff, to be established through expert testimony using discounted cash flow analysis and comparable company valuations in the specialty food sector, including the lost value of each Plaintiff's high-CFP protein bar product pipeline.

224. Plaintiffs lost customer relationships and goodwill valued between $500,000 and $1 million based on customer lifetime values, reputational harm from breached commitments, and relationship rebuilding costs.

225. Plaintiffs incurred additional consequential damages totaling $179,000, including employee termination costs, lease penalties, equipment liquidation losses, and retail penalties triggered by non-delivery.

226. These damages flow directly from Defendants' acquisition of Epogee and termination of EPG supply to all non-affiliated customers, and will be proven through established economic methodologies, including yardstick analysis comparing businesses with and without EPG access, market valuations for going concern value, and econometric modeling for future losses through 2032 when EPG patents expire.

227. Defendants achieved a $750 million valuation and project $300 million in annual revenue while operating as the sole producer in the high-CFP protein bar market (Exhibit 18, p.2). Plaintiffs seek treble damages pursuant to 15 U.S.C. § 15(a).

## XI. ANTITRUST INJURY

228. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

229. Plaintiffs are foreclosed competitors in the high-CFP protein bar market. Prior to Defendants' acquisition and refusal to deal, Plaintiffs were developing competing high-CFP protein bars and commercially selling EPG-based products. Following Defendants' termination of EPG supply, Plaintiffs were forced to cease production, abandon their protein bar development, terminate employees, and breach retail commitments. Plaintiffs' injuries flow from the anticompetitive aspects of Defendants' conduct (the acquisition of the sole EPG

manufacturer and the refusal to sell EPG to any competitor) and would not have occurred but for that conduct.

230. Plaintiffs are efficient enforcers of the antitrust laws. Plaintiffs maintained a continuous commercial relationship with Epogee spanning more than six years, collectively invested over $615,000 in EPG-based product development including protein bar formulations, and were commercially selling EPG-based products or finalizing directly competing high-CFP protein bars at the time of foreclosure. Even a firm that has not yet entered a market may recover damages for exclusion where it intended to enter and was prepared to do so within a reasonable time.

231. As set forth above, Lighten Up's preparation to enter the high-CFP protein bar market included both an independent development path and an arrangement with OWN to use OWN's already-developed formulation. Defendants' conduct foreclosed both paths to entry: it eliminated Lighten Up's independent access to EPG and simultaneously eliminated OWN's ability to produce the formulation that Lighten Up's entry depended on.

232. Plaintiffs made these investments at Epogee's active encouragement, through years of R&D collaboration, formulation assistance, food scientist support, and confidentiality agreements, and in reliance on a continuous commercial relationship in which Epogee gave no indication that supply was at risk. Defendants acquired Epogee and, with it, detailed knowledge of every firm developing competing products, and terminated every such firm within twenty days. Plaintiffs' injuries, including lost investment, halted product pipelines approaching commercial readiness, and foreclosure from a market they were prepared to enter, are the type of harm the antitrust laws were designed to prevent.

233. Industry participants, including Defendants themselves, recognize high-CFP protein bars as a distinct category. Defendants created the CFP metric, published comparison charts with a reference line at the physical barrier, labeled conventional bars "Our Predecessors," and identified boiled cod rather than any protein bar as their closest competitor. High-CFP protein bars require a patented ingredient with no commercial substitute to achieve nutritional performance physically impossible with traditional fats. The market serves distinct customers who evaluate products by protein-to-calorie ratio, accept taste tradeoffs for higher CFP, and do not switch to conventional bars despite David's 44-171% price premiums and the continuous availability of conventional protein bars through the same retail channels. High-CFP protein bars sell at distinct prices sustained without erosion or promotional discounting since launch; a 15% price increase produced no identified switching to lower-CFP protein bars available on the same platform.

234. Plaintiffs' injuries reflect harm to competition in the high-CFP protein bar market, not merely harm to individual competitors. Defendants' conduct eliminated all competitive entry, reduced output from at least six firms to one, sustained supracompetitive pricing of 44-171% by eliminating the entrants who would have competed those premiums down, and foreclosed all consumer choice in the relevant market. This competitive harm extends beyond Plaintiffs: at least five firms developing high-CFP protein bars were foreclosed, and at least ten EPG customers were terminated.

## XII. CAUSES OF ACTION

### COUNT I — VIOLATION OF SHERMAN ACT § 1

*(Restraint of Trade - 15 U.S.C. § 1)*

235. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

236. This claim is brought under Section 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.

237. Beginning no later than January 2025, Defendants Linus Technology, Inc. and Epogee LLC entered into and engaged in a contract, combination, and/or conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act. The cornerstone of this agreement was a seven-year exclusive EPG supply contract allocating 100% of Epogee's available output to David Protein (Exhibit 16, Responses to Interrogatory Nos. 1 and 2), executed while the two entities were separately owned and operated.

238. During the relevant period, Linus Technology and Epogee were separate economic entities capable of conspiring within the meaning of Section 1. The agreement between them was vertical: Epogee was the supplier and Linus Technology was the purchaser of EPG.

239. The agreement was formed and implemented through concerted actions while Linus Technology and Epogee remained separately owned companies, including: execution of the exclusive supply agreement in January 2025; exchange of Epogee's confidential customer records with David Protein during pre-acquisition due diligence; coordinated announcement of EPG "shortages" to non-affiliated customers beginning March 25, 2025; and joint concealment of the supply agreement and acquisition negotiations from EPG customers from February 2025 through the May 9, 2025 acquisition closing. The termination of all ten non-affiliated customers on May 29, 2025 was the direct consequence of the exclusive allocation established by the pre-acquisition agreement.

240. The agreement was formed between separate economic entities in January 2025 and produced its first anticompetitive effects on March 25, 2025, when Epogee announced that EPG was unavailable to non-affiliated customers while continuing to supply David under the agreement's exclusive allocation. Those effects have continued without interruption for more than one year. No Plaintiff or other non-affiliated customer has obtained EPG or released any new EPG product, let alone protein bars, since March 25, 2025. The agreement's seven-year term through December 2031 ensures this foreclosure will continue for an additional six years absent judicial intervention. The subsequent acquisition did not create, modify, or terminate the agreement; it was formed and began operating while the entities were separate, and its exclusive allocation of 100% of EPG output to David remains in effect by its own terms.

241. Under the rule of reason, this agreement unreasonably restrained trade in the high-CFP protein bar market. Direct evidence of anticompetitive effect includes the foreclosure of at least five firms from access to the sole ingredient necessary to produce high-CFP protein bars beginning March 25, 2025, a foreclosure that has continued for more than one year with no competing firm obtaining EPG access during that period, and sustained supracompetitive pricing, with David charging 44-171% premiums over the nearest conventional protein bars and 30-63% more than the prices foreclosed high-CFP entrants planned to charge. David faced zero competitors in the relevant market.

242. In the more than one year since the agreement's foreclosure effects began, no firm has entered the high-CFP protein bar market, no firm has released a new EPG-based product of any kind, and no firm has announced development of any such product (Safai Decl. ¶¶ 59-62), despite price premiums of 44-171% that would attract competitive entry in any market not foreclosed by the agreement.

243. The agreement did not advance Epogee's business interests or promote competition in any market. As described above, Epogee had pursued broad EPG market adoption across 14 FDA-approved food categories for over six years, supplied at least ten non-affiliated customers, and announced improving supply conditions as recently as September 2024. The exclusive agreement abandoned that business model in favor of allocating 100% of output to a single downstream competitor. After the acquisition, Defendants expanded production capacity 3.6-fold, yet allocated 100% to David; on October 6, 2025, Defendants stated under oath that all EPG supply was allocated to David's production runs, and seven days later, on October 13, 2025, David sent a marketing email to consumers announcing "We are back in stock" across all product lines (Exhibit 15, p.1). Less restrictive alternatives existed, including minimum order quantities, volume-based pricing, purchase commitments, or partial supply allocation. Defendants pursued none of them, as confirmed by Defendant Rahal's statements that David would not supply EPG "to a customer with a directly competitive product" (Exhibit 12, p.10) and that the strategy would create "a really defensible business with 3 moats" (Exhibit 6, p.7).

244. The conspiracy affected a substantial volume of interstate commerce, including David's projected $300 million annual revenue (Exhibit 18, p.2), the $75 million Epogee acquisition, and over $615,000 in Plaintiffs' EPG-based product development.

245. As a direct and proximate result of Defendants' unlawful agreement, Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**COUNT II — VIOLATION OF SHERMAN ACT § 2**

*(Monopolization, Attempted Monopolization, and Monopoly Leveraging - 15 U.S.C. § 2)*

246. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

247. This claim is brought under Section 2 of the Sherman Act, which makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

248. Defendants used their monopoly power in the worldwide EPG supply market, as defined above, to gain a competitive advantage in a distinct market, the high-CFP protein bar market, as defined above. These are two separate relevant markets: EPG supply is an input market in which Defendants hold 100% of worldwide production, control the sole manufacturing facility, and own all process and application patents extending through 2032; high-CFP protein bars are a downstream product market in which Defendants hold 100% of sales. Defendants have the ability to exclude all other firms from accessing EPG. By refusing to sell EPG to any competing firm while using it exclusively for David Protein, Defendants foreclosed at least five firms from the high-CFP protein bar market, eliminated all competitive entry, and enabled sustained price premiums of 44-171% over the nearest conventional protein bars. As set forth above, conventional protein bars are not reasonably interchangeable with high-CFP protein bars, and Defendants possess monopoly power in this distinct relevant market. Defendants have already achieved 100% of the high-CFP protein bar market; no firm can enter without EPG; and EPG patents foreclose competitive entry until 2032.

249. Defendants admitted to willfully acquiring and maintaining monopoly power in the high-CFP protein bar market. Before the acquisition, EPG was commercially available through Epogee to any firm willing to purchase it, and at least five firms besides David were actively developing competing high-CFP protein bars. By acquiring the sole manufacturer of EPG, Defendants gained exclusive control over the only input necessary to produce such bars

and immediately exercised that control to terminate supply to every competing firm, reducing the number of producers or developers from at least six to one. Defendants' monopoly power in the downstream market is not the product of a superior product, business acumen, or historic accident; it is the direct result of acquiring the sole supplier of EPG and refusing to sell the monopolized input to any downstream competitor.

250. Defendants' refusal to deal constitutes exclusionary conduct for anticompetitive purposes. Epogee maintained voluntary, revenue-generating commercial relationships with multiple EPG customers for over six years, actively fostering adoption, investing in customers' product development, and announcing improving supply conditions as recently as September 2024. Following the acquisition, Defendants terminated every one of these relationships, forfeiting the revenues that had sustained Epogee's business for over six years, to eliminate all competitive entry into the high-CFP protein bar market. Defendants publicly confirmed this refusal, stating on their Instagram account: "right now, no— EPG access isn't open to other companies" (Exhibit 7, p.7).

251. In the alternative, Defendants attempted to monopolize the high-CFP protein bar market with the specific intent to monopolize and a dangerous probability of success. Defendant Rahal stated that Defendants' strategy would create "a really defensible business with 3 moats" to prevent competitors (Exhibit 6, p.7), that David would have "most-favored nation" status over competitors (Exhibit 14, p.22), and that David would not supply EPG "to a customer with a directly competitive product" (Exhibit 12, p.10). Defendants currently hold 100% of the relevant market. No firm can enter without EPG; there is no alternative ingredient, no alternative supplier, and no prospect of competitive entry before EPG patents expire in 2032.

252. Defendants' conduct lacks legitimate business justification and was exclusionary rather than the result of competition on the merits.

253. Plaintiffs do not challenge the validity of Defendants' EPG patents. As set forth above, this action challenges the acquisition and the use of acquired control to foreclose downstream competition.

254. As a direct and proximate result of Defendants' monopolization, attempted monopolization, and monopoly leveraging, Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**COUNT III — VIOLATION OF CLAYTON ACT § 7**

*(Illegal Acquisition - 15 U.S.C. § 18)*

255. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

256. This claim is brought under Section 7 of the Clayton Act, which prohibits acquisitions where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

257. On or about May 9, 2025, Defendant Linus Technology acquired all assets of Defendant Epogee LLC for approximately $75 million, including all EPG manufacturing facilities, intellectual property, inventory, and customer relationships. The merger was vertical: it combined a customer (David Protein) with its supplier (Epogee). The effect of that acquisition was to substantially lessen competition in, or to create a monopoly in, the high-CFP protein bar market.

258. The acquisition foreclosed competitors of the purchasing firm from access to the sole source of supply necessary to compete in the high-CFP protein bar market. Before the

acquisition, at least five firms besides David were developing high-CFP protein bars using EPG. After the acquisition, Defendants terminated all of those firms' EPG supply, and only David Protein remains in the high-CFP protein bar market.

259. As set forth above, no alternative ingredient, supplier, or independent path to EPG production exists. Defendants allocated 100% of post-acquisition EPG production to David Protein, foreclosing all competitive entry into the high-CFP protein bar market.

260. The foreclosure caused competitive harm in the high-CFP protein bar market: the number of competing producers fell from at least six to one, price premiums of 44% to 171% persist unchallenged, and consumer choice was eliminated.

261. No cognizable efficiencies justify these anticompetitive effects. Before the acquisition, Epogee served multiple customers for over six years. The acquisition eliminated that multi-customer model and replaced it with exclusive self-supply, without producing any cost savings, quality improvements, or other cognizable efficiencies sufficient to justify foreclosing all competing purchasers.

262. As a direct and proximate result of this illegal acquisition, Plaintiffs have been injured in their business and property in an amount to be determined at trial.

**COUNT IV — VIOLATION OF NEW YORK DONNELLY ACT**

*(Monopolization and Restraint of Trade - N.Y. Gen. Bus. Law § 340)*

263. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

264. This claim is brought under the New York Donnelly Act, N.Y. Gen. Bus. Law § 340 et seq., which prohibits monopolization and contracts, agreements, arrangements, or combinations in restraint of trade.

265. The Donnelly Act applies because Defendants Linus Technology, Inc. and Peter Rahal maintain their principal place of business in New York, the anticompetitive conduct was directed from New York, and the conduct has substantial effects on commerce within New York.

266. The relevant market under the Donnelly Act is the same as under federal law: high-CFP protein bars sold in the United States.

267. Defendants have engaged in conduct constituting monopolization and restraint of competition in violation of N.Y. Gen. Bus. Law § 340(1) through the same conduct alleged in Counts I through III.

268. As a direct and proximate result of Defendants' violations of the Donnelly Act, Plaintiffs have been injured in their business and property. Pursuant to N.Y. Gen. Bus. Law § 340(5), Plaintiffs are entitled to treble damages.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Adjudge and decree that Defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

B. Adjudge and decree that Defendants have violated Section 7 of the Clayton Act, 15 U.S.C. § 18;

C. Adjudge and decree that Defendants have violated the New York Donnelly Act, N.Y. Gen. Bus. Law § 340;

D. Permanently enjoin Defendants from refusing to sell EPG to Plaintiffs and other competitors in the high-CFP protein bar market;

E. Order Defendants to provide EPG to Plaintiffs and other historic customers on fair, reasonable, and non-discriminatory (FRAND) terms at prices not exceeding those in effect on January 1, 2025;

F. Order structural relief if necessary to restore competition in the high-CFP protein bar market, including but not limited to divestiture of Epogee, licensing of EPG manufacturing rights, and/or allowing Plaintiffs to be authorized distributors of EPG;

G. Award Plaintiffs damages in an amount to be proven at trial, automatically trebled pursuant to 15 U.S.C. § 15(a) and N.Y. Gen. Bus. Law § 340(5);

H. Award Plaintiffs their costs of suit, including reasonable attorneys' fees pursuant to 15 U.S.C. § 15(a);

I. Award Plaintiffs pre-judgment and post-judgment interest as provided by law;

J. Order Defendants to preserve all remaining documents, communications, and electronic evidence related to EPG supply, customer relationships, and the Epogee acquisition, with daily monetary sanctions for any further spoliation;

K. Appoint a special master or forensic examiner to investigate the scope of Defendants' evidence destruction and recover any retrievable deleted materials;

L. Grant such other and further relief as the Court deems just and proper.

## XIV. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

Dated: April 1, 2026,

By: */s/ Brittany Meyer-Belnap*
Brittany Meyer-Belnap
1121 14th Street NW #1010
Washington DC 20009
Tel. 202-550-5700
bmeyer@tmdstrategies.com

*Attorney for Plaintiffs*