USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/2/26

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

OWN YOUR HUNGER LLC and DEFIANT FOODS LLC,

Plaintiffs,

- against -

LINUS TECHNOLOGY, INC., EPOGEE LLC, and PETER RAHAL,

Defendants.

**25-CV-4544 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Plaintiffs OWN Your Hunger LLC ("OWN") and Defiant Foods, LLC ("Defiant Foods" and, collectively, "Plaintiffs") bring antitrust claims against defendants Linus Technology, Inc., *d/b/a* "David Protein" ("David Protein"), Epogee LLC ("Epogee"), and Peter Rahal ("Rahal" and, collectively, "Defendants"). Plaintiffs allege claims under Section 1 of the Sherman Act ("Section 1"), 15 U.S.C. § 1, Section 2 of the Sherman Act ("Section 2"), 15 U.S.C. § 2, Section 7 of the Clayton Act ("Section 7"), 15 U.S.C. § 18, and New York's Donnelly Act, N.Y. Gen. Bus. Law § 340. (See "Third Amended Complaint" or "TAC", Dkt. No. 81.) Before the Court is Defendants' motion to dismiss the TAC. (Dkt. No. 84.) For the reasons stated below, the Court **GRANTS** Defendants' motion to dismiss in its entirety and **DISMISSES** Plaintiffs' Third Amended Complaint with prejudice.

# I. BACKGROUND[1]

The Court assumes the parties' familiarity with the facts giving rise to this litigation, as set forth in the Court's prior Decision and Order dismissing Plaintiffs' Second Amended Complaint. (See Dkt. No. 77.) The Court therefore recites the facts only as necessary to decide Defendants' motion to dismiss the TAC

## A. FACTUAL BACKGROUND

This litigation arises out of David Protein's 2025 acquisition of Epogee, the sole producer of a plant-based "fat alternative" known as esterified propoxylated glycerol ("EPG"). (See TAC ¶ 1.)

Plaintiffs comprise two producers of "low-calorie" food products. (Id. at ¶¶ 13, 15.)[2] OWN manufactures and sells low-calorie nut-butter spreads and "protein dessert squares." (See "Safai Decl.", Dkt. No. 81-5 at ¶ 1; TAC ¶¶ 116-17.) Defiant Foods manufacturers and sells low-calorie chocolate products. (See "Fugal Decl.", Dkt No. 81-3 at ¶ 1; TAC ¶ 121.)

[1] The following facts are taken from Plaintiff's TAC, which the Court takes as true for the purpose of resolving Defendants' motion to dismiss. See Safka Holdings LLC v. iPlay, Inc., 42 F. Supp. 3d 488, 491 (S.D.N.Y. 2013). Where indicated, the Complaint's factual allegations are supplemented by facts and information drawn from documents appended to the Complaint. See Tannerite Sports, LLC v. NBCUniversal Media LLC, 135 F. Supp. 3d 219, 225 n.1 (S.D.N.Y. 2015).

[2] Lighten Up Foods, LLC ("Lighten Up"), a manufacturer and seller of low-calorie sauces, was previously a party to this action. On June 15, 2026, Lighten Up was voluntarily dismissed as a party with prejudice. (See Dkt. No. 91; "Sanburg Decl.", Dkt. No. 41-1 at ¶ 1.)

Both companies manufacture their products using EPG, which provides many of the functional qualities of a traditional fat but contains 0.7 calories per gram as compared to the approximately 9 calories per gram in traditional fats. (See TAC ¶ 33; Safai Decl. at ¶¶ 25-27; Fugal Decl. at ¶¶ 4-5.)

EPG was developed by Epogee, which holds four patents on EPG's manufacturing process. (See TAC ¶ 29.) Before events giving rise to this litigation, Plaintiffs and David Protein all purchased EPG from Epogee, which was the sole producer and supplier of EPG. (See TAC ¶¶ 52-53.)

In February 2025, David Protein and Epogee began negotiations in anticipation of David Protein's acquisition of Epogee. (See TAC ¶ 141.) On March 25, 2025, Epogee sent a notice to Plaintiffs stating that it would not be accepting new orders for EPG from Plaintiffs due to "unexpectedly high lead times for [] raw materials." (Dkt. No. 81-9 at 9; TAC ¶ 147.) On May 9, 2025, David Protein acquired Epogee for $75 million. (See TAC ¶ 154.) On May 29, 2025, Defendants sent notices to Plaintiffs stating that Defendants were "wind[ing] down support for [Plaintiffs'] account[s]" and would not accept new orders for EPG from Plaintiffs in the future. (See Dkt. No. 81-9 at 14.) In an interview shortly after the acquisition, Rahal, one of the founders of David Protein, stated that David Protein "will be taking all the supply" of

EPG. (TAC ¶ 182.) From March 25, 2025 through the present, Defendants have not accepted any new orders for EPG from Plaintiffs. (See TAC ¶ 212.)

B. PROCEDURAL HISTORY

On June 2, 2025, Plaintiffs commenced this action by filing their original complaint along with a motion for an *ex parte* temporary restraining order ("TRO") and preliminary injunction ("PI"). (See Dkt. Nos. 4, 5.) On June 17, 2025, this Court denied Plaintiffs' motion for a TRO. (See Dkt. No. 27.)

Plaintiffs filed their First Amended Complaint on June 23, 2025, (See Dkt. No. 30), and their Second Amended Complaint on July 17, 2025. (See Dkt. No. 41.) On September 22, 2025, Defendants filed their motion to dismiss the Second Amended Complaint. (See Dkt. No. 60.)

On February 4, 2026, the Court granted Defendants' motion to dismiss the Second Amended Complaint and denied Plaintiffs' motion for a preliminary injunction. (See Dkt. No. 77.) The Court dismissed the Second Amended Complaint primarily because Plaintiffs failed to adequately define the relevant product markets in which they alleged harm to competition occurs. (See Dkt. No. 77 at 11-14; Dkt. No. 80 at 2.)

On February 6, 2026, Plaintiffs requested leave to file a Third Amended Complaint. (See Dkt. No. 78.) Defendants opposed that request on February 11, 2026. (See Dkt. No. 79.) On March 17, 2026, this Court granted Plaintiffs' motion for leave to amend their complaint, reasoning that "denial of leave to amend based on the sufficiency of Plaintiffs' proposed market definition" was inappropriate at that stage in part because "the viability of Plaintiffs' proposed market definition [was] better left for full argument and consideration on a motion to dismiss." (See Dkt. No. 80 at 3-4.)

On April 1, 2026, Plaintiffs filed their Third Amended Complaint, in which they attempt to address the Court's concerns by defining the relevant product market as the market for "High-CFP Protein Bars." (See TAC ¶¶ 8, 56-71.) Plaintiffs again allege that Defendants violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 340 of New York's Donnelly Act, N.Y. Gen. Bus. Law. § 340. (See TAC ¶¶ 235–68.) Plaintiffs assert that Defendants violated the various antitrust statutes by engaging in an unlawful pre-merger vertical exclusive relationship, whereby Epogee agreed to provide only David Protein with EPG, followed by a post-merger refusal to supply Plaintiffs with EPG. (See id.)

On May 1, 2026, Defendants filed their motion to dismiss the TAC and supporting memorandum of law. (See Dkt. Nos. 84, 85.) Plaintiffs filed a memorandum in opposition on May 15, 2026. (See "Opposition" or "Opp'n", Dkt. No. 86.) On May 22, 2026, Defendants filed a reply memorandum in support of their motion. (See "Reply", Dkt. No. 87.)

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible if the complaint states "'enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct" — there is no "probability requirement at the pleading stage[.]" Lynch v. City of New York, 952 F.3d 67, 75 (2d Cir. 2020) (quoting Twombly, 550 U.S. at 556); see Iqbal, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). "In other words, a complaint should not be dismissed when the factual allegations sufficiently 'raise a right to relief above the speculative level.'" Liboy v. Russ, No. 22-CV-10334, 2023 WL 6386889, at

*4 (S.D.N.Y. Sept. 29, 2023) (quoting Twombly, 550 U.S. at 555).

In reviewing a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(6) ("Rule 12(b)(6)"), the Court must "constru[e] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (citation omitted). The Court may also "consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings in order to determine if a complaint should survive a [Rule] 12(b)(6) motion." Garcia v. Lewis, No. 05-CV-1153, 2005 WL 1423253, at *3 (S.D.N.Y. June 16, 2005); see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) ("[W]e may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

## III. DISCUSSION

Plaintiffs have failed to state a claim for two reasons. First, they have failed to plausibly define the relevant product market. Second, even if the "high-CFP protein bar"

market is the relevant product market for antitrust purposes, the Court is not persuaded that Plaintiffs have plausibly alleged that Defendants' conduct harmed competition in that market.

A. PLAINTIFFS' ALLEGED PRODUCT MARKET IS IMPLAUSIBLE

Plaintiffs' "high-CFP protein bar" market is implausible because it is (1) an inconsistently defined single product market and (2) fails to include all reasonably interchangeable substitute products.

1. Law Governing Relevant Market

All of Plaintiffs' claims require Plaintiffs to show harm to competition within a relevant market. The Sherman Act Section 1 prohibits any "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of [interstate] trade or commerce." 15 U.S.C. § 1. "To prove a Sherman Act Section One violation, a plaintiff must show first that there were 'concerted actions between at least two legally distinct economic entities' which evince 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" Caruso Mgmt. Co. Ltd. v. Int'l Council of Shopping Ctrs., 403 F. Supp. 3d 191, 201 (S.D.N.Y. 2019) (quoting United States v. Apple, Inc., 791 F.3d 290, 313, 315 (2d Cir. 2015)). Plaintiffs must then show that the concerted action "constituted an unreasonable restraint of trade."

Anderson News, LLC v. Am. Media, Inc., 899 F.3d 87, 97 (2d Cir. 2018) (internal quotation omitted). "Courts presumptively apply a rule of reason analysis to challenged agreements to determine whether they restrain trade." Fed. Trade Comm'n v. Shkreli, 581 F. Supp. 3d 579, 624 (S.D.N.Y. 2022). "[U]nder the rule of reason, a plaintiff must identify the *relevant market* that is subject to the restraint and then demonstrate the restraint's adverse effects on competition in that market." Caruso Mgmt., 403 F. Supp. 3d at 201 (emphasis added).

The Sherman Act Section 2, the Clayton Act Section 7, and the Donnelly Act claims also require plaintiffs to identify the relevant market affected. Section 2 of the Sherman Act proscribes "monopoliz[ing] any part of the [interstate] trade or commerce." 15 U.S.C. § 2. It has two elements: "(1) the possession of monopoly power in the *relevant market* and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966) (emphasis added).

Section 7 of the Clayton Act prohibits acquisitions when their effect "may be substantially to lessen competition, or to tend to create a monopoly," 15 U.S.C. § 18, and requires

that competition be harmed or monopoly power acquired in a *defined market*. See United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593 (1957) (emphasis added) ("Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition. Substantiality can be determined only in terms of the market affected"); Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp., 224 F. Supp. 2d 657, 666 (S.D.N.Y. 2002) (recognizing the "standards of liability under the Clayton Act largely mirror those under the Sherman Act").

Under the Donnelly Act, any contract, agreement, or arrangement that forms a monopoly or restrains competition in trade is illegal. See N.Y. Gen. Bus. Law. § 340(1). A party alleging a violation of the Donnelly Act must: "1) identify the *relevant product market*; 2) describe the nature and effects of the purported conspiracy; 3) allege how the economic impact of that conspiracy is to restrain trade in the market in question; and 4) show a conspiracy or reciprocal relationship between two or more entities." Altman v. Bayer Corp., 125 F. Supp. 2d 666, 672 (S.D.N.Y. 2000) (emphasis added).

The relevant market for antitrust purposes is the "area of effective competition within which the defendant operates." Concord Assocs., L.P. v. Ent. Props. Tr., 817 F.3d 46, 52 (2d Cir. 2016) (internal quotation marks and citation omitted). The relevant market includes "all products reasonably interchangeable by consumers for the same purposes." Regeneron Pharms., Inc. v. Novartis Pharma AG, 96 F.4th 327, 338 (2d Cir. 2024) (internal quotation omitted). "Two products are reasonably interchangeable where there is sufficient cross-elasticity of demand — that is, where consumers would respond to a slight increase in the price of one product by switching to another product." Id. (internal quotation omitted).

While "market definition is a deeply fact-intensive inquiry not ordinarily subject to dismissal at the pleadings stage [of litigation], there is no absolute rule against dismissal" of claims for failure to allege a relevant product market. Concord Assocs., L.P., 817 F.3d at 53 (internal quotation marks and citation omitted). The Second Circuit has recognized that "cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a

plausible explanation as to why a market should be limited in a particular way." Todd v. Exxon Corp., 275 F.3d 191, 200 (2d Cir. 2001) (Sotomayor, J.) (cleaned up). Here, Plaintiffs' market definition fails for both reasons.[3]

2. Analysis of Plaintiffs' Proposed Product Market

Plaintiffs' market definition is implausible because it is (1) a creatively worded single product/brand market and (2) fails to include "all products reasonably interchangeable by consumers for the same purposes." Regeneron Pharms., 96 F.4th at 338; see also Todd, 275 F.3d at 200.

Plaintiffs allege that the relevant market for their claims is "High-CFP Protein Bars, defined as protein bars that exceed the physical CFP (Calories from Protein) ceiling achievable with traditional fats and fall within the physical CFP ceiling achievable with EPG" in the United States. (See TAC ¶¶ 56, 241, 248, 266.) Plaintiffs contend that the relevant market is bounded by EPG's physical properties. (See TAC ¶ 56) (noting the bounds as "approximately 50% CFP (the

[3] Plaintiffs argue that this Court has already held that their revised market definition, "high-CFP protein bars sold in the United States," addresses the issues identified in this Court's Decision and Order granting leave to amend Plaintiffs' Complaint. (See Opp'n at 4.) However, the Court's Decision and Order granting leave to amend recognized that arguments related to market definition are "better left for full argument and consideration on a motion to dismiss" and did not rule on the sufficiency of Plaintiff's proposed market. (See Dkt. No. 80 at 3-4.) Given that the parties have now had the opportunity to present their arguments at the motion to dismiss stage, the Court considers arguments regarding Plaintiffs' market definition here.

point at which traditional fats can no longer be reduced without the bar losing structural form or acceptable taste) and approximately 75% CFP (the point at which even EPG reaches the same physical constraint)”). The only protein bars within Plaintiffs’ proposed market are David bars, *i.e.*, protein bars produced with EPG. (See id.)

Defendants argue that Plaintiffs’ proposed market definition is a differently worded version of the same “single ingredient/single product market that plaintiffs have repeatedly and unsuccessfully argued for in the past,” including the “EPG-based protein bars” market. (See Dkt. No. 85 at 8-9.) Further, Defendants maintain that the proposed market for high-CFP protein bars “improperly excludes interchangeable substitute products.” (Dkt. No. 85 at 10; see Reply at 5.)

As a threshold matter, Plaintiffs’ new proposed market is still inconsistently defined and hinders the Court’s ability to analyze whether harm to competition in that market has occurred. Despite alleging that the relevant market is “High-CFP Protein Bars,” (TAC ¶¶ 56, 241, 248, 266), with CFP “fall[ing] within the approximately 50% to 75% range,” Plaintiffs assert that Built Puff bars, which contain 49% CFP, *i.e.*, approximately 50% CFP, fall outside the “high-CFP protein bar” market because they use “an incomplete protein.”

(Opp'n at 7; TAC ¶ 67.) Similarly, Plaintiffs implicitly recognize broader market definitions than the "high-CFP protein bar" market, including "premium protein bar[s,]" (Opp'n at 9), and "protein bars containing 12-17 grams of protein." (Opp'n at 26.) Moreover, in certain places, Plaintiffs suggest that David Bronze bars may even be in a separate product market from David Gold bars.[4] (See Opp'n at 2-3, 12.)

As this Court stated in its prior Decision and Order dismissing Plaintiffs' Second Amended Complaint, Plaintiffs' failure to consistently define the relevant product market undermines all their antitrust claims. (See Dkt. No. 77 at 14). While dismissal may be appropriate where "a plaintiff has defined the relevant market in an inconsistent and facially implausible way," Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp., No. 15-CV-05488, 2016 WL 5719790, at *6 (S.D.N.Y. Sept. 29, 2016), aff'd, 708 F. App'x 29 (2d Cir. 2017), the Court rejects Plaintiffs' proffered market definition because it (1) is a single product market and (2) excludes reasonably interchangeable substitutes.

a. Single Product Market

[4] David Bronze bars contain "approximately 150 calories and 20 grams of protein, yielding a CFP of approximately 53%." (TAC ¶ 59.) David Gold bars contain "approximately 150 calories and 28 grams of protein, yielding a CFP of approximately 75%." (Id.)

Plaintiffs attempt to define the relevant market in terms of a single brand name product, David bars, based on a single ingredient, EPG. (See TAC ¶¶ 56-108.) "[C]ourts have consistently held that a [single] brand name product cannot define a relevant market." Mathias v. Daily News, L.P., 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001). For example, in Mathias v. Daily News, L.P., this Court rejected a proposed single brand market of "home delivery subscriptions of the [New York Daily] News," explaining that "at a basic level, the Daily News is a newspaper, functionally interchangeable with many others, that competes in a market for readers of the news." Id. at 482-82. Similarly, in Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc., then-Judge Sotomayor repudiated a single product market of "tickets for travel on TWA between certain city pairs" because TWA tickets "are like tickets on any other airline[,]" just like "Pepsi is one of many sodas, and NBC is just another television network." 960 F. Supp. 701, 705 (S.D.N.Y. 1997).

Here, perhaps recognizing that single product markets are routinely non-cognizable, Plaintiffs attempt to define the relevant market more creatively: they confine their relevant market to high-CFP protein bars that reach the approximately 50 percent CFP threshold, because those bars use EPG and no other ingredient is able to reach that

threshold. (See TAC ¶ 56.) Applying this definition to the general protein bar or high protein bar market, Plaintiffs' proffered definition conveniently results in only one brand name product in the proposed product market: David bars. (See TAC ¶ 56.) Moreover, the market definition is limited by a single ingredient, EPG. (See TAC ¶ 56.)

When stripped of Plaintiffs' inventive framing, however, Plaintiffs' proposed market definition mirrors the rejected single product markets for the New York Daily News and TWA tickets, respectively. See Mathias, 152 F. Supp. 2d at 483; Trans World Airlines, Inc., 960 F. Supp. at 705. Just as the New York Daily News is one of many newspapers, and TWA tickets were one of many airline tickets, high-CFP protein bars, *i.e.*, EPG-based David bars, are one of many protein bars. See Mathias, 152 F. Supp. 2d at 483; Trans World Airlines, Inc., 960 F. Supp. at 705.

b. Reasonable Interchangeability

Plaintiffs' proffered market fails for the additional reason that it does not include "all products reasonably interchangeable by consumers for the same purposes." Regeneron Pharms., Inc., 96 F.4th at 338 (internal quotation and citations omitted). "Two products are reasonably interchangeable where there is sufficient cross-elasticity of demand — that is, where consumers would respond to a slight

increase in the price of one product by switching to another product." Id. (internal quotation omitted). In other words, products are "reasonably interchangeable if consumers treat them as 'acceptable substitutes.'" PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002) (internal citation omitted).

The Second Circuit and courts in this district have found that proposed relevant market definitions are insufficient where they do "not encompass all interchangeable substitute products." Chapman v. New York State Div. for Youth, 546 F.3d 230, 238 (2d Cir. 2008). For example, the Second Circuit rejected a proposed market for "restraint training services to private child care providers" because plaintiffs failed to "show how the market for restraint training services *to child care providers* is any different from the larger market for restraint training services to other businesses, agencies, and organizations." Id. at 239. Likewise, in Bayer Schering Pharma AG v. Sandoz, Inc., this Court rejected a proposed market for two "oral contraceptives commonly prescribed [] to treat PMDD and associated symptoms" based on the only "molecule that performs the dual function that defines the market" because drugs containing that molecule were part of a broader market for both contraception and relief from PMDD and associated symptoms. See 813 F. Supp. 2d 569, 576-78

(S.D.N.Y. 2011); see also B.V. Optische Industrie De Oude Delft v. Hologic, Inc., 909 F. Supp. 162, 172 (S.D.N.Y. 1995).

In their TAC, Plaintiffs assert that high-CFP protein bars are not reasonably interchangeable with other protein bars, such as Quest, Barebells, and Pure Protein bars, in the general or high protein bar market. (See TAC ¶ 248.) Plaintiffs first contend that their proposed market is defined by what "no firm can build" without EPG. (Opp'n at 13-14; see TAC ¶¶ 5, 56, 68). Second, they argue that pricing differences, cross-elasticity, and consumer-perception data confirm that the relevant market is "high-CFP protein bars." (See TAC ¶¶ 5, 56, 68; Opp'n at 10-11.)

The TAC confirms that the EPG-based protein bars in the alleged "high-CFP protein bar" market compete with and are not separate from a broader protein bar market. That is, consumers view EPG-based protein bars as reasonably interchangeable with other protein bars. (See TAC ¶¶ 64, 65, 77, 90.)

For instance, Plaintiffs concede that Defendants "consider [David Protein's] competitive set to be nutrition bars that contain at least 12 grams of protein per serving." (TAC ¶ 77). Plaintiffs further acknowledge that protein bar consumers choose between "conventional bars" and "David's products . . . [as both] are available on the same shelf or

webpage." (See TAC ¶ 90.) Likewise, Plaintiffs' submissions refer to "the protein bar market" and assert that David Protein competes in the "premium protein bar segment" of that same market. ("Han Decl.", Dkt. No. 81-4 at ¶¶ 34-35; see also TAC ¶ 64 ("David Protein and these conventional protein bars are continuously available through the same retail channels, including Amazon, grocery chains, and health food stores."); ¶ 65 (describing chart comparing "the leading products of the top 20 high-protein bar brands available in mass retail."))

First, Plaintiffs argue that the alleged high-CFP protein bar market is bounded by what manufacturers can produce with or without EPG. (See TAC ¶¶ 5, 56, 68; Opp'n 5-6, 13-14.) Plaintiffs maintain that precedent regarding reasonably interchangeable substitutes does not apply because "no firm can produce a bar [] above approximately 50% CFP" without EPG, "regardless of consumer preference." (Opp'n 13-14; see also TAC ¶¶ 60, 64, 67-69) (noting that "[n]o known manufacturer produces a commercially viable protein bar using a complete protein source within the approximately 50% to 75% CFP range without using EPG.") Defendants counter that product markets should "be defined from the perspective of consumers, not manufacturers." (Reply at 9.)

The Court agrees with Defendants. The Supreme Court has made clear that "[t]he relevant market for antitrust purposes is determined by the choices available" to consumers. Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 481–82 (1992); see Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). Moreover, this Court rejected a proposed market "for one-ply rollers made pursuant to the one-ply process" in part because "one-ply rollers would be interchangeable with those of the competitors in the consumer's eyes." Linzer Prods. Corp. v. Sekar, 499 F. Supp. 2d 540, 554 (S.D.N.Y. 2007). Here, from the "consumer's eyes," rather than the manufacturer's or supplier's eyes, EPG-based David bars are reasonably interchangeable with protein bars that contain no EPG. See id.; Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC, No. 03-CV-1895, 2007 WL 39301, at *12 (S.D.N.Y. Jan. 8, 2007) ("For antitrust purposes, the proper inquiry is how consumers, not suppliers, view the market.")

Second, Plaintiffs argue that pricing differences, cross-elasticity, and consumer-perception data confirm that the relevant market is "high-CFP protein bars." (See TAC ¶¶ 85-101; Opp'n at 10-11.)

While uniform price is "one hallmark of reasonable interchangeability," "significant price differences do not always indicate distinct markets." AD/SAT, Div. of Skylight,

Inc. v. Associated Press, 181 F.3d 216, 228 (2d Cir. 1999). For example, in a case about shoe markets, the Supreme Court found that the "relevant lines of commerce are men's, women's, and children's shoes," not "medium-priced" versus "low-priced" shoes. Brown Shoe Co., 370 U.S. at 326. That was because the public recognized lines based on characteristics, not price; each line's distinct characteristics made it noncompetitive with others; and each had a different class of customers. See id.

Here, Plaintiffs contend that David bars' 56 percent price premium over Quest, 44 percent premium over Barebells, and 130 percent premium over Pure Protein, among others, suggests a separate product market for "high-CFP protein bars." (See TAC ¶¶ 85-86.) However, price disparities are not always indicative of separate markets. See AD/SAT, Div. of Skylight, Inc., 181 F.3d at 228. Moreover, consumers shop for protein bars, not "medium-priced" versus "low-priced" protein bars. See Brown Shoe Co., 370 U.S. at 326. Plaintiffs' price differential arguments are further undermined by the fact that outside their single product market for "high-CFP protein bars," there is a 70 percent price differential between Quest ($2.25) and Costco's Kirkland Signature bars ($1.33), suggesting that a 56 percent price differential

between David bars and Quest bars does not necessarily establish separate markets. (See TAC ¶¶ 85-86.)

Plaintiffs' cross-elasticity and consumer perception allegations also fail. A relevant product market includes all reasonably interchangeable products. See Todd, 275 F.3d at 201. Products are "reasonably interchangeable where there is sufficient cross-elasticity of demand." Id. (cleaned up). "[C]ross-elasticity of demand" exists where "consumers would respond to a slight increase in the price of one product by switching to another product." Todd, 275 F.3d at 201-02 (quoting AD/SAT, Div. of Skylight, Inc., 181 F.3d at 227). Plaintiffs allege cross-elasticity of demand based primarily on the following event: when the per-bar third-party Amazon price of David bars spiked 15 percent above its $3.25 baseline in August 2025, other protein bar manufacturers maintained their price on Amazon, and David bars subsequently returned to $3.25 rather than dropping lower. (See TAC ¶ 89; Opp'n at 10.) Put differently, Plaintiffs assert that, since the prices of other protein bars and David bars did not respond to increased pricing of third-party David bars, cross-elasticity between David bars and conventional protein bars does not exist, suggesting they are in separate markets. (See id.)

However, the alleged lack of a competitive market response to the August 2025 price spike in third-party David bars does not necessarily indicate cross-elasticity of demand within the purported "high-CFP protein bar" or conventional protein bar markets. These assertions are entirely silent as to whether the alleged markets would exhibit cross-elasticity if Defendants, rather than third parties, raised the price of David bars. And, as Defendants point out, following the August 2025 price spike, David Protein resumed selling its bars for the same price as before the spike, suggesting that David bar prices are at least somewhat restrained by competition in the protein bar market. (See Reply at 7.) Plaintiffs' allegations are insufficient to sustain the proposed separate product market based on "cross elasticity of demand." See Todd, 275 F.3d at 201-02.

At bottom, David bars are protein bars that are reasonably interchangeable with other protein bars. See Trans World Airlines, Inc., 960 F. Supp. at 705 (concluding that "[t]ickets on TWA are reasonably interchangeable with tickets on other airlines—all tickets between city pairs get passengers to and from desired locations"); Chapman, 546 F.3d at 239 (finding that "restraint training services to child care providers" is reasonably interchangeable with "restraint training services to other businesses, agencies, and

organizations”). That is, consumers shop for protein bars, not “high-CFP” protein bars, even if certain shoppers prefer the protein content, taste, and other characteristics of David bars. See Queen City Pizza v. Domino’s Pizza, 124 F.3d 430, 438 (3d Cir. 1997) (reasoning that “the dough, tomato sauce, and paper cups that meet Domino’s Pizza, Inc. standards and are used by Domino’s stores are interchangeable with dough, sauce and cups available from other suppliers and used by other pizza companies.”)

Plaintiffs have failed to plead sufficient facts to demonstrate that no protein bar is an acceptable substitute for “high-CFP protein bars,” *i.e.*, EPG-based David bars. See, e.g., Bayer Schering Pharma AG, 813 F. Supp. at 578; B.V. Optische Industrie De Oude Delft, 909 F. Supp. at 172. The Court concludes that the proposed product market in Plaintiffs’ Third Amended Complaint is not plausible, and all their antitrust claims require a plausible product market. Thus, their claims alleging violations of the Sherman Act Sections 1 and 2, the Clayton Act Section 7, and the Donnelly Act must be dismissed.

B. PLAINTIFFS’ CLAIMS FAIL TO PLAUSIBLY ALLEGE HARM

Even if the Court accepts Plaintiffs’ proposed product market, Plaintiffs’ various antitrust claims still fail

because they have not plausibly alleged harm to competition in the "high-CFP protein bar" market, as explained below.

1. Sherman Act Section 1 Claim

In their Section 1 claim, Plaintiffs allege that, before Epogee and David Protein merged, the two then-separate firms agreed, through a January 2025 exclusive supply contract, that Epogee would sell EPG only to David Protein and cease supplying EPG to Plaintiffs and others. (See TAC ¶¶ 139-140.) Plaintiffs assert that this agreement was formed through concerted action and that it "unreasonably restrained trade in the high-CFP protein bar market." (See TAC ¶¶ 238-242.) Plaintiffs claim that this allegedly exclusive agreement constitutes a "contract, combination . . . or conspiracy" prohibited by Section 1. (See Opp'n at 21.)

Plaintiffs have failed to allege facts sufficient to support this theory. As a threshold matter, the TAC suggests that the January 2025 supply agreement between David Protein and Epogee was not exclusive, as the TAC itself mentions supply agreements with other firms extending past January 2025. For instance, the TAC asserts that one Epogee customer "held a supply agreement . . . running from December 2020 through December 2025." (TAC ¶ 47; see also Dkt. No. 81-21 at 11.) Likewise, Exhibit 16 shows that Defendants shipped EPG to other firms in May and September 2025. (See Dkt. No. 81-

21 at 11.) These examples undercut Plaintiffs' assertion that the January 2025 supply agreement between David Protein and Epogee was exclusive, therefore undermining their Section 1 claim.

Even assuming Plaintiffs' alleged market for "high-CFP protein bars" is plausible, Plaintiffs fail to plead a Section 1 claim because they have failed to show that David Protein's actions resulted in an "adverse effect" on competition in the relevant market. A Section 1 claim requires "a combination or some form of concerted action between at least two legally distinct economic entities that constituted an unreasonable restraint of trade either per se or under the rule of reason." PepsiCo, Inc., 315 F.3d 109. The parties agree that the rule of reason applies here.

"Under rule of reason analysis, an agreement will not violate the antitrust laws unless it can be shown that it will have an actual adverse effect on competition in the relevant market." Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 244 (2d Cir. 1997). "The fact that the defendant's actions prevent a plaintiff from competing in a market is not enough, standing alone, to satisfy this initial burden of proof." Virgin Atl. Airways Ltd. v. Brit. Airways PLC, 257 F.3d 256, 264 (2d Cir. 2001).

There are a number of ways by which an antitrust plaintiff can plead an adverse effect on competition. Plaintiffs can show an adverse effect directly, such as by showing reduced output or higher prices. See N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc., 883 F.3d 32, 42 (2d Cir. 2018). Plaintiffs can also demonstrate an adverse effect indirectly, "by showing that the defendant has sufficient market power to cause an adverse effect on competition" and "other grounds for believing the challenged restraint harms competition." Id. "[O]ther grounds might include price increases, reduced output or market quality, significantly heightened barriers to entry, or reduced consumer choice." Id.

Proving an "actual adverse effect" on price requires showing "that prices actually increased." MacDermid Printing Sols. LLC v. Cortron Corp., 833 F.3d 172, 184 (2d Cir. 2016). The TAC does not allege that David bar prices increased following the January 2025 agreement. If anything, Plaintiffs concede the absence of any price increases: "David has maintained its $3.25 per-bar price since commercial launch." (TAC ¶ 88.) Instead, Plaintiffs speculate that, had they had access to EPG and been able to manufacture high-CFP protein bars, David Protein would have decreased the price of David bars. (See Opp'n at 15.) However, that assertion about the

price of David bars but for the alleged conspiracy "amounts to little more than speculation" and is insufficient to show any actual adverse effect on price. MacDermid Printing Sols. LLC, 833 F.3d at 184 (rejecting argument that defendant "would have decreased its prices but for the conspiracy").

Nor have Plaintiffs presented "evidence that the purported conspiracy led to reduced output in the [high-CFP protein bar] market." Id. at 185. Reduced output in a relevant market is evaluated "from the consumer's perspective." Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 96 (2d Cir. 1998); see also MacDermid Printing Sols. LLC, 833 F.3d at 184. Here, Plaintiffs assert that there was reduced output because the alleged market participants fell from six firms to one. (See TAC ¶ 234; Opp'n at 17.) However, a reduction in the number of alleged market participants is not the same as a reduction in output in the high-CFP protein bar market. See Tops Markets, Inc., 142 F.3d at 96. Moreover, the TAC nowhere else asserts that consumers faced reduced output in the "high-CFP protein bar" market. If anything, the TAC suggests that high-CFP protein bar output may have increased. (See TAC ¶ 173 (noting that increased supply of EPG was "allocated to upcoming production runs for David Protein").)

As for quality, Plaintiffs claim that changes to David Protein's sweetener system and a single anonymous review from

a consumer with "an extremely low bar for diet products that [he will] consider palatable" demonstrate reduced quality in the high-CFP protein bar market. (See TAC ¶¶ 210-211; Dkt. No. 81-27 at 1-6.) However, these "bare assertions" are similarly insufficient to show reduced quality among high-CFP protein bars. See MacDermid Printing Sols. LLC, 833 F.3d at 185 n.5.

As the Court noted in its Decision and Order dismissing the Second Amended Complaint, "Plaintiffs' failure to define the relevant [] markets undermines their attempts to show harm to competition within those markets." (Dkt. No. 77 at 17.) In the TAC, Plaintiffs have again failed to show direct harm to competition in their proposed market. They do not allege a cognizable connection between the exclusive supply agreement and Defendants' higher price. Nor do they sufficiently allege reduced output or quality in the defined market. For these reasons, Plaintiffs have failed to adequately plead their Section 1 claim.

2. Sherman Act Section 2 Claim

For similar reasons, Plaintiffs fail to plausibly state their Section 2 claim. Section 2 makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with

foreign nations." 15 U.S.C. § 2. A viable claim under Section 2 "must, like a Section 1 claim, show a harm to competition" in the relevant market. E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 31 (2d Cir. 2006).

A Section 2 monopolization claim further requires "(1) [] monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Grinnell Corp., 384 U.S. at 570-71. "The latter element requires a plaintiff to establish that 'the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition.'" United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Takeda Pharm. Co. Ltd., 11 F.4th 118, 137 (2d Cir. 2021) (quoting PepsiCo, Inc., 315 F.3d at 108). The Second Circuit has defined such anticompetitive conduct as "conduct without a legitimate business purpose that makes sense only because it eliminates competition." In re Adderall XR Antitrust Litig., 754 F.3d 128, 133 (2d Cir. 2014) (quotations and citations omitted). "[A] monopolist's vertical expansion could be anticompetitive [] where the monopolist uses the vertical integration to facilitate price discrimination, to avoid government regulation of price at one level, or to

preserve its production monopoly by putting up entry barriers to new competitors seeking to enter at the production level." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 126 (2d Cir. 2007).

Plaintiffs' Section 2 claims again primarily challenge Defendants' decision to cease supplying EPG to Plaintiffs.[5] (See TAC ¶¶ 246-254.) Plaintiffs first assert that Defendants "willfully acquir[ed] and maintain[ed] monopoly power in the high-CFP protein bar market" by refusing to sell EPG to Plaintiffs. (TAC ¶ 249.) In the alternative, Plaintiffs allege that Defendants leveraged their EPG monopoly to gain a competitive advantage in the high-CFP protein bar market. (See TAC ¶ 251.) Neither allegation suffices to state a Section 2 claim.

Here, as was the case in Port Dock & Stone Corp. v. Oldcastle Ne., Inc., Plaintiffs have "not alleged any such circumstance that would make [Defendants'] vertical integration and refusal to deal with [them] anticompetitive." Id. at 126. Instead, Plaintiffs acknowledge that Defendants prioritized selling EPG to David Protein because "demand for

[5] To the extent that Plaintiffs' Section 2 claim challenges Defendants' merger, that claim mirrors Plaintiffs' Clayton Act Section 7 claim and fails to state a claim for the reasons discussed concerning the Section 7 claim. Cf. Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp., 224 F. Supp. 2d 657, 666 (S.D.N.Y. 2002) (recognizing the "standards of liability under the Clayton Act largely mirror those under the Sherman Act").

[David] bars outpaced supply . . . [Defendants] didn't buy EPG to gatekeep — [Defendants] did it to execute." (See TAC ¶¶ 4, 164, Fig. 8.) Plaintiffs further concede that "David's demand" for EPG was "120% or eventually 150% of Epogee's capacity," leading to Defendants' providing all available EPG for David bars. (Opp'n at 30.)[6] Those allegations do not suffice to plead anticompetitive conduct.

Plaintiffs' monopoly leveraging theory fails for the same reason. To state a claim for monopoly leveraging, a plaintiff must allege that the defendant "(1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage . . . in another distinct market; and (3) caused injury by such anticompetitive conduct." Virgin Atlantic Airways Ltd. v. British Airways PLC, 257 F.3d 256, 272 (2d Cir. 2001). The plaintiff must also allege "a dangerous probability of success in monopolizing [the] second market." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993); see In re Google Digital Advert. Antitrust Litig.,

[6] Pursuant to Federal Rule of Evidence 201(b)(2), Plaintiffs request judicial notice of an article attached as Appendix 1 for the fact publication and verbatim statements by Defendant Peter Rahal. (See Opp'n at 3-4.) Both sides have referenced the article and its contents. (See, e.g., Opp'n at 11, 16; Reply at 12.) The Court may, and does, "take judicial notice of articles and Web sites published on the Internet," here, the article attached as Appendix 1 to Plaintiffs' Opposition. Bryant v. Thomas, 274 F. Supp. 3d 166, 189 n.9 (S.D.N.Y. 2017) (citation omitted); see also Friemoth v. IBTimes LLC, No. 25-CV-4111, 2026 WL 2690036, at *5 n.2 (S.D.N.Y. Sept. 14, 2026).

721 F. Supp. 3d 230, 266 (S.D.N.Y. 2024). As explained above, Plaintiffs have not plausibly alleged anticompetitive conduct, so their monopoly leveraging theory fails, too.

For these reasons, the Court concludes that Plaintiffs have again failed to state a cognizable Section 2 claim. See Elecs. Commc'ns Corp., 129 F.3d at 244, 246 ("Nor is it a violation of the antitrust laws, without a showing of an actual adverse effect on competition market-wide, for a manufacturer to terminate a distributor . . . and to appoint an exclusive distributor."). The Court, therefore, dismisses Plaintiffs' Section 2 claim.

3. Clayton Act Section 7 Claim

Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. In assessing Section 7 claims challenging vertical mergers, courts usually apply a burden-shifting approach. See FTC v. IQVIA Holdings Inc., 710 F. Supp. 3d 329, 351 (S.D.N.Y. 2024); Illumina, Inc. v. FTC, 88 F. 4th 1036, 1048 (5th Cir. 2023).[7]

[7] The burden-shifting framework is "less entrenched in the context of vertical mergers" than in horizontal merger cases. IQVIA Holdings, 710 F at 351. In fact, "[t]here is a dearth of modern judicial precedent on vertical mergers and a multiplicity of contemporary viewpoints about how they might optimally be adjudicated and enforced." United States v. AT&T,

Under this approach, the plaintiff must first "make a fact-specific showing that the proposed merger is likely to be anticompetitive." AT&T, 916 F.3d at 1032. If the plaintiff does so, "the burden shifts to the defendant to present evidence that the *prima facie* case inaccurately predicts the relevant transaction's probable effect on future competition or to sufficiently discredit the evidence underlying the *prima facie* case." Id. (internal quotation marks and citation omitted). If the defendant is successful, "the burden of producing additional evidence of anticompetitive effects shifts back to the [plaintiff] and merges with the ultimate burden of persuasion." IQVIA Holdings, 710 F. Supp. 3d at 351.

One important fact differentiates the plaintiff's initial burden in vertical merger cases from that in actions challenging horizontal mergers. "A vertical merger, unlike a horizontal one, does not eliminate a competing buyer or seller from the market." Fruehauf Corp. v. FTC, 603 F.2d 345, 351 (2nd Cir. 1979). "It does not, therefore, automatically have an anticompetitive effect or reduce competition." Id.

---

Inc., 916 F.3d 1029, 1037 (D.C. Cir. 2019). But the burden-shifting approach has been adopted in the horizontal merger context by the Second Circuit, see In re AMR Corp., No. 22-901, 2023 WL 2563897, at *2-3 (2d Cir. Mar. 20, 2023), and in the vertical merger context by courts of appeals that have addressed the issue. See AT&T, 916 F.3d at 1037; Illumina, 88 F. 4th at 1048.

(citation omitted). The "competitive significance of a vertical merger" therefore "results primarily from the degree, if any, to which it may increase barriers to entry into the market or reduce competition by (1) foreclosing competitors of the purchasing firm in the merger from access to a potential source of supply, or from access on competitive terms, (2) by foreclosing competitors of the selling firm . . . from access to the market or a substantial portion of it, or (3) by forcing actual or potential competitors to enter or continue in the market only on a vertically integrated basis because of advantages unrelated to economies attributable solely to integration." Id. at 352.[8]

The "ultimate objective" of the evaluation of a vertical merger is "to determine whether and how the particular merger in issue may lessen competition, *i.e.*, what its anticompetitive effect on the market, if any, is likely to be." Id. Yet again, Plaintiffs have failed to plausibly allege facts sufficient to satisfy that inquiry.

---

[8] In the words of a leading antitrust treatise: "A vertical merger standing alone does not alter concentration either in the supplier's market or in its customers' markets, and hence adds nothing to whatever market position either firm previously had. . . . Accordingly, any anticompetitive effects of a vertical merger must arise from other structural or behavioral consequences, such as increased entry barriers, the elimination of unintegrated rivals by foreclosure, or the raising of rivals' costs." Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1000a, LexisNexis (database updated Sept. 2025).

Plaintiffs allege that the merger harmed competition by "foreclose[ing] competitors of [David Protein] from access to the sole source of supply necessary to compete in the high-CFP protein bar market," EPG, and that "Defendants allocated 100% of post-acquisition EPG production to David Protein, foreclosing all competitive entry into the high-CFP protein bar market." (TAC ¶¶ 258-59.) This argument embodies essentially the same formulation of Plaintiffs' Clayton Act Section 7 theory that this Court has already rejected: that the merger harmed competition via "[e]limination of all independent sources of EPG supply," (Dkt. No. 41 ¶ 234), and that "Defendant's acquisition transformed an already concentrated market into an absolute monopoly, moving from 90% to 100% control" of EPG. (Dkt. No. 66 at 7.)

The Court is not persuaded by Plaintiffs' recycled theory. As this Court explained in dismissing the Second Amended Complaint:

> [T]he merger had no effect on concentration in the EPG market: prior to the merger that market was entirely controlled by Epogee, and after the merger it remains a monopoly controlled now by David. That makes sense as David and Epogee were not competitors in the EPG market but customer and supplier. As explained, a vertical merger between a customer and supplier does not directly cause any change in market concentration.

(Dkt. No. 77 at 25-26) (citing Fruehauf, 603 F.2d at 351). "The mere fact that, after a vertical merger, a company might

make some of its newly acquired intellectual property exclusive to its platforms does not, without more, show a substantial lessening of competition." Federal Trade Commission v. Microsoft Corp., 136 F.4th 954, 970-71 (9th Cir. 2025).

The Court concludes that Plaintiffs here have failed to allege how Defendants' conduct harms competition in the high-CFP protein bar market. Consequently, Plaintiffs have failed to state a cognizable Clayton Act Section 7 claim.

4. Donnelly Act Claim

Plaintiffs' Donnelly Act claim challenges the same conduct as their federal law claims and alleges the same relevant market. (See TAC ¶¶ 263-68 ("The relevant market under the Donnelly Act is the same as under federal law: high-CFP protein bars sold in the United States.").) The Donnelly Act requires "identical basic elements of proof for claims of monopolization" as the Sherman Act, including the definition of a relevant market and a showing that the "economic impact of [the] conspiracy is to restrain trade in the market in question." Altman, 125 F. Supp. 2d at 672. Accordingly, Plaintiffs have also failed to state a sufficient claim as to the Donnelly Act, for the same reasons they have failed to state claims for their federal law causes of action.

* * * * *

In sum, this action constitutes Plaintiffs' fourth attempt to plead facts showing that Defendants have violated various antitrust laws. The Third Amended Complaint endeavors to creatively plead around the deficiencies identified in this Court's Decision and Order dismissing the Second Amended Complaint. (See Dkt. No. 77.) Fundamentally, as before, Plaintiffs complain that Defendants cut off their supply of EPG. However, "antitrust is not concerned with denial of access in the abstract, but only with denial of access that foreseeably results in an output reduction and attendant increase in price." Phillip E. Areeda and Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 1821c, LexisNexis (database updated Sept. 2025); (see also Dkt. No. 77 at 30.) Plaintiffs have neither plausibly defined the relevant product market, nor alleged facts showing that Defendants' actions can harm competition in the purported high-CFP protein bar market.

## IV. DISMISSAL WITH PREJUDICE

Defendants argue that Plaintiffs' claims should be dismissed with prejudice. (See Dkt. No. 85 at 28; Reply at 3.) Dismissal with prejudice is appropriate where "further amendment of [the] complaint would be futile." Van Buskirk v. The New York Times Co., 325 F.3d 87, 92 (2d Cir. 2003).

Here, even after three amendments, Plaintiffs have still failed to cure the deficiencies in the Complaint. This "[r]epeated failure to cure deficiencies by amendments previously allowed" warrants dismissal with prejudice. Sprague v. Salisbury Bank & Tr. Co., 969 F.3d 95, 101 (2d Cir. 2020) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)); see also Toussaint v. One Brooklyn Health Sys./Brookdale Hosp. Med. Ctr., No. 1:24-CV-07573, 2026 WL 2687269, at *4 (E.D.N.Y. Sept. 14, 2026) (dismissing complaint with prejudice after three amendments). Plaintiffs' antitrust claims are therefore dismissed with prejudice.

## V. ORDER

For the foregoing reasons, it is hereby

**ORDERED** that the motion (Dkt. No. 84) of Defendants Linus Technology, Inc., *d/b/a* "David Protein", Epogee LLC, and Peter Rahal to dismiss the Third Amended Complaint (Dkt. No. 81) is **GRANTED**. It is further

**ORDERED** that Counts I through IV of the Third Amended Complaint are hereby **DISMISSED WITH PREJUDICE**.

The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

Dated: 2 November 2026

New York, New York

Victor Marrero
U.S.D.J.